Exhibit A

**Before the**
**Federal Communications Commission**
**Washington, DC  20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Petition for Declaratory Ruling Regarding | ) | CG Docket No. _____ |
| Non-Telemarketing Use of Predictive Dialers | ) | |
| | ) | |
| Rules and Regulations Implementing the | ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | ) | |

**PETITION FOR DECLARATORY RULING**

Communication Innovators

David Thomas
Executive Director
1341 G Street, NW
Suite 1100
Washington, DC  20005
(202) 585-0258

June 7, 2012

# TABLE OF CONTENTS

Page

I.      SUMMARY ................................................................................................ - 2 -

II.     THE TCPA'S AUTODIALER PROVISION ONLY APPLIES TO EQUIPMENT
        THAT HAS THE CURRENT ABILITY TO GENERATE AND DIAL
        RANDOM OR SEQUENTIAL NUMBERS, AND IT IS PRIMARILY
        FOCUSED ON ABUSIVE TELEMARKETING CALLS. ........................................... - 5 -

        A.      The Text of the TCPA Autodialer Provision Excludes Predictive Dialers
                That Do Not Have the Current Ability to Generate and Dial Random or
                Sequential Numbers. ....................................................................... - 5 -

        B.      The Legislative History Confirms that the TCPA's Autodialer Provision
                Was Enacted to Curtail Unwanted *Telemarketing* Calls ....................................... - 6 -

        C.      Commission Precedent Demonstrates That Predictive Dialers Should Not
                Be Subject to the TCPA's Autodialer Restriction Unless They Have the
                Current Ability to Generate and Dial Random or Sequential Numbers. ............ - 9 -

III.    THE COMMISSION'S INTERPRETATION OF "AUTODIALER" HAS
        CAUSED SIGNIFICANT CONFUSION AND AN ARRAY OF UNINTENDED
        CONSEQUENCES THAT LIMIT INNOVATION, HARMING CONSUMERS
        AND BUSINESSES ALIKE. ...................................................................... - 10 -

        A.      The Commission's 2003 TCPA Order and 2008 Declaratory Ruling Have
                Created Substantial Uncertainty for Businesses Using Predictive Dialers ....... - 10 -

        B.      The Uncertainty from the 2003 and 2008 Decisions Has Created an Array
                of Unintended Consequences that Harm Consumers and Businesses Alike. ... - 14 -

IV.     TO ADDRESS THE EXISTING CONFUSION, THE COMMISSION SHOULD
        CLARIFY WHAT CONSTITUTES AN "AUTODIALER" UNDER THE TCPA ..... - 16 -

V.      CHANGED CIRCUMSTANCES AND THE BENEFITS OF PREDICTIVE
        DIALER USE FOR INNOVATIVE, NON-TELEMARKETING PURPOSES
        WARRANT A CLARIFICATION ................................................................ - 18 -

        A.      Today's Innovative Predictive Dialing Technology Provides Significant
                Benefits to Consumers and Businesses ............................................... - 19 -

        B.      Many of Today's Predictive Dialers Do Not Have the Ability to Generate
                and Dial Random or Sequential Telephone Numbers ................................. - 21 -

        C.      The Number of Wireless-Only Households Continues to Climb, Making it
                Difficult to Provide Time-Sensitive Information to a Growing Portion of
                Consumers ................................................................................... - 22 -

VI.     CONCLUSION ......................................................................................... - 24 -

**Before the**
**Federal Communications Commission**
**Washington, DC  20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Petition for Declaratory Ruling Regarding | )   CG Docket No. _____ |
| Non-Telemarketing Use of Predictive Dialers | ) |
| | ) |
| Rules and Regulations Implementing the | )   CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | ) |

## PETITION FOR DECLARATORY RULING

Communication Innovators ("CI"),[1] pursuant to Section 1.2 of the Federal

Communications Commission's ("Commission") rules,[2] hereby respectfully submits this Petition

for Declaratory Ruling to eliminate significant confusion regarding the applicability of the

Commission's Telephone Consumer Protection Act ("TCPA") rules[3] to "predictive dialers" used

to provide informational, non-telemarketing calls to consumers.  Specifically, CI requests that

the Commission clarify, consistent with the text of the TCPA and Congressional intent, that

predictive dialers that (1) are not used for telemarketing purposes and (2) do not have the current

ability to generate and dial random or sequential numbers, are not "automatic telephone dialing

systems" ("autodialers") under the TCPA[4] and the Commission's TCPA rules.

---

[1] CI is a 501(c)(4) organization that seeks to maximize the pace of telecommunications
innovation and its benefit for American consumers and businesses.  CI and its member
technology companies strongly endorse efforts by the President, the Commission, and many in
Congress to minimize the burden imposed on innovators and entrepreneurs by outdated,
unnecessary, or inefficient regulations.

[2] 47 C.F.R. § 1.2.

[3] *See id.* § 64.1200.

[4] *See* 47 U.S.C. § 227.

## I.    SUMMARY

Congress enacted the TCPA specifically to curb aggressive telemarketing practices that were found to be an invasion of privacy, a risk to public safety, and that improperly shifted marketing costs to consumers.  As the Commission recognized for more than a decade, the TCPA was not intended to restrict businesses from placing informational and other non-telemarketing calls to their customers and accountholders, including on their wireless telephones. Nor did Congress intend to restrict the use of technologies such as predictive dialers – innovative equipment that dials specifically programmed contact numbers and enables company representatives to provide important, timely informational calls to consumers accurately, efficiently, and cost-effectively.[5]

In 2003, however, the Commission determined that certain predictive dialers are autodialers under the TCPA, irrespective of whether such equipment uses a statutorily required random or sequential number generator.  In finding that certain predictive dialers are autodialers, the Commission's stated concern was that the telemarketing industry had evolved to the point where calling lists of numbers using a predictive dialer was more cost-effective than calling arbitrary (*i.e.*, random or sequential) numbers, so it was necessary to take steps to prevent telemarketers from circumventing the TCPA's restrictions on automated calls.  The Commission's 2003 decision did not discuss the use of predictive dialers in non-telemarketing contexts, and it did not address whether the Commission was simply determining that devices with the unused capacity to generate and dial random or sequential numbers are autodialers under the statute, or whether it was reading the requirement of a random or sequential number

---

[5] Predictive dialers help live representatives dial telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a representative of the caller will be available to take the call.

generator out of the statutory definition altogether.  In 2008, the Commission reiterated that certain predictive dialers that did not make use of a random or sequential number generator are autodialers, but provided no additional clarity as to the rationale for including these devices. Combined, these decisions have created significant confusion for companies that use predictive dialers to place live calls for non-telemarketing purposes.[6]

Expanding the definition of autodialer to include equipment that does not have the current ability to generate and dial random or sequential numbers and is not used for telemarketing purposes would be contrary to both the text of the TCPA and Congressional intent. It would be contrary to the text because the statute requires that, to be an autodialer, equipment must have "the capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator."[7]  It would be contrary to Congressional intent because non-telemarketing calls to accountholders and other consumers made using these predictive dialers do not jeopardize consumer privacy, threaten public safety, or shift marketing costs to consumers. Moreover, the Commission's current expansive interpretation – and the resulting confusion – has led to unintended consequences that harm consumers and businesses alike.  The current skyrocketing TCPA class litigation environment is also hindering innovation, diverting time and resources away from consumer-facing operations, chilling critical account communications, and creating substantial costs that inevitably are passed on to consumers.

---

[6] The Commission may issue a declaratory ruling terminating a controversy or removing uncertainty.  47 C.F.R. § 1.2.

[7] As discussed below, the confusion has also led GroupMe, Inc. to seek clarification from the Commission over the meaning of the term "capacity" in the autodialer definition.  *See infra* Section III.A.

Predictive dialer usage and technology have also changed significantly over the past decade, further warranting a declaratory ruling on this issue.[8]  Today's predictive dialers do not and cannot generate and dial random or sequential numbers, and the companies that rely on them are often not telemarketers.  Rather, the predictive dialers in use today are complex and innovative equipment and technologies used by a wide array of non-telemarketing businesses that need to connect their live representatives with consumers quickly and efficiently.  Their use benefits both consumers and businesses by, among other things, increasing productivity, performing critical regulatory compliance functions, and ensuring that consumers are not subject to improper calls.  Thus, it advances Chairman Genachowski's goal of "harnessing the power of communications technology to grow our economy, create jobs, enhance U.S. competitiveness, empower consumers, and unleash broad opportunity and a higher quality of life for all Americans."[9]

Importantly, clarifying that predictive dialers may be used to place non-telemarketing calls without being considered "autodialers" would not lead to an increase in calls or costs to consumers.  The same callers can already contact consumers on their mobile devices using manual dialing, and they have no incentive to place unnecessary informational calls.  Thus, it is only *how* some calls are made that would change, not whether the calls can be made or the number of calls that can be placed.

In addition, there has been a significant shift in consumer calling demographic patterns over the last decade due in part to a significant decrease in the cost of a wireless telephone call,

---

[8] The Commission is "especially mindful of the need to clarify [its] rules in light of technological changes."  *See, e.g.*, *Closed Captioning of Video Programming*, Declaratory Ruling, 23 FCC Rcd 16674 (2008).

[9] Remarks of FCC Chairman Julius Genachowski, Georgetown Center for Business and Public Policy, Georgetown University, Washington, DC, 1 (Nov. 7, 2011) ("Genachowski Remarks").

as approximately one-third of all households now have only wireless telephone numbers and consumers can easily "port" their wireline number to their wireless device.  Now that wireless service is so inexpensive and accessible that it has replaced traditional (landline) telephone service for one-third of the U.S. population, such unnecessary restrictions on predictive dialer use are counterproductive and can prevent consumers from receiving important, time-sensitive notifications from companies that they do business with, and are thus counterproductive.

In light of these changed circumstances and the growing benefits of informational calls to wireless consumers, the Commission should clarify that companies may use predictive dialers to place non-telemarketing calls to wireless telephone numbers without triggering the TCPA's autodialer restrictions, particularly when such dialers do not have the current ability to generate and dial random or sequential numbers.

## II.   THE TCPA'S AUTODIALER PROVISION ONLY APPLIES TO EQUIPMENT THAT HAS THE CURRENT ABILITY TO GENERATE AND DIAL RANDOM OR SEQUENTIAL NUMBERS, AND IT IS PRIMARILY FOCUSED ON ABUSIVE TELEMARKETING CALLS.

### A.   The Text of the TCPA Autodialer Provision Excludes Predictive Dialers That Do Not Have the Current Ability to Generate and Dial Random or Sequential Numbers.

The TCPA and the Commission's TCPA rules define an "automatic telephone dialing system" ("autodialer") as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."[10]  Under this definition, the phrase "using a random or sequential number generator"

_____

[10] 47 U.S.C. § 227(a)(1); 47 C.F.R. § 64.1200(f)(1).  The TCPA prohibits the use of an autodialer to place any call, absent an emergency or the prior express consent of the called party, "(i) to any emergency telephone line (including any '911' line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency); (ii) to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or (iii) to any telephone

modifies "to store or produce telephone numbers to be called."  In addition, the phrase "to dial

such numbers" refers to dialing numbers that have been randomly or sequentially generated.

Thus, under the plain language of the TCPA, predictive dialers that do not have the *ability* to

generate and dial random or sequential numbers are excluded from the definition of an

autodialer.

> **B.** **The Legislative History Confirms that the TCPA's Autodialer Provision Was Enacted to Curtail Unwanted *Telemarketing* Calls.**

Congress enacted the TCPA in response to an increasing number of consumer complaints

regarding "the use of automated equipment to engage in telemarketing."[11]  The legislation was

created to address the explosion of unwanted automated telephone advertising and solicitations

made possible by automatic dialing machines that could generate and dial random or sequential

telephone numbers and bombard parties with "computerized" solicitations.[12]

Congress recognized that, in addition to being annoying and intrusive, computerized

telephone sales calls threatened public health and safety.  For example, telemarketers could use

autodialers to generate random or sequential telephone numbers and "dial numbers in sequence,

---

number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call[.]"  47 U.S.C. § 227(b)(1)(A); 47 C.F.R. § 64.1200(a)(1).

[11] *See, e.g.*, Sen. Rep. No. 102-178, at 1 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968, 1969; 137 Cong. Rec. 35302 (1991) ("The compromise gives the public a fighting chance to start to curtail unwanted telemarketing practices.").

[12] *See, e.g.*, TCPA, Pub. L. No. 102-243, 105 Stat. 2394, 2395 (finding that "automated or prerecorded calls are a nuisance and an invasion of privacy"); 137 Cong. Rec. 35304 (1991) (explaining that the legislation "target[s] that abusive robotic use of [telemarketing] technology"); 137 Cong. Rec. 30818 (1991) ("[T]his legislation does not cover calls made by live persons.  The intention of this bill is to deal directly with computerized calls."); 137 Cong. Rec. 18123 (1991) (stating that the bill was introduced to ban "computer voice" telemarketing calls).

thereby tying up all the lines of a business and preventing outgoing calls."[13] Such telemarketing activities also tied up the emergency lines of police, fire, and medical services and prevented real emergency calls from getting through.[14] In addition, when unwanted telemarketing calls were placed to cell phones or paging services, they imposed costs on the called party.

The TCPA's primary purpose was and remains protecting individuals from telemarketing activity and ensuring the smooth transmission of emergency communications; it "targets calls that are the source of consumer complaints – telemarketing calls placed to the home."[15] It was not intended to prohibit businesses from using predictive dialers to place non-telemarketing calls that deliver account-related information to their customers and accountholders.[16] In fact, the legislative history recognizes that there are certain classes of helpful calls that consumers do not mind receiving, and that Congress did not pass the legislation to prohibit, such as a bank contacting a customer about his or her credit card.[17] Real world examples abound where such calls are, in fact, helpful to the average consumer:

- Data breach and identity theft notifications;
- Fraudulent activity warnings and updates;
- Parcel delivery notifications;

---

[13] *See, e.g.*, S. Rep. No. 102-178, at 1-2 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968, 1969; H.R. Rep. No. 102-317, at 10 (1991) ("Telemarketers often program their systems to dial sequential blocks of telephone numbers, which have included those of emergency and public service organizations, as well as unlisted telephone numbers.").

[14] *See, e.g.*, 137 Cong. Rec 35303 (1991); 137 Cong. Rec. 30821 (1991).

[15] *See* 137 Cong. Rec. 18123 (1991).

[16] *See, e.g.*, 137 Cong. Rec. 35302 (1991) (describing the TCPA as allowing the FCC to exempt certain types of calls, including calls "to leave messages with consumers to call a debt collection agency to discuss their student loan . . . ."); *id*. at 35304 ("Calls informing a costumer that a bill is overdue, or a previously unstocked item is now available at a store are clearly not burdensome, and should not be prohibited.").

[17] *See* 137 Cong. Rec. 30817-18 (1991).

- Appointment reminders, including from hospitals, healthcare providers, or repair technicians;
- Calls inquiring about missed payments and advising of the prospect of interrupted service or coverage;
- Service outage or interruption reports;
- School closing announcements;
- Product recall and safety notifications; and
- Urgent employee communications.

Consistent with this approach, the Commission affirmed in the recent Robocall Report and Order that it did not want to "impede" or "unnecessarily restrict" purely informational calls when implementing the TCPA.[18]

To the extent that Congress was concerned about some non-telemarketing calls – those made through autodialers with the capacity to generate and dial random or sequential numbers – Congress was clearly focused on extensive wide-reaching "scattershot" calls, not specific and targeted calls to accountholders. As discussed below, predictive dialers used for non-telemarketing purposes reduce the number of improper calls received by consumers and improve regulatory compliance.

Members of Congress also distinguished live calls from intrusive autodialed telemarketing calls lacking human-to-human interaction in passing the TCPA. Representative Cooper, for example, expressed hope that "the FCC [would] regard robotic calls by machines such as autodialers and computer-generated voices to be a much greater threat to the privacy of our homes than calls by live operators."[19] Predictive dialers can connect the called party to a live

---

[18] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, FCC 12-21 ¶ 21 (rel. Feb. 15, 2012) ("Robocall Report and Order").

[19] *See* 137 Cong. Rec. 35304 (1991).

person so he or she has the opportunity to speak to the person, ask questions, and address the matter at hand.[20]  This further underscores that Congress did not intend to restrict the use of predictive dialers to place non-telemarketing calls to wireless telephone numbers.

### C.  Commission Precedent Demonstrates That Predictive Dialers Should Not Be Subject to the TCPA's Autodialer Restriction Unless They Have the Current Ability to Generate and Dial Random or Sequential Numbers.

The Commission's original interpretation and implementation of the TCPA acknowledged that the use of predictive dialers to place non-telemarketing commercial calls should be regulated differently than unwanted, autodialed telemarketing communications made to random or sequential telephone numbers.  Specifically, in 1992, the Commission appropriately stated that certain non-telemarketing uses of predictive dialers are not intended to be prohibited by the TCPA.[21]  The Commission determined that debt collection calls, for example (which were not directed to random or sequential numbers), did not fall within the definition of autodialer.[22]  It also stated that the TCPA's overall intent was to protect consumers from unrestricted telemarketing practices,[23] so the provisions were not intended to restrict the use of predictive dialers for non-telemarketing activities.  In 1995, the Commission again confirmed that certain non-telemarketing calls are not prohibited by the TCPA's autodialer restriction because they "are

---

[20] *See id.*

[21] *See Rules and Regulations Implementing Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, 7 FCC Rcd 2736 ¶ 15 (1992) ("1992 TCPA NPRM") (discussing the use of predictive dialers in the debt collection industry and noting the benefits of increased efficiency and better communication with the called party).

[22] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 7 FCC Rcd 8752 ¶ 39 (1992) (explaining that debt collection calls are not subject to the FCC's identification rules for artificial or prerecorded messages "because such calls are not autodialer calls (*i.e.,* dialed using a random or sequential number generator) . . . .").

[23] *See id.* ¶ 9.

not directed to randomly or sequentially generated telephone numbers, but instead are directed to the *specifically programmed contact numbers* . . . ."[24]

In the Robocall Report and Order, the Commission imposed new requirements on telemarketing calls but declined to do so for informational calls.  It recognized that consumers find informational calls and messages to be "highly desirable" and noted that it did not want to "discourage" the delivery of purely informational calls and messages.[25]  It also stated that it was "employ[ing] the flexibility Congress afforded to address new and existing technologies."[26]

## III. THE COMMISSION'S INTERPRETATION OF "AUTODIALER" HAS CAUSED SIGNIFICANT CONFUSION AND AN ARRAY OF UNINTENDED CONSEQUENCES THAT LIMIT INNOVATION, HARMING CONSUMERS AND BUSINESSES ALIKE.

### A. The Commission's 2003 TCPA Order and 2008 Declaratory Ruling Have Created Substantial Uncertainty for Businesses Using Predictive Dialers.

As discussed above, in 1992 the Commission confirmed that (1) non-telemarketing use of a predictive dialer is not intended to be prohibited by the TCPA,[27] and that (2) certain non-telemarketing calls that are not made to randomly or sequentially generated telephone numbers do not fall within the TCPA's autodialer restriction.[28]  However, in 2003, contrary to the TCPA's plain language, the legislative history, and its own precedent, the Commission ruled that some predictive dialers that do not use a random or sequential number generator are nonetheless

---

[24] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Memorandum Opinion and Order, 10 FCC Rcd 12391 ¶ 19 (1995) ("1995 TCPA Order") (discussing debt collection calls; emphasis added), *citing* Household International Petition for Reconsideration, CC Docket No. 92-90, at 6.

[25] Robocall Report and Order ¶ 29.

[26] *Id.*

[27] 1992 TCPA NPRM ¶ 15.

[28] *See* Section II.C., *supra.*

"autodialers" under the TCPA.[29]  The Commission held that "to be considered an autodialer, the equipment need only have the *capacity* to store or produce telephone numbers."[30]  The Commission was concerned that the telemarketing industry had evolved such that it was more cost-effective for telemarketers to use predictive dialers to call lists of numbers than to call random or sequential numbers.[31]  Thus, the Commission concluded that it was necessary to classify some predictive dialers as autodialers to "ensure that the prohibition on autodialed calls not be circumvented" by telemarketers who operate by automatically dialing "lists of numbers" instead of "creat[ing] and dial[ing] 10-digit numbers arbitrarily."[32]

In essence, the Commission's decision in the 2003 TCPA Order indirectly regulated the telemarketing *use* of predictive dialers by focusing on the underlying equipment *design*. However, by taking an indirect approach, and focusing only on one aspect of the equipment design (*i.e.*, a capacity to store or produce numbers rather than the capacity to generate and dial random or sequential numbers), the Commission did not address squarely whether predictive dialers that have no current "capacity" or ability to generate and dial random or sequential numbers also qualify as autodialers, particularly if such dialers are used for non-telemarketing purposes.  Nor did it explain whether such dialers raise similar concerns justifying the same treatment as predictive dialers used for telemarketing purposes.

It is not clear how this ruling squares with the statutory definition of autodialer or Congress's intent in passing the TCPA.  In the 2003 ruling, the Commission seemed to focus on

---

[29] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd 14014 ¶ 133 (2003) ("2003 TCPA Order").

[30] *Id.* ¶ 132 (emphasis in original).

[31] *Id*.

[32] *Id.* ¶ 133.

what it believed to be the equipment's potential capacity to generate and dial random or sequential numbers, noting that predictive dialing hardware "when paired with certain software, has the capacity to store or produce numbers and dial those numbers and dial those numbers at random, in sequential order, or from a database of numbers."[33]  But then the Commission described the "basic function" of autodialer equipment as being the "capacity to dial numbers *without human intervention*"[34] – a concept that appears nowhere in the statute and is very different from the ability to "store or produce telephone numbers to be called," use "a random or sequential number generator," and dial numbers that have been randomly or sequentially generated.[35]

The Commission did not explain how focusing on the ability to dial numbers without human intervention was consistent with the text of the TCPA or with Congressional intent, especially if such numbers were not randomly or sequentially generated.  Nor did it explain whether it was making a blanket rule that <u>all</u> predictive dialers and other equipment that dials numbers without human intervention fall within the statute, or whether it was simply finding that predictive dialers can be autodialers <u>if</u> they have the capacity to generate and dial random or sequential numbers.  In addition, the Commission did not explain whether calls to the "specifically programmed contact numbers" of existing customers qualified as dialing numbers "without human intervention."  This absence of clarity has generated significant confusion among businesses as to what types of predictive dialers and other equipment, if any, can be used to place non-telemarketing calls and, in particular, whether a predictive dialer that has *no ability*

---

[33] *Id.* ¶ 131.

[34] *Id.* (emphasis added).

[35] 47 U.S.C. § 227(a)(1); 47 C.F.R. § 64.1200(f)(1).

to generate and dial random or sequential numbers, and which is not being used by telemarketers to circumvent the TCPA, falls within the statute.

In 2008, ACA International requested that the Commission clarify that a predictive dialer "meets the definition of autodialer only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists."[36]  In response, the Commission reiterated its 2003 determinations and held that the autodialer restrictions apply when predictive dialers operate through calling lists.  However, it did not elaborate on or clarify the ambiguities created by the 2003 ruling, and thus did not answer the question of whether a predictive dialer that, without significant alteration, has *no ability* to generate and dial random or sequential numbers, and which is not being used by telemarketers to circumvent the TCPA, is nonetheless still subject to the TCPA's restrictions on autodialers.  Thus, further clarification is warranted.

It is also unclear whether calls to "specifically programmed contact numbers" of *existing* customers (discussed above as part of the 1995 TCPA Order) are part of the "lists of numbers" mentioned in the Commission's 2003 and 2008 decisions.  Specifically, the Commission's reference to "lists of numbers" appeared to be intended to address telemarketer's use of a list of non-customer phone numbers in place of the random or sequential dialing of phone numbers.

As further evidence of the confusion created by the Commission's 2003 and 2008 decisions, GroupMe, Inc. ("GroupMe") recently filed a Petition for Expedited Declaratory Ruling and Clarification requesting that the Commission clarify and limit the scope of the term "capacity" in the autodialer definition to encompass "only equipment that, at the time of use,

---

[36] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, 23 FCC Rcd 559 (2008) ("2008 ACA Declaratory Ruling").

could, in fact, have employed the functionalities described in the TCPA without human intervention and without first being technologically altered."[37]  GroupMe offers a free service that allows a group creator to define a group of individuals who may exchange non-commercial text communications (and conference calls) to individuals that comprise the group.[38]

> **B.     The Uncertainty from the 2003 and 2008 Decisions Has Created an Array of Unintended Consequences that Harm Consumers and Businesses Alike.**

The Commission's 2003 and 2008 decisions regarding autodialers have led to unintended consequences that harm consumers and businesses alike, including skyrocketing class action litigation for businesses and increased costs to consumers.  It also has curtailed the ability of companies to offer new products and services that consumers demand.  To prevent further harm, the Commission should confirm, at a minimum, that consistent with the statutory language, companies may use predictive dialers to place non-telemarketing informational calls to wireless telephone numbers when there is no current ability or "capacity" to generate and dial random or sequential numbers.

As the Commission is aware, the penalties for TCPA violations are substantial – up to $1,500 per call.  Plaintiffs' lawyers are aggressively filing larger and larger numbers of TCPA lawsuits based on alleged violations.  Specifically, there has been a surge in TCPA claims and class actions in recent years involving alleged autodialer use, filed against a wide array of leading, established companies in the financial services industries and other sectors.  For example, conservative estimates indicate that at least 13 TCPA class actions involving autodialers were filed in 2008, at least 36 in 2009, and at least 60 in 2010.  In 2011, there were at

---

[37] *See Petition for Expedited Declaratory Ruling and Clarification*, GroupMe, Inc., CG Docket No. 02-278 (filed Mar. 1, 2012).

[38] *See id.* at 2.

least 90 TCPA class actions filed involving autodialers.[39]  Thus, TCPA class actions involving

autodialers have risen a staggering <u>592%</u> in the last few years alone.  And hundreds of TCPA

cases overall (including non-class actions) have been filed since the Commission's 2008 ACA

Declaratory Ruling.[40]

     TCPA class actions are also increasingly targeting predictive dialer use in light of the

confusion created by Commission's 2003 and 2008 TCPA decisions.  As shown in the chart

below, by conservative estimates there has been an <u>800% increase</u> in the number of predictive

dialer class actions filed in the last few years.[41]  And the true number of such class actions is

likely much higher.[42]



     Under the current regulatory environment, almost every major financial institution using

dialing technology to accurately and efficiently call accountholders is, or soon will be, a

defendant in TCPA litigation.  And as the *Griffith* case demonstrates, the confusion and

---

[39] These statistics exclude cases focused on the TCPA's fax restrictions.  In addition, these statistics only include data from courts with records that are searchable online.  As a result, the numbers provided likely underreport the true number of TCPA class actions that have been filed.

[40] One San Diego plaintiffs' firm alone has filed at least 32 class action complaints since 2008.

[41] As with the statistics above, these statistics exclude cases focused on the TCPA's fax restrictions and only include data from courts with records that are searchable online.

[42] TCPA complaints that only reference "autodialers" have been excluded, even though they often involve the alleged use of predictive dialers.

regulatory uncertainty created by the 2003 TCPA Order potentially subjects companies to crippling liability for non-telemarketing calls, and for calls made using predictive dialer equipment that has no ability to generate and dial random or sequential numbers.[43]

The current wave of TCPA litigation harms both consumers and businesses and stifles innovation. The lawsuits divert time and resources away from consumer-facing operations and have a chilling effect on critical account communications. They also create substantial litigation costs for defendants and increase costs for companies that want to place informational calls to their own customers.[44] Unless the Commission confirms that companies may use predictive dialers to place non-telemarketing calls to wireless telephone numbers, these TCPA class actions will continue to have a significant detrimental impact on consumers and businesses, even where there is no telemarketing activity involved. They will also continue to threaten jobs and the viability of entire companies, increase costs for consumers, and hinder future consumer lending and financial services efforts, all contrary to Chairman Genachowski's and the Administration's goals of promoting economic growth, innovation, competitiveness, and job creation.[45]

## IV.    TO ADDRESS THE EXISTING CONFUSION, THE COMMISSION SHOULD CLARIFY WHAT CONSTITUTES AN "AUTODIALER" UNDER THE TCPA.

To address the confusion and remedy these problems, the Commission should issue a declaratory ruling to clarify, consistent with the text of the TCPA and Congressional intent, that predictive dialers that (1) are not used for telemarketing purposes and (2) do not have the current

---

[43] *Griffith v. Consumer Portfolio Serv., Inc.*, Memorandum Opinion, Case No. 10-2697 (N.D. Ill., Aug. 16, 2011) (holding that irrespective of the statutory language, pursuant to the Commission's 2003 and 2008 decisions, predictive dialers fall within the TCPA's autodialer definition because they "have the capacity to dial numbers without human intervention").

[44] *See, e.g.*, Reply Comments of the Federal Reserve Board Staff, CG Docket No. 02-278, 4 (filed June 8, 2010).

[45] *See* Genachowski Remarks at 2.

ability to generate and dial random or sequential numbers are not "automatic telephone dialing systems" ("autodialers") under the TCPA and the Commission's TCPA rules.  In reaching this decision, the Commission should focus on the meaning of the term "capacity" in the autodialer definition and declare that, at least for informational calls, capacity refers to a present ability to generate and dial random or sequential numbers.

"Capacity" is not defined by the TCPA and thus the Commission as the expert agency can define this important term.  The Commission should clarify that the definition of an autodialer under the TCPA reflects equipment that has a *present* capacity, such as having the current ability to generate and dial random or sequential numbers without additional modifications to the equipment.  The Commission should not interpret capacity as encompassing any conceivable hardware or software modification to a device that would permit it to generate, store, and dial numbers randomly or in sequence.  For example, mobile phones, smart phones, tablets, e-readers, and personal computers can all theoretically be modified with sufficient effort and ingenuity, using various third-party software or hardware configurations, to randomly or sequentially generate and dial telephone numbers.  Such an unconstrained interpretation would make the statutory term capacity superfluous, contrary to elementary rules of statutory interpretation.

To continue protecting wireless consumers against unwanted automated telemarketing calls, the Commission can also distinguish between telemarketing and informational calls when it clarifies the meaning of capacity.  The Commission has correctly recognized that changes in technology and industry practices must be taken into account under the TCPA,[46] and it could, for example, find that predictive dialers and other equipment used for *informational calls* only have

---

[46] 2003 TCPA Order ¶ 132 (internal citations omitted).

the required "capacity" to generate and dial random or sequential numbers when the capacity is actually *enabled* (*e.g.*, installed as a functioning feature on the device without requiring further modifications to the device), while also finding that the requisite "capacity" for *telemarketing calls* includes the current ability to dial numbers from a list.  The Commission made a similar distinction between telemarketing and informational calls when it amended its prior express consent requirements in the Robocall Report and Order.

## V.     CHANGED CIRCUMSTANCES AND THE BENEFITS OF PREDICTIVE DIALER USE FOR INNOVATIVE, NON-TELEMARKETING PURPOSES WARRANT A CLARIFICATION.

The Commission has correctly recognized that changes in technology and industry practices must be taken into account under the TCPA,[47] and the circumstances regarding predictive dialer use have changed significantly over the past decade.  The growing use of predictive dialers to place telemarketing calls was a dispositive factor in the Commission's 2003 decision.  However, today's predictive dialers – many of which have no current capacity to dial random or sequential numbers – are used for a number of innovative non-telemarketing purposes that simultaneously bring benefits to both consumers and businesses.  There has also been a significant shift in consumer calling patterns over the last decade, resulting in approximately one-third of households now having only wireless telephone numbers.  In light of these changed circumstances, the Commission should clarify that companies may use predictive dialers to place non-telemarketing calls to wireless telephone numbers without triggering the TCPA's autodialer restrictions, especially if the dialers also cannot generate and dial random or sequential numbers.

---

[47] *Id.* (internal citations omitted).

### A.   Today's Innovative Predictive Dialing Technology Provides Significant Benefits to Consumers and Businesses.

The predictive dialers in use today are a far cry from the autodialing machines that telemarketers used in the early 1990s to bombard random households with pre-recorded sales pitches.  Today's predictive dialers provide significant benefits to both consumers and businesses by allowing businesses with a legitimate need to contact a large number of specific accountholders or other consumers to do so accurately, efficiently, and cost-effectively.  They are used to place a variety of non-telemarketing calls, including informational calls to: discuss time-sensitive account transactions; provide appointment or service reminders or cancellation notifications; prevent or review fraudulent account activity or potential identity theft; confirm or arrange payments; provide data security breach notifications;[48] notify policyholders in advance of an insurance termination or lapse;[49] make calls to employees regarding workplace closures, personnel benefits, and use of annual flexible spending account funds; and discuss other legitimate account-related issues with existing customers, accountholders, and other parties with whom a caller has an existing business relationship.[50]  Today's predictive dialers also help protect consumers against improper calls.  Many states, for example, have varying laws regarding what hours it is permissible to call consumers, the number of times it is permissible to call consumers, waiting periods for contacting consumers, the circumstances under which calls must cease, and whether or when consumers can be called at work, and predictive dialers can be

---

[48] *See, e.g.*, Comments of the Financial Services Roundtable, The American Bankers Association, and The Consumers Bankers Association, CG Docket No. 02-278, 3 (filed May 21, 2010).

[49] *See id.* at 9.

[50] *See also* Robocall Report and Order ¶ 21 (stating that the Commission does not want to "unnecessarily impede" informational calls including, for example, "bank account balance, credit card fraud alert, package delivery, and school closing information").

programmed to accommodate these and other limitations.  For example, they can be programmed to restrict calls to:

- Specific telephone numbers;
- Specific individuals or accountholders;
- Certain area codes or regions;
- Certain hours of the day;
- Certain days of the week;
- A limited number of attempts or contacts per telephone number, individual, or accountholder;
- A limited number of messages left per telephone number; and
- A minimum amount of time between calls to a particular telephone number, individual, or accountholder.

Thus, predictive dialers also better protect consumer privacy and perform a critical regulatory compliance function.  Limiting companies' ability to rely on predictive dialing technology, on the other hand, means that more calls will have to be dialed manually.  As the U.S. Department of the Treasury has recognized in supporting exceptions to the autodialer restrictions, manual dialing creates a heightened risk of human error, which harms both consumers who may receive improper calls and companies that face liability for such calls under myriad statutes and regulations[51] (including, in some cases, a strict liability standard such as under the Federal Debt Collection Practices Act).  Predictive dialers also substantially increase employee productivity.

Requiring companies to contact consumers manually for informational and other non-telemarketing calls also increases communications and staffing costs, which could be particularly

---

[51] *See, e.g.*, Comments of the Financial Management Service of the Department of the Treasury, CG Docket No. 02-278, 2-3 (filed May 20, 2010) (stating that the restrictions on the use of autodialers should not apply to debt collection calls, and explaining that the use of autodialers helps collectors ensure compliance with the Fair Debt Collection Practices Act).

harmful to small businesses.  These increased costs divert critical resources away from innovative products and services.  Given how limited many companies' resources are in this economy, this diversion has a particularly severe negative impact (especially on small businesses).

In addition, clarifying that predictive dialers may be used to place non-telemarketing calls without being considered "autodialers" would not lead to an increase in calls to consumers. Callers already can contact consumers on their wireless telephone numbers using manual dialing, and they have no incentive to place unnecessary calls.  Thus, it is only *how* some calls are made that would change, not whether or how often the calls can be made.[52]

### B.   Many of Today's Predictive Dialers Do Not Have the Ability to Generate and Dial Random or Sequential Telephone Numbers.

Many of today's predictive dialers do not fall within the statutory autodialer definition because they cannot randomly or sequentially generate and dial telephone numbers.  In fact, representatives of seven leading manufacturers and marketers of predictive dialer equipment have submitted declarations stating that their respective predictive dialers:

- Do not have the capacity to store or generate telephone numbers using a random or sequential number generator;
- Have not been upgraded with separate software to provide the capacity to do so; and
- Cannot function without a list of telephone numbers provided by the user.[53]

---

[52] To the extent that the Commission has any concerns about a ruling being inappropriately applied to provide additional flexibility for companies to place telemarketing calls, CI notes that such calls would, at a minimum, be subject to the National Do Not Call Registry.

[53] Reply Comments of ACA International, CG Docket No. 02-278, Exhibit 1 (filed June 21, 2010) ("ACA Robocall NPRM Reply Comments"); *see also* Letter from Sen. Blunt to FCC Chairman Julius Genachowski, CG Docket No. 02-278 (dated June 28, 2011) (stating that "[t]he current generation of predictive dialers does not raise concerns about calling random numbers – the practice that Congress intended to prevent when it enacted the TCPA").

Several also declared that their predictive dialer equipment is not used for telemarketing, advertisements, or solicitations.[54] And most indicated that it would require "fundamentally changing the architecture of the hardware and software" to provide even the *capacity* to randomly or sequentially generate telephone numbers using a number generator.[55] Quite simply, this is not the type of equipment that Congress sought to regulate when it enacted the TCPA, and it is not the type of equipment that is encompassed in the statutory definition of autodialer.

   C.   **The Number of Wireless-Only Households Continues to Climb, Making it Difficult to Provide Time-Sensitive Information to a Growing Portion of Consumers.**

   Another significant changed circumstance with respect to the TCPA's restriction on autodialed calls to wireless telephone numbers is the surge in the number of wireless subscribers and, in particular, the number of wireless-only households – a trend that shows no signs of slowing. When the TCPA was enacted in 1991, there were only an estimated 7 million wireless subscribers in the United States.[56] Today, there are more than 300 million wireless subscribers,[57] and almost one-third of all households <u>only</u> have wireless telephones (with that number expected to continue rising).[58] In addition, more than half of consumers aged 25-29 are living in wireless-

---

[54] ACA Robocall NPRM Reply Comments at Exhibit 1.

[55] *Id.*

[56] Prepared Testimony of Michael Altschul, General Counsel, CTIA – The Wireless Association® before the House Subcommittee on Communications & Technology regarding the Mobile Informational Call Act of 2011, 1 (Nov. 4, 2011) ("Altschul Testimony").

[57] *Id.* at 2.

[58] *See, e.g.*, CDC Study: Wireless Substitution: Early Release of Estimates From The National Health Interview Survey, July-December 2010, *available at* http://www.cdc.gov/nchs/data/nhis/earlyrelease/wireless201106.htm (last accessed Oct. 18, 2011).

only households.[59]  The cost of a wireless telephone call was also ten times higher when Congress enacted the TCPA than it is today, having dropped dramatically from approximately 44 cents per minute in 1993 to less than five cents per minute in recent years.[60]

Subjecting all calls made using predictive dialers to the autodialer restrictions thus significantly limits the ability of companies to provide service to their customers and contact their accountholders.  In particular, it hinders their ability to provide critical, time-sensitive notifications regarding identity theft, fraudulent account activity, service or appointment cancellations, or other transaction-related information.  Moreover, given that the percentage of wireless-only households is higher among low-income groups, restricting such informational calls could have a disproportionate negative impact on such individuals.[61]  And the fact that consumers can now easily "port" their wireline number to their wireless device further restricts the ability of companies to place such informational calls.  Although the Commission provides a very limited 15-day grace period for ported numbers,[62] that period would be too short for companies looking to place critical informational calls on even a monthly basis.

---

[59] Lance Whitney, *Over Half of Late-20s Crowd Own Cell Phones Only*, CNET (Dec. 22, 2010), *at* http://news.cnet.com/8301-1035_3-20026395-94.html.

[60] Altschul Testimony at 1, *citing Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993, Annual Report and Analysis of Competitive Market Conditions With Respect to Mobile Wireless, Including Commercial Mobile Services*, Fifteenth Report, 26 FCC Rcd 9664, Table 20 (2011) (indicating that the average revenue per minute for a wireless telephone call dropped from approximately 44 cents per minute in 1993 to five cents per minute in 2009) *and* Glen Campbell, Bank of America Merrill Lynch, 3Q Global Wireless Matrix, 2 (Sept. 28, 2011) (reporting that the average revenue per wireless minute was three cents, down from four cents at the end of 2010).

[61] *1 in 4 Homes Have Cell Phone, No Landline*, CBS NEWS (May 12, 2010), *at* http://www.cbsnews.com/stories/2010/05/12/tech/main6476743.shtml.

[62] 47 C.F.R. § 64.1200(a)(1)(iv).

Finally, the use of predictive dialers for non-telemarketing purposes creates *no* additional costs for wireless consumers because callers can already contact the same consumers on their wireless telephone numbers (through manual dialing), and they have no incentive to place unnecessary calls.  Using predictive dialers merely changes the mechanics of how those consumers are reached in a way that reduces improperly dialed calls, better protects their privacy, and promotes regulatory compliance.

## VI.    CONCLUSION

For the foregoing reasons, the Commission should clarify and confirm that predictive dialers that (1) are not used for telemarketing purposes and (2) have no current ability to generate and dial random or sequential numbers are not considered "autodialers" under the TCPA.

Respectfully submitted,

David Thomas
Executive Director
Communication Innovators
1341 G Street, NW
Suite 1100
Washington, DC  20005
(202) 585-0258

June 7, 2012

Exhibit B

# PUBLIC NOTICE

**Federal Communications Commission**
**445 12th St., S.W.**
**Washington, D.C. 20554**

News Media Information 202 / 418-0500
Internet: http://www.fcc.gov
TTY: 1-888-835-5322

---

**DA 12-1653**
**Released: October 16, 2012**

## CONSUMER AND GOVERNMENTAL AFFAIRS BUREAU SEEKS COMMENT
## ON PETITION FOR DECLARATORY RULING FROM COMMUNICATION INNOVATORS

**CG Docket No. 02-278**

**Comments Due:  November 15, 2012**
**Reply Comments Due:  November 30, 2012**

With this Public Notice, we seek comment on a Petition for Declaratory Ruling filed by Communication Innovators.[1]  Communication Innovators asks the Commission to clarify that predictive dialers that are not used for telemarketing purposes and do not have the current ability to generate and dial random or sequential numbers are not "automatic telephone dialing systems"[2] as defined by the Telephone Consumer Protection Act[3] and the Commission's related rules.[4]  Communication Innovators states that there are growing benefits of informational calls to wireless consumers that justify such a clarification.[5]

Pursuant to sections 1.415 and 1.419 of the Commission's rules,[6] interested parties may file comments and reply comments on or before the respective dates indicated on the first page of this Notice. Comments may be filed using the Commission's Electronic Comment Filing System (ECFS).  *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).

- Electronic Filers:  Comments may be filed electronically using the Internet by accessing the ECFS:  http://fjallfoss.fcc.gov/ecfs2/.

- Paper Filers:  Parties who choose to file by paper must file an original and one copy of each filing.

---

[1] *See* Communication Innovators, Petition for Declaratory Ruling, CG Docket No. 02-278 (filed June 7, 2012) (*Petition*), a copy of which is attached to this Public Notice.

[2] *Petition* at 1.

[3] Codified as 47 U.S.C. § 227.

[4] 47 C.F.R. § 64.1200.

[5] *Petition.* at 5.

[6] 47 C.F.R. §§ 1.415, 1.419.

- Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail.  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

- All hand-delivered or messenger-delivered paper filings for the Commission's Secretary must be delivered to FCC Headquarters at 445 12th St., SW, Room TW-A325, Washington, DC 20554.  The filing hours are 8:00 a.m. to 7:00 p.m.  All hand deliveries must be held together with rubber bands or fasteners.  Any envelopes and boxes must be disposed of <u>before</u> entering the building.

- Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9300 East Hampton Drive, Capitol Heights, MD  20743.

- U.S. Postal Service first-class, Express, and Priority mail must be addressed to 445 12th Street, SW, Washington DC  20554.

People with Disabilities:  To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty).

The proceeding this Notice initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[7]  Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies).  Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation.  If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum.  Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with rule 1.1206(b).  In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (*e.g.*, .doc, .xml, .ppt, searchable .pdf).  Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

**FOR FURTHER INFORMATION CONTACT:**  Karen F. Johnson, Consumer and Governmental Affairs Bureau, Federal Communications Commission, 202-418-7706, or karen.johnson@fcc.gov.

-FCC-

---

[7] *Id.* §§ 1.1200 *et seq.*

Exhibit C

**Before the**
**Federal Communications Commission**
**Washington, DC  20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Consumer & Governmental Affairs Bureau | ) | CG Docket No. 02-278 |
| Seeks Comment on Petition for Declaratory | ) | |
| Ruling from Communication Innovators | ) | |
| | ) | |
| Rules and Regulations Implementing the | ) | |
| Telephone Consumer Protection Act of 1991 | ) | |
| | ) | |

**REPLY COMMENTS OF COMMUNICATION INNOVATORS**

David Thomas
Executive Director
Communication Innovators
1341 G Street, NW
Suite 1100
Washington, DC  20005
(202) 585-0258

November 30, 2012

## TABLE OF CONTENTS

Page

I.    ABOUT COMMUNICATION INNOVATORS. ................................................................ - 2 -

II.   THE VAST MAJORITY OF COMMENTERS AGREE THAT TODAY'S
      PREDICTIVE DIALERS ARE NOT AUTODIALERS. .............................................. - 3 -

      A.    There is Broad Agreement by a Number of Commenters that Under the
            Plain Language of TCPA, Today's Predictive Dialers are not Autodialers. ...... - 3 -

      B.    Many Commenters Also Agree that the Legislative History of the TCPA
            Reveals that Congress Never Intended to Restrict Non-Telemarketing,
            Informational Use of Predictive Dialers. ................................................ - 8 -

      C.    The TCPA Provides Ample Authority for the Commission to Distinguish
            Between Telemarketing Calls and Non-Telemarketing, Informational
            Calls in Clarifying the Definition of Autodialer. ................................. - 10 -

III.  COMMENTERS OVERWHELMINGLY SUPPORT THE USE OF
      PREDICTIVE DIALERS FOR INNOVATIVE, NON-TELEMARKETING
      PURPOSES ................................................................................................................ - 12 -

IV.   MANY COMMENTERS AGREE THAT GRANTING THE CI PETITION
      WILL NOT ALLOW ANY NEW UNWANTED CALLS. ........................................ - 15 -

V.    CONCLUSION .......................................................................................................... - 16 -

**Before the**
**Federal Communications Commission**
**Washington, DC  20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Consumer & Governmental Affairs Bureau | ) | CG Docket No. 02-278 |
| Seeks Comment on Petition for Declaratory | ) | |
| Ruling from Communication Innovators | ) | |
| | ) | |
| Rules and Regulations Implementing the | ) | |
| Telephone Consumer Protection Act of 1991 | ) | |
| | ) | |

## REPLY COMMENTS OF COMMUNICATION INNOVATORS

Communication Innovators ("CI") respectfully submits these reply comments in response to the October 16, 2012 Public Notice released by the Consumer and Governmental Affairs Bureau ("Bureau") in the above-captioned proceeding,[1] which seeks comment on a Petition for Declaratory Ruling ("Petition") filed by CI.[2]  In the Petition, CI asks the Federal Communications Commission ("Commission") to clarify that when predictive dialers: (1) are not used for telemarketing purposes; and (2) do not have the current ability to generate and dial random or sequential numbers, they are not "automatic telephone dialing systems" ("autodialers") under the Telephone Consumer Protection Act ("TCPA")[3] and the Commission's TCPA rules.[4]

---

[1] *Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Declaratory Ruling from Communication Innovators*, CG Docket No. 02-278, Public Notice, DA 12-1653 (rel. Oct. 16, 2012).

[2] *See* Communication Innovators, Petition for Declaratory Ruling, CG Docket No. 02-278 (filed June 7, 2012) ("Petition").

[3] 47 U.S.C. § 227.

[4] 47 C.F.R. § 64.1200 *et seq.*

As discussed below, commenters agree that the Commission should grant the Petition and address the widespread confusion regarding whether predictive dialers that lack the required ability to generate and dial random or sequential numbers are "autodialers" under the TCPA. The record confirms that, under the plain language of the TCPA, today's predictive dialers are not autodialers.  In addition, as commenters explain, Congress never intended to target non-telemarketing, informational calls placed using live representatives and predictive dialers. Instead, Congress's goal was to curb abusive telemarketing and prerecorded "robocalling" practices that, among other things, threatened public safety by tying up emergency lines and blocks of telephone numbers.

As commenters have overwhelmingly demonstrated, predictive dialers enhance consumer privacy and provide a number of other important benefits to consumers and businesses without creating any new unwanted calls.  The Commission should continue to support the ability of companies to provide innovative services to consumers on their mobile devices by declaring that today's predictive dialers are not autodialers, especially when used for non-telemarketing, informational purposes.

## I.      ABOUT COMMUNICATION INNOVATORS.

CI is a 501(c)(4) coalition of technology companies that seeks to maximize the pace of telecommunications innovation for American consumers and businesses.  CI works to identify and support important telecommunications innovations and to provide policy leaders insight into regulatory barriers that may limit their development and deployment.  CI and its member technology companies strongly endorse efforts by the President, the Commission, and many in Congress to minimize the burden imposed on innovators and entrepreneurs by outdated, unnecessary, or inefficient regulations.

## II.   THE VAST MAJORITY OF COMMENTERS AGREE THAT TODAY'S PREDICTIVE DIALERS ARE NOT AUTODIALERS.

As many commenters explain, the plain language and legislative history of the TCPA, along with Commission precedent, support a ruling granting the Petition.  Under the plain language of the TCPA, today's predictive dialers do not have the "capacity" to generate random or sequential numbers or to dial such numbers.  Moreover, the legislative history of the TCPA shows that Congress never intended to prevent companies from using predictive dialers to make non-telemarketing, informational calls using live representatives.  In addition, to the extent that the Commission may be concerned about enabling unwanted *telemarketing* calls, it has ample authority to prevent such abuse while still granting the Petition.

### A.    There is Broad Agreement by a Number of Commenters that Under the Plain Language of TCPA, Today's Predictive Dialers are not Autodialers.

Many commenters agree with CI that today's predictive dialers do not meet the definition of an autodialer.[5]  The TCPA and the Commission's TCPA rules define an autodialer as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."[6]  As CI explained in the Petition, the phrase "using a random or sequential number generator" modifies "to store or produce telephone numbers to be called," and the phrase "to dial such numbers" refers to dialing numbers that have been randomly or sequentially generated.  Thus, under the plain language of

---

[5] *See, e.g.*, Comments of Varolii Corporation, CG Docket No. 02-278 at 2 (Nov. 15, 2012) ("Varolii Comments"); Comments of U.S. Chamber of Commerce, CG Docket No. 02-278 at 9-10 (Nov. 15, 2012) ("Chamber Comments").

[6] 47 U.S.C. § 227(a)(1); *see also* 47 C.F.R. § 64.1200(f)(1).

the TCPA, predictive dialers that do not have the "capacity" to generate and dial random or sequential numbers are excluded from the definition of an autodialer.[7]

The plain English meaning of "capacity" is "ability,"[8] and today's predictive dialers have no number-generating abilities (sequential, random, or otherwise) – they merely dial numbers that have been entered into them.[9]  As Noble Systems Corporation ("Noble") confirms, "the predictive dialers used by [Noble] and its customers, and generally used throughout the industry, do not come equipped with random or sequential number generating software."[10]  The Commission should recognize that such equipment is not an autodialer, especially when used to place non-telemarketing, informational calls.

The plain language of the TCPA also requires that, to be considered an autodialer, equipment must have an actual, present capacity, *i.e.*, the *current* ability to generate and dial random or sequential numbers without additional modifications to the equipment.[11]  Specifically, autodialers include only equipment that "has the capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator."[12]  As the U.S. Chamber of Commerce recognizes, Congress's choice of the present tense "has the capacity" instead of the

---

[7] Petition at 5-6.

[8] Oxford English Dictionary (2012) (defining "capacity" as "[t]he power, ability, or faculty for anything in particular").

[9] *See, e.g.*, Comments of CenturyLink, CG Docket No. 02-278 at 3 (Nov. 15, 2012) ("CenturyLink Comments").

[10] Comments of Noble Systems Corporation, CG Docket No. 02-278 at 8 (Nov. 15, 2012) ("Noble Comments").

[11] *See, e.g.*, Chamber Comments at 9 (explaining that the plain language of the TCPA "excludes equipment [that], only with substantial subsequent modifications, would gain the ability to store or produce randomly or sequentially generated numbers, and then to dial those numbers"); Varolii Comments at 2 ("Based on the plain language of the TCPA, it follows that telephone systems or equipment that do not have the current ability to generate and dial 'random or sequential numbers' are excluded from the definition of an autodialer.").

[12] 47 U.S.C. § 227(a)(1) (emphasis added).

future tense "will have the capacity," is informative.[13]  Thus, equipment should only be considered an autodialer if, *at the time of use*, it has the ability to generate and dial random or sequential numbers without first being technologically altered.  Equipment meeting this standard has random or sequential number generation and dialing as a functioning feature – one that can be used readily and without further software or device changes (*e.g.*, without the installation or modification of software or hardware) – even if the feature is turned "off" at the time of use.[14] The Commission should reject claims that some theoretical, future ability to generate and dial random or sequential numbers is sufficient to qualify equipment as an autodialer.[15]  Congress could have passed language that looked to a theoretical future capacity simply by changing the verb tense.  It did not.

Furthermore, to avoid absurd results, the Commission must interpret capacity as a current ability.  For example, if capacity were interpreted broadly to encompass any theoretical, future ability to store or produce randomly or sequentially generated lists of numbers (*i.e.*, with different software or hardware), all smartphones and computers would fall within the TCPA's autodialer definition.[16]  As a result, callers could be exposed to TCPA liability simply for

---

[13] *See* Chamber Comments at 10.

[14] Therefore, if a caller merely has to "flip a switch" to generate and dial random or sequential numbers, the device would still be an autodialer, even if the switch or feature is turned off at the time the call is made.

[15] *See, e.g.*, Comments of Robert Biggerstaff, CG Docket No. 02-278 at 15-16 (Aug. 29, 2012) (contending that "'capacity' expressly includes a capabilit[y] realized if a device can be 'used in conjunction with other equipment.'"); Comments of Consumer Litigation Group, CG Docket No. 02-278 at 1 (Aug. 31, 2012) ("[T]echnology should continue to be characterized as [an autodialer] if it *could* be used as a random or sequential number generator.").

[16] *See* Varolii Comments at 3; Comments of American Financial Services Association, CG Docket No. 02-278 (Nov. 26, 2012) ("AFSA Comments").  Simple software can be loaded onto most smartphones to allow them to generate random or sequential numbers, and then dial those numbers.

misdialing a wireless telephone number, as aggressive Plaintiffs' lawyers have proved all too willing to file abusive TCPA suits in the hopes of a payout.[17]

The Commission should also reject Gerald Roylance's erroneous reading of the autodialer provision. He contends that "the reasonable interpretation of ATDS has two prongs (storing or producing telephone numbers)"[18] and that "the bad English/comma-spliced phrase about number generators only applies to the producing prong."[19] As noted above, autodialers must, in part, have the capacity "to store or produce telephone numbers to be called, using a random or sequential number generator."[20] Roylance argues that autodialers only need to store numbers to be called; they do not need to store or produce such numbers using such a number generator.[21] Not only does Roylance misunderstand comma splices,[22] he essentially contends that any device with an address book or speed dialing function – including a traditional telephone – is an autodialer because it is capable of storing numbers. Roylance's argument illustrates perfectly the pitfalls of an overly broad interpretation of autodialer and capacity.

---

[17] *See, e.g.*, Petition at 14-16.

[18] Comments of Gerald Roylance, CG Docket No. 02-278 at 2 (Nov. 15, 2012) ("Roylance Comments").

[19] *Id.* at 2.

[20] 47 U.S.C. § 227(a)(1).

[21] *See* Roylance Comments at 2.

[22] A comma splice is the (erroneous) use of a comma to join two independent clauses. Neither the phrase "to store or produce telephone numbers to be called," nor the phrase "using a random number generator" are stand-alone clauses. *Cf.* R.W. Burchfield, Fowler's Modern English Usage at 162 (3d ed. 2004)**;** William Strunk, Jr. and E.B. White, *The Elements of Style* (1918) ("Do not join independent clauses by a comma.") *available at* http://xrl.us/bn3t6b.

Contrary to arguments from a few TCPA plaintiffs,[23] many commenters agree that there is significant confusion in the industry surrounding the scope of the Commission's prior rulings on predictive dialers.[24]  This uncertainty is even chilling calls from parties that have obtained prior express consent.  As DirecTV explains, although prior express consent is a defense in TCPA litigation, it is a costly defense to exercise.[25]  This cost of defending a suit, coupled with the risk that an overeager plaintiffs' attorney will sue, chills legitimate business activity.  The U.S. Chamber of Commerce's comments illustrate just how expensive the discovery process can be, even when a company has a valid consent defense.[26]  In *Ryabyschuck v. Citibank (South Dakota) N.A.*, No. 11-cv-1236 (S.D. Cal. filed June 6, 2011), it still took nearly a year (and thousands of dollars) for the defendant to prevail – even though it had a valid consent defense.  The plaintiff had even alleged in his original complaint that he had consented to receiving the calls, although he later removed those allegations and was able to clear the motion to dismiss stage (the defendant succeeded in having the case decided on summary judgment).  The difficulty of prevailing on the consent defense illustrates the need for the Commission to clarify that companies can use predictive dialers to place non-telemarketing, informational calls.

---

[23]  Comments of Joe Shields, CG Docket No. 02-278 at 1 (Nov. 15, 2012) ("Shields Comments"); Roylance Comments at 1; Comments of Robert Biggerstaff, CG Docket No. 02-278 at 1 (Nov. 15, 2012).

[24] Comments of Marketing Research Association, CG Docket No. 02-278 at 6 (Nov. 15, 2012) ("Marketing Research Association Comments"); Comments of DirecTV, CG Docket No. 02-278 at 7 (Nov. 15, 2012) ("DirecTV Comments").

[25] DirecTV Comments at 1-2.

[26] Chamber Comments at 6 n.30.

**B.    Many Commenters Also Agree that the Legislative History of the TCPA Reveals that Congress Never Intended to Restrict Non-Telemarketing, Informational Use of Predictive Dialers.**

Many commenters recognize that the legislative history of the TCPA demonstrates that the autodialer restriction is targeted at telemarketing calls, not informational calls.  For example, as the Marketing Research Association explains, "[t]he Congressional sponsors . . . stated that the TCPA was focused on the use of the telephone (and associated technology) when such use is designed to encourage or sell products or services."[27]  Likewise, Varolii Corporation notes that "Congress enacted the TCPA to address no more than the use of automated equipment to engage in telemarketing."[28]  In targeting telemarketing calls, Congress did not intend for the TCPA "to be a barrier to the normal, expected or desired communications between businesses and their customers."[29]

As Congress explained, the moving force behind the TCPA was that "[t]he use of automated equipment to engage in telemarketing [wa]s generating an increasing number of consumer complaints."[30]  Increased complaints were traced to "two sources: the increasing number of telemarketing firms in the business of placing telephone calls, and the advance of technology which makes automated phone calls more cost-effective."[31]  In passing the TCPA, Congress intended to "target . . . calls that [we]re the source of the tremendous amount of

---

[27] Marketing Research Association Comments at 5 (citing H.R. Rep. No. 102-317 (1991); 137 Cong. Rec. S9874 (daily ed. July 11, 1991) (statement of Sen. Hollings); 137 Cong. Rec. 518317 (daily ed. Nov. 26, 1991) (statement of Sen. Pressler)).

[28] Varolii Comments at 3 (internal citations omitted).

[29] H.R. Rep. No. 102-317 (1991).

[30] *See, e.g.*, Sen. Rep. No. 102-178, at 1 (1991), reprinted in 1991 U.S.C.C.A.N. 1968, 1969; 137 Cong. Rec. 35302 (1991) ("The compromise gives the public a fighting chance to start to curtail unwanted telemarketing practices.").

[31] *Id.*

consumer complaints – telemarketing calls placed to the home."[32]  Congress was also particularly concerned by the threat that computerized telephone sales calls posed to public health and safety.  When telemarketers used automated equipment to dial random or sequential telephone numbers, they could tie "up all the lines of a business and prevent[] outgoing calls."[33]  Likewise, such randomly or sequentially dialed numbers tied up emergency lines and prevented true emergency calls from reaching emergency services.[34]

As CI explained in the Petition, Congress explicitly acknowledged that it did not intend to prohibit certain non-telemarketing, informational calls.  For instance, Congress explained that the Act was not intended to prevent business from using predictive dialers to deliver account-related information to customers.[35]  Indeed, the legislative history recognizes that there are certain classes of helpful calls that consumers do not mind receiving and that Congress did not pass the legislation to prohibit, such as a bank contacting a customer about his or her credit card.[36]  Thus, the legislative history of the TCPA shows that it targets telemarketing calls and is not intended to prevent businesses from making non-telemarketing, informational calls to customers.

---

[32] 137 Cong. Rec. 18123 (1991).

[33] *See, e.g.*, S. Rep. No. 102-178, at 1-2 ("Telemarketers often program their systems to dial sequential blocks of telephone numbers, which have included those of emergency and public service organizations, as well as unlisted telephone numbers.").

[34] *See, e.g.*, 137 Cong. Rec 35303 (1991); 137 Cong. Rec. 30821 (1991).

[35] *See, e.g.*, Petition at 7; 137 Cong. Rec. 35302 (1991) (describing the TCPA as allowing the Commission to exempt certain types of calls, including calls "to leave messages with consumers to call a debt collection agency to discuss their student loan"); *id.* at 35304 ("Calls informing a customer that a bill is overdue, or a previously unstocked item is now available at a store are clearly not burdensome, and should not be prohibited.").

[36] *See* 137 Cong. Rec. 30817-18 (1991).

C.   **The TCPA Provides Ample Authority for the Commission to Distinguish Between Telemarketing Calls and Non-Telemarketing, Informational Calls in Clarifying the Definition of Autodialer.**

To the extent that the Commission is concerned about facilitating abusive telemarketing practices, many commenters agree that the Commission can distinguish between telemarketing calls and non-telemarketing, informational calls when it clarifies the meaning of "capacity."[37]  In fact, the Commission made a similar distinction between telemarketing and informational calls for purposes of requiring prior express written consent in the *Robocall Report and Order*.[38]  In that decision, the Commission required prior express written consent for telemarketing calls to prevent telemarketing abuses, even though the text of the TCPA does not mention a written consent requirement.[39]  Indeed, the Commission explicitly refused to adopt an in-writing requirement for informational calls because "it would unnecessarily restrict consumer access to information."[40]  Just as the Commission distinguished between informational and telemarketing calls in clarifying the definition of prior express consent, the Commission can distinguish between informational and telemarketing calls in clarifying the definition of autodialer.[41]

Making this distinction will facilitate innovative non-telemarketing, informational uses of predictive dialers and other consumer-friendly technologies while still preventing harm from unwanted telemarketing calls.  Contrary to arguments from Joe Shields, informational calls are

---

[37] *See, e.g.*, Comments of Global Connect LLC, CG Docket No. 02-278 at 2 (Nov. 15, 2012) ("Global Connect Comments"); Comments of Global Tel*Link Corporation, CG Docket No. 02-278 at 3 (Nov. 15, 2012); Chamber Comments at 12 (Nov. 15, 2012).

[38] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, FCC 12-21 (rel. Feb. 15, 2012) ("*Robocall Report and Order*").

[39] *Id.* ¶ 21.

[40] *Id.*

[41] CI notes that the TCPA and the Commission's TCPA rules also do not define "capacity."  Nor do they define (or even reference) predictive dialers.

far less invasive than telemarketing calls.[42]  Companies contacting consumers with informational calls often have preexisting relationships with consumers.  Moreover, because of the non-telemarketing, informational purpose of the call, callers do not have the same incentive to bombard consumers that telemarketers do.  For callers placing non-telemarketing, informational calls, every random number dialed wastes valuable resources.[43]  For telemarketers, on the other hand, every random number dialed is another potential sale.  In addition to lacking this incentive to barrage consumers, informational callers, unlike telemarketers, provide a service that consumers are increasingly demanding.[44]

The Commission also does not need to worry that it will allow an end-run around the TCPA's autodialer restrictions.  For example, the Commission can recognize that loading a predictive dialer with randomly or sequentially generated numbers would render the predictive dialer an autodialer.  It can also clarify that a predictive dialer, without the current ability to randomly or sequentially generate numbers itself, has the required capacity when combined with software or equipment that randomly or sequentially generates numbers.  Without the connection of such software or equipment, however, the predictive dialer would not have the requisite capacity to store or produce randomly or sequentially generated numbers.

---

[42] Shields Comments at 2 ("Simply because the calls are not telemarketing calls does not lessen the cost to the recipients or lessen the invasion of privacy caused by the automated calls.").

[43] *See, e.g.*, Reply Comments of Portfolio Recovery Associates, CG Docket No. 02-278 at 1-2 (Sept. 10, 2012) ("Wrong party contacts are costly and time-wasting for any business that contacts consumers by telephone.").

[44] *See* Chamber Comments at 3 ("[C]onsumers are increasingly demanding the ability to receive real-time, non-marketing information from the companies with which they do business.").

### III.    COMMENTERS OVERWHELMINGLY SUPPORT THE USE OF PREDICTIVE DIALERS FOR INNOVATIVE, NON-TELEMARKETING PURPOSES.

As the comments demonstrate, predictive dialers provide significant benefits to both consumers and businesses by allowing businesses with a legitimate need to contact large numbers of specific customers and accountholders to do so accurately, efficiently, and cost-effectively.  Among the many services already provided using predictive dialers, companies contact consumers regarding time-sensitive information about home appointments, package deliveries, transportation delays, and data breach notifications.  Likewise, universities use predictive dialers to remind students about deadlines for aid applications, payments, or registration; warnings about class cancellations due to lack of payment; and alerts for school closures.[45]  Indeed, Hurricane Sandy showed the potential for predictive dialers to aid companies in using live representatives to contact consumers quickly after a natural disaster – as Global Connect explained, predictive dialers enabled the company to make over 40 million calls during the Hurricane on behalf of local municipalities and utility companies.[46]

Without predictive dialers, it would be cost-prohibitive for companies to provide many of these services.  According to Noble, predictive dialers increase the efficiency of live representatives in reaching customers by at least 200 to 300 percent: "an agent in a manual call center achieves only 15 to 20 productive minutes – that is, minutes spent in conversation with

---

[45] Comments of National Association of College and University Business Officers & Coalition of Higher Education Assistance Organizations, CG Docket No. 02-278 at 1 (Nov. 15, 2012) ("NACUBO/COHEAO Comments").

[46] Global Connect Comments at 1.

intended persons – each hour."[47]  In comparison, a modern predictive dialer increases "the average agent's productive time . . . to as much as 40 to 57 minutes per hour."[48]

Americans "are increasingly demanding the ability to receive real-time, non-marketing information from the companies with which they do business,"[49] and they continue to adopt wireless devices as their primary (and, increasingly, only) telephones.  As commenters recognize, the number of wireless-only households continues to increase.[50]  This trend is even more pronounced among the youth: "[c]ollege students and other young people are among the most likely to forgo a landline telephone altogether and rely only on cell phones."[51]  This wireless-only adoption rate can be especially problematic for institutions of higher education, which "find that, as students have become inured to email communications, they often need to call students to provide them with necessary and timely information."[52]  Confirming that today's predictive dialers are not autodialers, particularly when used for non-telemarketing, informational calls, will allow consumers that primarily rely on wireless phones to receive the information that they desire.

Predictive dialers also significantly enhance consumer privacy compared to manual dialing.  They aid companies in complying with consumer protection laws by allowing them to keep a record of how often they call and what time of day they call.  They also ensure that

---

[47] Noble Comments at 3.

[48] *Id.*

[49] Chamber Comments at 3.

[50] Marketing Research Association Comments at 10; Chamber Comments at 2 (citing Centers for Disease Control and Prevention, Stephen J. Blumberg & Julian V. Luke, *Wireless Substitution: Early Release of Estimates From the National Health Interview Survey, July-December 2011*, at 2 (June 2012)).

[51] NACUBO/COHEAO Comments at 2.

[52] *Id.* at 1.

companies do not make improper calls to numbers on Federal, state, or entity-specific do-not-call lists.[53]  Furthermore, predictive dialers significantly reduce the number of misdialed calls by eliminating human dialing errors.  Predictive dialers can even enable consumer-specific calling preferences (*i.e.*, contacting a consumer at his or her work telephone number during the day and home telephone number at night).  They can also help callers to allow a specified amount of time to lapse between calls and aid in making timely scheduled callbacks that are requested by a customer.

Predictive dialers provide these privacy (and convenience) benefits without the risks associated with prerecorded robocalls because predictive dialers require the use of live representatives.  Whereas prerecorded robocalls can be placed to thousands of consumers in just a few minutes, calls placed using a predictive dialer are limited by the number of live representatives available.  For this reason, companies using predictive dialers also do not tie up phone lines in the way prerecorded robocalls do.

By requiring live representatives, the use of predictive dialers for non-telemarketing, informational purposes also helps to create jobs for U.S. workers who are most familiar with American culture and American English.[54]  Although American workers are often paid a premium over foreign workers, this increased pay is more cost-effective when American workers spend most of their time talking on calls, as predictive dialers allow them to do.[55]  If, however, American workers have to spend a significant amount of time dialing calls, waiting for the telephone to ring, and receiving busy signals and answering machines, then it becomes more difficult to justify the increased costs.  Companies could be forced to outsource additional jobs if

---

[53] *See, e.g.*, DirecTV Comments at 4; Noble Comments at 4 n.6.

[54] Noble Comments at 6.

[55] *Id.*

they are unable to maximize worker efficiency,[56] contrary to the Chairman's efforts to bring 100,000 call center jobs back to the U.S as part of the Jobs4America initiative.

### IV.   MANY COMMENTERS AGREE THAT GRANTING THE CI PETITION WILL NOT ALLOW ANY NEW UNWANTED CALLS.

Granting the CI Petition and clarifying that today's predictive dialers are not autodialers will not authorize any new unwanted calls.  Live representatives are already allowed to dial customers manually for non-telemarketing, informational purposes.[57]  Predictive dialers merely connect these live representatives with consumers while weeding out unproductive calls.  As CenturyLink explained in its comments, "a Commission declaration allowing the use of predictive dialers generally in the context of non-marketing communications would affect only the mechanics of how some calls are made, not whether the calls are made at all or the number of calls made."[58]

Granting the CI Petition also will not provide any new ability for parties to send unwanted text messages.[59]  Companies can already send non-telemarketing, informational text messages manually.  Such callers do not have an incentive to flood customers with texts, as discussed above.  Furthermore, wireless carriers also limit the ability of companies to inundate customers with text message spam.[60]

---

[56] *Id.*

[57] *See* AFSA Comments at 4.

[58] CenturyLink Comments at 4.

[59] *Contra* Comments of Gerald Roylance, CG Docket No. 02-278 at 2 (Nov. 15, 2012).

[60] For example, the Mobile Marketing Association's U.S. Consumer Best Practices require prior express consent to send messages to mobile devices.  Mobile Marketing Association, *U.S. Consumer Best Practices*, Version 7.0, at 4 & § 1.4-1 (Oct. 16, 2012), *available at* http://www.mmaglobal.com/uploads/Consumer-Best-Practices.pdf.

Many calls are also regulated under dozens of separate Federal and state laws and regulations. For example, consumers have extensive protections from telemarketing calls based on the National Do Not Call registry as well as state and company-specific do-not-call lists. Likewise, debt collection practices are already regulated under the Fair Debt Collection Practices Act and dozens of other Federal and state consumer protection laws. The Commission does not change any of these protections by granting the CI Petition.

## V.    CONCLUSION

For the foregoing reasons, the Commission should declare that predictive dialers that are not used for telemarketing purposes and do not have the current ability to generate and dial random or sequential numbers are not autodialers under the TCPA and the Commission's TCPA rules.

Respectfully submitted,

*/s/ David Thomas*

David Thomas
Executive Director
Communication Innovators
1341 G Street, NW
Suite 1100
Washington, DC  20005
(202) 585-0258

November 30, 2012

- 16 -

Exhibit D

# Congress of the United States
## Washington, DC 20515

0619

June 19, 2013

Mignon L. Clyburn
Acting Chairwoman, Federal Communications Commission
445 12th Street, SW
Washington, D.C.  20554

Dear Chairwoman Clyburn:

In line with the mission of the Federal Communications Commission (FCC) to promote jobs, technological innovation, and enhance consumer privacy, we write to request clarification of the applicability of the Telephone Consumer Protection Act ("TCPA") to predictive dialers.  Specifically, we encourage the FCC to expeditiously consider the Communication Innovators ("CI") Petition for Declaratory Ruling and issue a ruling on the merits.

Congress passed the TCPA more than twenty years ago to protect consumers against unwanted telemarketing calls and to prevent callers from endangering public safety by tying up blocks of telephone lines.  Unfortunately, the FCC's 2003 and 2008 TCPA autodialer decisions have created significant confusion for companies that use predictive dialers to initiate live calls for non-telemarketing purposes, including for a variety of communications that may not have been anticipated by the FCC.  This confusion and regulatory uncertainty has resulted in a surge in TCPA class action litigation, with plaintiffs' attorneys seeking millions of dollars from a wide array of leading, established companies.

The CI Petition for Declaratory Ruling seeks to resolve the existing confusion over the use of predictive dialers for non-telemarketing purposes.  It asks the FCC to clarify, consistent with the text of the TCPA and Congressional intent, that predictive dialers which: (1) are not used for telemarketing purposes; and (2) do not have the current ability to generate and dial random or sequential numbers, are not "autodialers" under the TCPA and the FCC's TCPA rules.

We urge the FCC to expeditiously consider this Petition and promptly issue a ruling on the merits.  Thank you in advance for your time and attention to this matter.  We look forward to your response.

Sincerely,

Duncan Hunter
Member of Congress

Scott Peters
Member of Congress

Juan Vargas
Member of Congress

cc:
Commissioner Jessica Rosenworcel
Commissioner Ajit Pai



# FEDERAL COMMUNICATIONS COMMISSION

September 10, 2013

**Mignon L. Clyburn**
**Acting Chairwoman**

The Honorable Duncan Hunter
U.S. House of Representatives
223 Cannon House Office Building
Washington, DC 20515

Dear Congressman Hunter:

Thank you for your letter regarding Communication Innovators' Petition for Declaratory Ruling. I appreciate your interest in this matter and am pleased to provide the enclosed letter on this issue from the Acting Chief of the FCC's Consumer and Governmental Affairs Bureau.

If you have any additional questions or need any further assistance, please do not hesitate to contact me.

Sincerely,

Mignon L. Clyburn

Enclosure



Federal Communications Commission
Washington, D.C. 20554

September 10, 2013

Control No.  1300619

The Honorable Duncan Hunter
U.S. House of Representatives
223 Cannon House Office Building
Washington, D.C. 20515

Dear Congressman Hunter:

Thank you for your letter regarding the Petition for Declaratory Ruling filed with the
Federal Communications Commission (Commission) by Communication Innovators on
June 7, 2012.  The Petition seeks clarification that predictive dialers that are not used for
marketing purposes and that do not have the current ability to generate and dial random
or sequential numbers do not fall within the definition of "automatic telephone dialing
system" as used in the Telephone Consumer Protection Act (TCPA), which is codified as
47 U.S.C. § 227.  In your letter, you encourage the Commission to consider the Petition
and issue a ruling on the merits.

A draft order to resolve the Petition is under consideration by the Commission, and
Communication Innovators has met with the staff recently to discuss the matter.  We take
seriously the issues raised in the Petition and the potential impact on consumers, and
expect the Commission to resolve it soon.

I appreciate your interest in this important matter.  Should you have additional questions
or concerns, please do not hesitate to contact me.

Sincerely,

Kris Anne Monteith
Acting Chief
Consumer and Governmental Affairs Bureau



**FEDERAL COMMUNICATIONS COMMISSION**

September 10, 2013

Mignon L. Clyburn
Acting Chairwoman

The Honorable Scott Peters
U.S. House of Representatives
241 Rayburn House Office Building
Washington, DC  20515

Dear Congressman Peters:

Thank you for your letter regarding Communication Innovators' Petition for Declaratory Ruling.  I appreciate your interest in this matter and am pleased to provide the enclosed letter on this issue from the Acting Chief of the FCC's Consumer and Governmental Affairs Bureau.

If you have any additional questions or need any further assistance, please do not hesitate to contact me.

Sincerely,

Mignon L. Clyburn

Enclosure



Federal Communications Commission
Washington, D.C. 20554

Control No.   1300619

September 10, 2013

The Honorable Scott Peters
U.S. House of Representatives
2410 Rayburn House Office Building
Washington, D.C. 20515

Dear Congressman Peters:

Thank you for your letter regarding the Petition for Declaratory Ruling filed with the
Federal Communications Commission (Commission) by Communication Innovators on
June 7, 2012.  The Petition seeks clarification that predictive dialers that are not used for
marketing purposes and that do not have the current ability to generate and dial random
or sequential numbers do not fall within the definition of "automatic telephone dialing
system" as used in the Telephone Consumer Protection Act (TCPA), which is codified as
47 U.S.C. § 227.  In your letter, you encourage the Commission to consider the Petition
and issue a ruling on the merits.

A draft order to resolve the Petition is under consideration by the Commission, and
Communication Innovators has met with the staff recently to discuss the matter.  We take
seriously the issues raised in the Petition and the potential impact on consumers, and
expect the Commission to resolve it soon.

I appreciate your interest in this important matter.  Should you have additional questions
or concerns, please do not hesitate to contact me.

Sincerely,

Kris Anne Monteith
Acting Chief
Consumer and Governmental Affairs Bureau



# FEDERAL COMMUNICATIONS COMMISSION

September 10, 2013

Mignon L. Clyburn
Acting Chairwoman

The Honorable Juan Vargas
U.S. House of Representatives
1605 Longworth House Office Building
Washington, DC  20515

Dear Congressman Vargas:

Thank you for your letter regarding Communication Innovators' Petition for Declaratory Ruling.  I appreciate your interest in this matter and am pleased to provide the enclosed letter on this issue from the Acting Chief of the FCC's Consumer and Governmental Affairs Bureau.

If you have any additional questions or need any further assistance, please do not hesitate to contact me.

Sincerely,

Mignon L. Clyburn

Enclosure

445 12th Street S.W. Washington, D.C. 20554  (202) 418-1000



Federal Communications Commission
Washington, D.C. 20554

Control No.  1300619

September 10, 2013

The Honorable Juan Vargas
U.S. House of Representatives
1605 Longworth House Office Building
Washington, D.C. 20515

Dear Congressman Vargas:

Thank you for your letter regarding the Petition for Declaratory Ruling filed with the
Federal Communications Commission (Commission) by Communication Innovators on
June 7, 2012.  The Petition seeks clarification that predictive dialers that are not used for
marketing purposes and that do not have the current ability to generate and dial random
or sequential numbers do not fall within the definition of "automatic telephone dialing
system" as used in the Telephone Consumer Protection Act (TCPA), which is codified as
47 U.S.C. § 227.  In your letter, you encourage the Commission to consider the Petition
and issue a ruling on the merits.

A draft order to resolve the Petition is under consideration by the Commission, and
Communication Innovators has met with the staff recently to discuss the matter.  We take
seriously the issues raised in the Petition and the potential impact on consumers, and
expect the Commission to resolve it soon.

I appreciate your interest in this important matter.  Should you have additional questions
or concerns, please do not hesitate to contact me.

Sincerely,

Kris Anne Monteith
Acting Chief
Consumer and Governmental Affairs Bureau

Exhibit E

Before the
**Federal Communications Commission**
Washington, DC 20554

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Rules and Regulations Implementing the | ) |
| Telephone Consumer Protection Act of 1991 | )   GC Docket No. 02-278 |
| | ) |
| Petition of YouMail, Inc. For Expedited | ) |
| Declaratory Ruling That YouMail's Service | ) |
| Does Not Violate the TCPA | ) |

**PETITION FOR EXPEDITED DECLARATORY RULING**

**YOUMAIL, INC.**

Lauren Lynch Flick
Andrew D. Bluth
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037

Its Attorneys

Dated:  April 19, 2013

**Summary**

YouMail is a small, start-up technology company that offers smart phone users a software-based menu of advanced voicemail features. YouMail's service can function in the nature of a "virtual receptionist," responding to calls received by and voicemail messages left for the YouMail subscriber. Both the caller and the YouMail subscriber benefit from the virtual assistant's abilities, such as customizing greetings to different categories of callers, sending a text message in response to a voicemail left for a subscriber letting the caller know that the voicemail message was received and will be acted on, and even managing the types of abusive telemarketing calls from which the TCPA seeks to protect consumers. The virtual assistant empowers consumers and businesses to manage their telephone interactions with features that are highly customizable to best facilitate efficient one-to-one communications between the caller and the called party, ultimately cutting down on the number of misdirected, fruitless, and potentially privacy endangering phone communications consumers and businesses endure. The YouMail service has been embraced by professionals, tradespeople, large and small businesses, and everyday consumers.

However, as was the case in the Commission's recent <u>Soundbite</u> decision, YouMail has been the target of ruinous class action lawsuits premised on three arguments. First, class action plaintiffs' lawyers characterize YouMail's software that enables sending of the optional text confirming receipt of a caller's voicemail message as an Automatic Telephone Dialing System ("ATDS"). Next, these litigants argue that YouMail is the sender of the responsive text messages. Finally, the litigants argue that callers who leave voicemail messages do not consent to receiving a text message in response to their messages.

As the agency with expertise in defining what constitutes an ATDS, YouMail submits that the FCC should declare that YouMail's software, which was specifically designed to provide

only the types of virtual assistant services described here, lacks the current capacity to "store or produce numbers to be called using a random or sequential number generator" and therefore is not an ATDS under the TCPA. Litigants' focus on whether a system could, under any conceivable circumstance, be modified to be "capable" of randomly or sequentially dialing a telephone number needlessly embroils innovators in crippling class action litigation and retards their ability to provide consumers with the beneficial products made possible by the types of technological advances for which the Commission and Congress have set the stage.

Moreover, the Commission should continue to lead in reaching common sense decisions in interpreting the TCPA, as it did in its <u>Soundbite</u> decision. YouMail's experience demonstrates that callers who leave voicemail messages almost *universally* request a return communication in their voicemail messages. The text response the caller can receive from a YouMail subscriber is beneficial, providing the caller with valuable information, for example, the fact that a plumber they have tried to contact is at a worksite and will return calls within a certain timeframe. It is precisely the same benefit that the consumer receives from the confirmatory opt-out text at issue in <u>Soundbite</u> and a technological advance that empowers consumers which the Commission should promote. The Commission should recognize as well that YouMail is not the sender of the confirmatory text message. It is a system provider. The text message is part of the private conversation that begins with the caller leaving a voicemail message and the recipient opting to set up a text response to such a voicemail.

Finally, it is respectfully requested that the Commission expedite its consideration of this Petition as the pendency of class action litigation threatens the survival of YouMail, Inc. and the continuation of the many unchallenged services it provides its subscribers.

ii

## Table of Contents

**Page**

Summary......................................................................................................................... i

I.  **YouMail's Virtual Receptionist Is the Type of Innovative, Consumer-Friendly Technology Advance that Communications Policy Seeks to Foster**.................................. 2

    A.  YouMail's Service Benefits Consumers Who Are YouMail Subscribers......................... 2

    B.  YouMail's Service Benefits Consumers Who Call YouMail Subscribers ......................... 4

    C.  YouMail Benefits a Wide Array of Subscribers Who Use the Service in a Wide Variety of Ways ............................................................................................................................ 5

    D.  Calling Parties Benefit From YouMail's Features.......................................................... 6

    E.  YouMail's Auto-reply Technology Empowers Consumers ............................................ 7

II.  **YouMail's Auto-Reply Feature Does Not Violate the TCPA**........................................... 8

    A.  YouMail's System Is Not An ATDS ............................................................................... 9

    B.  YouMail Does Not Initiate A Call Within The Meaning of the TCPA ........................... 11

    C.  Callers Consent to Receiving Responsive Texts When Leaving Voicemail Messages.... 13

Conclusion ...................................................................................................................... 14

Before the
# Federal Communications Commission
Washington, DC 20554

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Rules and Regulations Implementing the | ) |
| Telephone Consumer Protection Act of 1991 | )   GC Docket No. 02-278 |
| | ) |
| Petition of YouMail, Inc. For Expedited | ) |
| Declaratory Ruling That YouMail's Service | ) |
| Does Not Violate the TCPA | ) |

## PETITION FOR EXPEDITED DECLARATORY RULING

YouMail, Inc., ("YouMail"), by its attorneys and pursuant to 47 C.F.R. § 1.2 of the rules

and regulations of the Federal Communications Commission, hereby respectfully requests that

the Commission declare that the YouMail service does not violate the Telephone Consumer

Protection Act of 1991 ("TCPA")[1] and the Commission's rules and regulations implementing it.

YouMail is a start-up technology company offering smart phone users a software-based menu of

advanced voicemail features that can function in the nature of a "virtual receptionist" to enable

consumers and businesses to manage their telephone interactions across their many personal and

professional circles.  YouMail offers many consumer-friendly and common sense features, but as

was the case in the Commission's recent Soundbite[2] decision, finds itself the target of ruinous

class action lawsuits premised on arguments that callers do not consent to receiving a one-time

text confirming receipt of their voicemail message; that YouMail's software that enables sending

of those texts somehow constitutes an Automatic Telephone Dialing System ("ATDS"); and that

YouMail is the sender of those texts.

YouMail submits that, as the agency with the expertise in defining what constitutes an

ATDS, the FCC must set some boundaries as to when a system or service has the requisite

---

[1]  Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991) *codified at* 47 U.S.C. § 227.

[2]  27 FCC Rcd 15391 (2012).

"capacity" to "store or produce numbers to be called using a random or sequential number generator." Without such guidance, innovative and beneficial products and practices which were never intended to be foreclosed by the TCPA will be needlessly prevented from coming to market. YouMail further submits that the confirmatory text messages that its subscribers can choose to send via the service are not initiated by YouMail in the first instance, and, in any event, constitute the same type of common sense, consumer-friendly messages that the Commission deemed consumers to consent to in the Soundbite decision.

Given the pendency of class action litigation addressing these very same interpretations of the TCPA, YouMail respectfully requests that the Commission expedite its consideration of this Petition. As a small start-up, YouMail's survival and the continuation of the many unchallenged services it provides its subscribers are at risk.

## I.      YouMail's Virtual Receptionist Is the Type of Innovative, Consumer-Friendly Technology Advance that Communications Policy Seeks to Foster

YouMail provides a service that allows smartphone users to replace the default voicemail options provided by their wireless telephone providers with a fully customizable suite of advanced telephone answering functions. It cannot be stressed enough that, since these functions are inherently answering service functions, they are reactive to the caller's action of initiating a conversation with the YouMail subscriber by dialing the YouMail subscriber's telephone number and leaving a voicemail message. YouMail's features merely facilitate the conversation by serving as a "virtual receptionist."

### A.      YouMail's Service Benefits Consumers Who Are YouMail Subscribers

A powerful, and free, function that YouMail offers its subscribers is its "smart greetings" function. This function allows the YouMail subscriber to create multiple personalized answering messages tailored to the calling party. For example, the subscriber can set up the service to greet callers by name when the system can identify the caller from the subscriber's contact list or the service's enhanced caller identification functions. In addition, the subscriber can establish multiple personalized outgoing answering messages based on who the calling party is. Thus, the

2

subscriber can set up a professional answering message for business contacts in its contact list, a very private message to the subscriber's spouse, and yet another message for friends. Smart greetings also empower YouMail subscribers to control threatening or harassing calls. An abusive partner can receive a message that the phone number called is not in service, while phone solicitors can receive a message asking that the subscriber be put on the company's do not call list.

YouMail subscribers can also control how they review voicemails that are left for them. In addition to a standard playback feature on the handset or from a separate call-in phone number, voicemail messages can be forwarded to the subscriber by email or the subscriber can review them by logging in from a computer when they are unable to use their smart phone to do so. Via a paid feature, subscribers can have voicemail messages transcribed into text which they can then access on their handset, by email or SMS text message. YouMail subscribers can also program the YouMail system to create an "extended information page" for each voicemail message they have received. The extended information page contains information such as the calling party's caller identification from YouMail's enhanced caller identification feature.

Finally, the YouMail service provides subscribers with the option of sending a reply text message, called an auto-reply, in response to a voicemail message that has been left for the subscriber by the calling party. As with YouMail's other features, auto-replies can be highly customized and personalized. First, the subscriber can choose whether to send any auto-replies or none. The subscriber can choose to send auto-replies only to some categories of callers, and to send only one auto-reply to a given caller, regardless of how many times they call. Other options allow the subscriber to establish how the subscriber's name appears in the auto-reply and to provide a special message such as indicating exactly when the subscriber will be available to return the call. Finally, the subscriber can provide a link to the extended information page for the call. This link allows the calling party to review information about the call or the subscriber, such as their website URL or email address, and to leave additional information about

3

themselves that will be helpful to the subscriber in making the return call, if they so desire. As a result of all these options, an auto-reply is only sent by text if all of the following conditions exist: (1) the subscriber has set his or her options to send a text auto-reply to some group of callers; (2) the calling party falls into that group; (3) the calling party has NOT opted out of receiving auto-replies; and (4) sufficient "caller id" information is available to send the text. All of this is determined by the YouMail subscriber; the role YouMail provides is the technology to proceed through the logic described above and carry out the subscriber's settings.

### B.      YouMail's Service Benefits Consumers Who Call YouMail Subscribers

As noted above, the calling party receives many benefits from YouMail's features. For example, the calling party can receive an appropriate and personalized greeting allowing them to be sure their call has been connected to the correct party, as opposed to having dialed a wrong number. The calling party that receives an auto-reply has further confirmation that his or her message has reached the correct party and gains additional information about the YouMail subscriber, to include when he or she will be available to return the call. In addition, calling parties can establish a limited account which, like the vast majority of YouMail's other features is free to the user, and gives the calling party certain controls whenever calling a YouMail subscriber. Specifically, a limited account can be used to create a caller profile so that when calling another YouMail subscriber, the calling party is identified to the YouMail subscriber in the manner the calling party desires, such as only giving a first name or providing a full business title. Through the limited account, the calling party can also control whether and how it receives auto-replies from YouMail subscribers who have elected to offer them. A limited account holder can affirmatively opt-out of receiving ANY auto–receipts from ANY YouMail subscriber. Or, the limited account holder can specify that auto-replies should be forwarded by email to a specific address, as well as by text. A limited account holder can also access the "extended information" page for a message that he or she has left and thus has a record of the call made and message left. Where the YouMail subscriber that was called has activated the transcription

function, the limited account holder can access the transcription to verify that is was correctly conveyed through the voice to text transcription process.  Given these benefits to the calling party, nearly ONE MILLION people have signed up for such limited accounts solely for the purpose of enhancing their interaction with other YouMail subscribers.

### C.    YouMail Benefits a Wide Array of Subscribers Who Use the Service in a Wide Variety of Ways

YouMail's subscribers come from all walks of life, businesses and industries.  From its customer service contacts and attending business conventions such as the National Association of Realtors and CTIA-The Wireless Association, as well as through profile information, such as email addresses and business titles that subscribers provide at the time they sign up for the service, it is evident that YouMail subscribers include professionals such as realtors, lawyers, and loan officers, trades people such as plumbers and electricians, and individuals who have identified themselves as "mom" or "student."

YouMail subscribers come to the service in a variety of ways:

- **Large Business Users**:  Some subscribers are individual users within a large enterprise, such as Southern Care, Inc., which have made the service available and encouraged or mandated its use by employees.  Others are individual loan officers, mortgage consultants and private bankers within entities like Wells Fargo, Bank of America, and Chase.

- **Small Business Users**:  Some subscribers are small business people, such as contractors, design consultants, electricians, plumbers, landscapers, cable and satellite television installers, housekeepers, carpet cleaners, health care professionals, personal trainers, real estate agents, lawyers, and others.

- **Small Wireless Providers**:  In some cases, a wireless telephone company has selected the YouMail service to serve as a primary or preferred option for its customers and set it as the default.

- **Personal/Family Users**:  As noted, many subscribers identify themselves as "mom" or "student" and have email addresses through services such as Gmail, Hotmail, and the like.

5

The uses to which YouMail users put the service are as varied as the users themselves. Personal users take advantage of the smart greetings option to have special greetings for their family members and friends. They also share voicemails, such as sung birthday greetings among family and friends or on social media. They even use the smart greetings function to let callers know that they do not listen to voicemail and would prefer to receive text or email messages. Finally, they use the service to manage telemarketing contacts and threatening or dangerous callers. Business users use the service in many of the same ways but with a business focus.

The auto-reply feature allows subscribers to provide an even more personalized response to the called party. For example, a plumber on a job site can program an auto-reply to send a text message to a caller who has left a voicemail message and advise the caller that the plumber is on a job site and will take a break to return messages every half hour. In this way, the caller can know that their message went to the correct party and that it is not likely to simply sit unanswered until the end of the day or over a weekend while the consumer deals with the emergency. The plumber can also include in the auto-reply a link to the extended information page and ask the caller to provide additional information about their issue so that both the plumber and the caller can move quickly to the substance of the conversation when the plumber makes the return call. And, again, this feature is triggered by the recipient of the auto-reply initiating the call to the YouMail subscriber and leaving a message.

### D.     Calling Parties Benefit From YouMail's Features

A blind database search of transcribed YouMail voicemail messages, while not a comprehensive record of all messages, nevertheless shows that more than 75% of callers speak the following words: "return [my] call," "hear back," "call [me] back," or provide a specific telephone number. In fact, half of all the messages contained a telephone number. Some messages also use the term "text" or "TXT" indicating a specific desire by the caller to be contacted by text. In addition to leaving messages that indicate a desire for a response, calling parties who are offered a link to the extended information page in an auto-reply will click on it to

6

see information about the message they have left, see how their caller id information appears, verify that a message that has been transcribed was transcribed correctly, or to opt out of the receipt of future auto-replies from any YouMail user.

### E.     YouMail's Auto-reply Technology Empowers Consumers

YouMail developed the software that enables all of the YouMail functions as a "home grown" program tailored to the specific functions that the service offers.  The software runs on generic hardware according to the specific protocol of the software program and the user's settings.  When an auto-reply is sent, it is done in response to a caller having left a voicemail message for a subscriber and only when the subscriber has set its settings to do so.

To physically accomplish delivery of an auto-reply, the service must navigate a variety of paths, depending on the wireless carrier through which the recipient has his or her cellular service.  Where a wireless provider has enabled the YouMail service for its customers, YouMail's system delivers the text message to the wireless carrier, which generally delivers the message as if it came from the telephone company itself, at no charge.  Where the recipient is the customer of one of the large national carriers, YouMail must generally deliver the message to that company's "email gateway."  The carrier then forwards the auto-reply to its customer identifying the YouMail subscriber as the sending party.  Finally, other wireless carriers require YouMail to deliver the auto-reply to an SMS gateway provider.  In these cases, YouMail delivers the message to OpenMarket, which forwards it as an SMS message to the telephone company for delivery to its customer.

In these operations, You Mail acts in the role of a common carrier, simply delivering the message that was triggered by the caller leaving a message and the subscriber directing that an auto-reply be sent to the caller.  The system does not store or produce any telephone numbers randomly or sequentially, or dial them from any database or list.  It only sends a single text response, when instructed to do so by a subscriber's settings, to a single recipient who previously contacted the subscriber and initiated a conversation by leaving a voicemail message.

7

Despite the single request-single response design of YouMail's auto-reply function, the vast array of contexts in which YouMail subscribers opt to send auto-replies, the personalized content of those messages, and the myriad pathways through which an auto-reply must travel, YouMail has become the object of various class action lawsuits alleging that its service constitutes an ATDS. Moreover, despite all the indicia of consent to receive a response to their voice messages and the benefits to consumers of receiving that response, these litigants claim that YouMail auto-replies are "unsolicited." As a result, these lawsuits seek enormous damages for asserted violations of the TCPA, and the cost simply to respond to these lawsuits is crippling.

## II.   YouMail's Auto-Reply Feature Does Not Violate the TCPA

Congress passed the TCPA to "address a growing number of telephone marketing calls and certain telemarketing practices Congress found to be an invasion of consumer privacy."[3]  In Section 227(b)(1), Congress specifically addressed the use of some types of automated telephone equipment, providing:

> (b)   Restrictions on the use of automated telephone equipment.
>
> (1)   Prohibitions. - It shall be unlawful for any person within the United States or any person outside the United States if the recipient is within the United States--
>
> (A)   to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice
>
> (iii)  to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.[4]

---

[3]   In the Matter of the Rules and Regulation Implementing the Telephone Consumer Protection Act of 1991, Request of ACA International for Clarification and Declaratory Ruling, 23 FCC Rcd 559 (2008) at ¶ 2 [hereinafter ACA Declaratory Ruling].

[4]   47 U.S.C. §227(b)(1)(A)(iii).

The Commission's implementing regulations similarly restrict initiating a call using an ATDS or a pre-recorded voice to a telephone number assigned to a cellular telephone service. The FCC has interpreted the term "call" as used in this section to include text messages.[5]

As a result, class action litigants have attempted to cast the system by which YouMail's subscribers can send auto-replies in response to voicemail messages as constituting an ATDS. An ATDS is defined as: [E]quipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers.[6]

### A.    YouMail's System Is Not An ATDS

As noted above, YouMail developed its system to provide the specific functions that it currently provides.  That is, it was designed to respond <u>one time</u>, to <u>a single input</u>, and only when instructed by a user's settings to do so and when adequate caller id information is available in the system to complete the text delivery.  It was <u>not</u> created to store or produce or dial telephone numbers in any random or sequential manner or even to call them from a list or database, all of which have been found to be problematic.  Not surprisingly, since it was not designed to do any of these things, it does not.

In adopting its rules implementing the TCPA, the FCC recognized early on that an essential element of the definition of an ATDS was random or sequential dialing.  For example, debt collectors were concerned that the Commission's provisions requiring identification of the calling party at the beginning of an automated call placed for debt collection purposes would conflict with requirements of the Fair Debt Collection Practices Act, which prohibit debt collectors from disclosing the debt collection nature of their call.  The Commission responded that the identification provisions did not apply to debt collection calls because they "are not

---

[5]  <u>In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991</u>, 18 FCC Rcd 14014 (2003) at ¶ 165 [hereinafter <u>2003 TCPA Order</u>].

[6]  47 U.S.C. §227(a)(1).

9

autodialer calls (i.e., dialed using a random or sequential number generator)."[7]  In response to concerns about the impact of the new rules on voice messaging services, the Commission similarly stated that "the prohibitions of § 227(b)(1) clearly do not apply to functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message services (PTDMS), because the numbers called are not generated in a random or sequential fashion."[8]

Later, however, in considering whether predictive dialers constitute ATDS equipment under the TCPA, the Commission noted that in most cases, predictive dialers are programmed with a list of numbers to be called.[9]  Accordingly, the FCC narrowed its focus, saying that the "statutory definition contemplates autodialing equipment that either stores or produces numbers"[10] and which "need only have the 'capacity to store or produce telephone numbers . . .'"[11] to be considered an ATDS.

Courts ruling on allegations of TCPA violations similarly focus on the equipment's capacity rather than its actual use.  For example, the Ninth Circuit in its decision in Satterfield v. Simon & Schuster, Inc.,[12] ruled that when determining whether a system is an ATDS, the relevant inquiry is to focus on whether the system has the capacity to store or produce telephone numbers to be called via a random or sequential number generator.  As a result, the focus of litigants' attention has become whether a system could ever, under any circumstances, be modified to undertake the activities associated with an ATDS.  This focus then devolves into a detailed factual analysis that can only be completed after long and expensive discovery and

---

[7]  In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order, 7 FCC Rcd 8752 (1992) at ¶ 39 [hereinafter 1992 TCPA Order]; see also In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Memorandum Opinion and Order, 10 FCC Rcd 12391 (1995) at ¶ 19 (Debt collection calls are not autodialed calls because they "are not directed to randomly or sequentially generated telephone numbers, but instead are directed to the specifically programmed contact numbers for debtors.")

[8]  1992 TCPA Order at ¶ 47.

[9]  2003 TCPA Order at ¶ 131.

[10]  Id. at ¶132.

[11]  Id.

[12]  569 F.3d 946 (9th Cir. 2009).

litigation, substantially burdening innovative service providers trying to provide beneficial and efficient products to the marketplace.[13]

Moreover, one can appreciate the endless rabbit trails associated with evaluating whether a device could be reprogrammed in the future to meet the definition of an ATDS.  Much like any ordinary computer could (with a complete overhaul) be transformed into a device to launch nuclear missiles, any desktop computer or smart phone could be modified to store telephone numbers to be called by a sequential number generator and dial those numbers.  However, the need for future modification, by definition, means those devices (and YouMail's system) do not meet the definition of ATDS presently.  Thus, while YouMail appreciates the need to have a flexible definition of an ATDS so that the TCPA and the FCC's rules implementing it can remain current with technological developments,[14] without some guidance, the evolution of the definition of the term ATDS is limited only by class counsel's imagination, or worse yet, will come to encompass every type of telephonic device in existence, thereby preventing anyone from calling a cellular phone number without express consent or except in an emergency.  Accordingly, YouMail submits that the Commission affirmatively state that only equipment that has a current capacity to store and produce telephone numbers to be called using a random or sequential number generator—and is currently being used for that purpose—should be considered an ATDS.

## B.    YouMail Does Not Initiate A Call Within The Meaning of the TCPA

The TCPA prohibits a person from "mak[ing]" a "call" to a cell phone using an automatic telephone dialing system or an artificial or prerecorded voice.[15]  The Supreme Court has employed the definition of the word "make" as "to cause to exist, appear or occur."[16]  Akin to a

---

[13] In Satterfield, the court remanded the case to the lower court for a factual determination as to what the equipment in use was capable of doing.

[14] 2003 TCPA Order at ¶ 132 ("It is clear from the statutory language and legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies.") (citation omitted).

[15] 47 U.S.C. § 227(b)(1)(A).

[16] United States v. Giles, 300 U.S. 41, 48 (1937).

telephone service provider (exempt from TCPA liability), which provides the infrastructure to connect the call initiated by the calling party, YouMail does not "make" calls because it does not cause the call to occur.[17]  Rather, the initiating party—in this case the YouMail subscriber who has requested that an auto-reply be sent—is the party "making" the call because the subscriber causes the call to exist by setting its YouMail preferences to request auto-replies.  Without the initiating party, there would be no call at all.

YouMail is a startup technology company that provides a software-based service. YouMail does not dictate whether any call is made, the time a call is made, or the telephone number to which a call is made or an auto-reply is sent.  You Mail has no influence over the content of the message selected by the subscriber. The sending of an auto-reply begins with the calling party dialing the YouMail subscriber's telephone number and leaving a voice message. As shown above, such messages almost universally request a return communication from the YouMail subscriber.  That request is only acted on, though, if the YouMail subscriber directs that it should be through his or her settings, AND if the intended recipient of the auto-reply has not previously opted out of receiving auto-replies.  YouMail's software simply applies logic decisions upon request from the subscriber to confirm that the recipient can receive an auto-reply, and apply the message pre-selected by the subscriber. It no more "makes" a call under the TCPA than does the provider of telephone lines or cellular networks.  YouMail is merely the service by which execution of the subscriber's call is arranged.

The above described mechanics of the YouMail system provide for private parties' ability to communicate with one another in an efficient and consumer-friendly manner.  Congress did not intend to limit such communications or limit the telephone numbers by which they do so, and the Commission has acknowledged that liability for any violation of the TCPA would fall on the subscriber of the service used to make the calls, not carriers providing the services.[18]

---

[17] See also Black's Law Dictionary 784 (6th ed. 1990) defining "initiate" as to "commence; start; originate; introduce; inchoate."

[18] 1992 TCPA Order at n. 83 ("We emphasize that where [speed dialing, call forwarding or public telephone delayed message services] are used for the purpose of telephone solicitation in violation of our rules and the

12

### C.     Callers Consent to Receiving Responsive Texts When Leaving Voicemail Messages

Finally, it must be remembered that the entire process that leads to the sending of an auto-reply is set into motion because the calling party wanted to communicate with the YouMail subscriber.  To do so, the caller secured that subscriber's telephone number, dialed it, listened through a greeting message that could alert the caller if he or she has called the wrong person, and finally left a voicemail message.  As detailed above, YouMail's experience (as common sense suggests) shows that the leaving of a message almost universally signifies that the caller wishes to receive a return communication.  Indeed, Congress recognized the day to day reality of such interactions and said "the called party has in essence requested the contact by providing the caller with their telephone number for use in normal business communications."[19]

The Commission also has acknowledged that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary."[20]  Based on this common sense approach, the Commission has held that debtors who provide a cellular telephone number during a transaction which gives rise to a debt provide the required "prior express consent" to receive auto-dialed and prerecorded calls from debt collectors in connection with that debt.[21]  Similarly, in its recent Soundbite decision, the Commission found that there was sufficient indicia of consent in the context of "unsubscribing" to a text service, to conclude that consumers consent to the receipt of a text message confirming their opt-out election.[22]

The auto-reply feature at issue here is no different from the confirmatory text message in Soundbite.  The sending of an auto-reply is a common courtesy and smart business practice akin

---

TCPA, the users of the services, not the cariers providing the services, would be held liable, consistent with Congress' policy that carriers not be held responsible for the content of messages transmitted through the network.") (citation omitted).

19 House Report 102-317, 1st Sess., 102nd Cong. (1991) at p. 13.

20 1992 TCPA Order at ¶ 31 (citing id.).

21 See ACA Declaratory Ruling at ¶ 9.

[22] 27 FCC Rcd 15391 (2012).

to an out-of-office reply email message. It is only sent in response to the caller's action of leaving a voicemail message and provides benefits to the consumer by confirming receipt of the message and providing additional information about the consumer's interaction with the called party. Further, the sending of an auto-reply is a one-time event that occurs in close proximity to the calling party leaving a message for a You Mail subscriber. The debt collection calls that the Commission approved in the <u>ACA Declaratory Ruling</u>, in contrast, may not occur until long after the debt was contracted. In the case of a revolving credit account, the debtor may remain current on the account for a long period of time before defaulting and triggering a debt collection call. In addition, debt collection calls may be repeated and occur over a long period of time, depending on the severity of the default.

## Conclusion

The Commission has acknowledged that "the overall intent of Section 227 is to protect consumers from unrestricted telemarketing, which can be an intrusive invasion of privacy."[23] That intention is being subverted by aggressive class action lawsuits that thwart the development of beneficial telephone communication services and products. These technological advances, rather than unleashing an onslaught of unsolicited marketing messages that tie up phone lines and disturb consumers at home and at all hours, are facilitating more efficient one-to-one communications between parties, ultimately cutting down on the number of misdirected, fruitless, and potentially privacy endangering phone communications consumers and businesses alike endure.

Given the history of telemarketing abuses that have led to the enactment of the TCPA, establishment of the Do Not Call list, and passage of other laws at the state level, it is clear that there is great sensitivity to the potential that a system or service might bulk dial consumers and deliver an irrelevant, generic message to them. In 2011, the Attorney Generals of all 50 states

---

[23] <u>In the Matter of the Telephone Consumer Protection Act of 1991</u>, <u>Notice of Proposed Rulemaking</u>, 7 FCC Rcd 2736 (1992) at ¶ 9.

and four territories implored Congress to reject H.R. 3035, which they claimed would have revised the definition of an ATDS and permit callers to contact consumers at a telephone number the consumer provided at any time and in any manner. The results the Attorney Generals envisioned were "that a wireless subscriber could be subjected to any number of robotic 'informational' follow-up calls just because he or she visited a store or website. Consumers will not even be able to opt-out of receiving these robo-calls under the proposed legislation."[24] They went on to say that, since most modern equipment uses preprogrammed lists of telephone numbers, the revision to the definition of ATDS would "effectively allow telemarketers to robo-dial consumers just by avoiding already antiquated technology."[25] However, none of the concerns raised by the Attorney Generals even come into play with the YouMail service.

YouMail auto-replies are not sent via any prohibited ATDS technology. The system provides a one-time message, when directed to do so by the subscriber, in response to a voicemail message left for the subscriber -- which message almost universally seeks a return communication from the subscriber.[26] The content of the auto-reply is dictated by the subscriber and can be personalized to maximize the efficiency of communication between the caller and the subscriber. YouMail's service would have to be substantially transformed to even begin to have the capacity to fulfill the feared functions of an ATDS, such as bulk delivery of a uniform message to large numbers of unaffiliated households. Sadly, this fact does not matter in today's litigation environment. The devastating litigation costs involved in merely establishing what a system's capabilities are or could be have proven to be ruinous to YouMail, and, it appears, to other companies facing class action lawsuits under the TCPA as well.

Given this sorry state of affairs, the FCC, the agency with expertise in this area, should provide guidance as to how today's advanced technologies, which are so often privacy-

---

24 See Letter to Members of Congress, GC Docket 02-278 (December 7, 2011) at 2.

25 Id. at 3.

26 This is a far cry from the indiscriminate bulk dialing of numbers "without human intervention" which the FCC now considers to be the "basic function" of an ATDS. See 2003 TCPA Order at ¶ 132.

15

enhancing, can be deployed without running afoul of the TCPA. To YouMail, the solution is simple. End the endless factual inquiry into the equipment's potential future capabilities by holding that only its current capabilities, as currently in use, matter for purposes of the definition of an ATDS in the TCPA.

Finally, the benefits of YouMail's auto-replies are at least as substantial as the benefits of the confirmatory text messages at issue in the <u>Soundbite</u> case. The YouMail service gives consumers and businesses more control over their telephone communications, including providing effective tools to manage the same types of abusive telemarketing calls that the TCPA seeks to protect consumers against. The service that YouMail provides is highly customizable. The auto-reply feature is an option that subscribers can choose to use or not use. YouMail has no control over how subscribers use it, but YouMail's experience, and common sense, dictate that consumers consent to receiving auto-replies from the service. As such, the Commission should apply the same common sense rationale to an auto-reply from a YouMail subscriber that it does to a confirmatory text message of the type in the <u>Soundbite</u> case.

For all the foregoing reasons, YouMail, Inc., by counsel, respectfully requests that the Commission take expedited action to issue a Declaratory Ruling establishing that (a) the YouMail auto-reply system is not an ATDS, (b) YouMail does not "initiate" the sending of auto-replies, and (c) calling parties consent to the receipt of auto-replies within the meaning of the TCPA.

Respectfully submitted,

YOUMAIL, INC.

By: _____

Lauren Lynch Flick
Andrew D. Bluth

Its Attorneys in this Matter


PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000


Dated:  April 19, 2013

17

DECLARATION

I, Alex Quilici, Chief Executive Officer of YouMail, Inc., hereby declare under penalty of perjury that I have reviewed the foregoing "Petition for Expedited Declaratory Ruling," and, except for (a) matters cited therein contained in the FCC's records, (b) matters for which other support is provided, and (c) matters of which the Commission may take official notice, the facts set forth therein are true and correct to the best of my personal knowledge, information and belief.

Respectfully submitted,

Alex Quilici

Dated: April 19, 2013

Exhibit F

# PUBLIC NOTICE

**Federal Communications Commission**
**445 12th St., S.W.**
**Washington, D.C. 20554**

News Media Information 202 / 418-0500
Internet: http://www.fcc.gov
TTY: 1-888-835-5322

---

DA 13-1433
Released:  June 25, 2013

## CONSUMER AND GOVERNMENTAL AFFAIRS BUREAU SEEKS COMMENT ON PETITION FOR EXPEDITED DECLARATORY RULING FROM YOUMAIL, INC.

### CG Docket No. 02-278

**Comment Date:  July 25, 2013**
**Reply Comment Date:  August 9, 2013**

With this Public Notice, the Consumer and Governmental Affairs Bureau seeks comment on a Petition for Declaratory ruling filed by YouMail, Inc. (YouMail)[1] seeking clarification of three issues arising under the Telephone Consumer Protection Act (TCPA)[2] and Section 64.1200 of the Commission's rules.[3]

YouMail states that it provides a software-based service that allows smartphone users to replace default voicemail options with customizable telephone answering functions, including automated text message replies to calls.[4]  YouMail first asks the Commission to clarify that its "virtual receptionist" software is not an "automatic telephone dialing system" (ATDS) as defined by 47 U.S.C. § 227(a)(1)"[5] because the software does not have the current capacity to store, produce, or dial random or sequential telephone numbers but, instead, responds one time to a single input (a caller leaving a voicemail message) and only when instructed to do so by a user's settings and when adequate caller ID information is available.  Second, YouMail asks the Commission to clarify that YouMail does not initiate calls because it does not cause the call to occur as defined by the TCPA.[6]  Third, YouMail asks the Commission to confirm that callers provide prior consent to receive a responsive text when leaving voicemail messages for a

---

[1] *See YouMail, Inc.*, Petition for Expedited Declaratory Ruling and Clarification, CG Docket No. 02-278 (filed Apr. 19, 2013) (*Petition*) (noting that several companies including YouMail are the subject of class action lawsuits based on the TCPA's definition of autodialer and classifications of group text-based services).

[2] Codified as 47 U.S.C. § 227.

[3] 47 C.F.R. § 64.1200.

[4] Petition at 2-3.

[5] *Id*. at 9-10.

[6] *Id*. at 12.

YouMail subscriber.[7]  YouMail states that these clarifications are needed to address the status of these technologies and services under the statute and implementing regulations.[8]

    Pursuant to sections 1.415 and 1.419 of the Commission's rules,[9] interested parties may file comments and reply comments on or before the respective dates indicated on the first page of this Notice.  Comments may be filed using the Commission's Electronic Comment Filing System (ECFS).  *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).

- Electronic Filers:  Comments may be filed electronically using the Internet by accessing the ECFS:  http://fjallfoss.fcc.gov/ecfs2/.

- Paper Filers:  Parties who choose to file by paper must file an original and one copy of each filing.

- Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail.  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

- All hand-delivered or messenger-delivered paper filings for the Commission's Secretary must be delivered to FCC Headquarters at 445 12th St., SW, Room TW-A325, Washington, DC 20554.  The filing hours are 8:00 a.m. to 7:00 p.m.   All hand deliveries must be held together with rubber bands or fasteners.  Any envelopes and boxes must be disposed of before entering the building.

- Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9300 East Hampton Drive, Capitol Heights, MD 20743.

- U.S. Postal Service first-class, Express, and Priority mail must be addressed to 445 12th Street, SW, Washington DC 20554.

People with Disabilities:  To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty).

    The proceeding this Notice initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[10]  Persons making *ex parte* presentations

---

[7] *Id.* at 13-14.

[8] *Id. at* 1-2.  YouMail notes that it and several other companies are the subjects of class action lawsuits based on the TCPA's definition of autodialer and classifications of group text-based services.  *Id.* at 8, 15.

[9] 47 C.F.R. §§ 1.415, 1.419.

[10] 47 C.F.R. §§ 1.1200 *et seq.*

must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies).  Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation.  If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum.  Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with rule 1.1206(b).  In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (*e.g.*, .doc, .xml, .ppt, searchable .pdf).  Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

**FOR FURTHER INFORMATION CONTACT:**  B. Lynn Follansbee, Consumer and Governmental Affairs Bureau, Federal Communications Commission, 202-418-1514, and lynn.follansbee@fcc.gov.

**-FCC-**

3

Exhibit G

Before the
# Federal Communications Commission
Washington, DC 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Rules and Regulations Implementing the | ) | |
| Telephone Consumer Protection Act of 1991 | ) | GC Docket No. 02-278 |
| | ) | |
| Petition of YouMail, Inc. For Expedited | ) | |
| Declaratory Ruling That YouMail's Service | ) | |
| Does Not Violate the TCPA | ) | |

## REPLY COMMENTS OF YOUMAIL, INC.

**YOUMAIL, INC.**

Lauren Lynch Flick
Andrew D. Bluth
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037

*Its Attorneys in this Matter*

Dated:  August 9, 2013

## Summary

The YouMail Petition has received a wide array of supporting comments demonstrating the urgent need for the Commission to grant the Petition and provide a common sense clarification that there is no violation of the Telephone Consumer Protection Act when subscribers to the YouMail virtual receptionist service send the very same one-time, individual-to-individual text reply to people who *first* initiate calls to them that the YouMail user could send on his or her own via any cellular phone.

The few opposing commenters ask the FCC to interpret the TCPA's definition of ATDS to sweep the YouMail system into it, by adding the word "future" to "capacity" and reading "random or sequential" out of it.  But, in using the present tense of the verb "has," the definition of ATDS is unambiguous and refers to equipment that currently "has the capacity to store or produce telephone numbers using a random or sequential number generator; and to dial those numbers."  Thus, it is the opposing commenters and not YouMail that seek to change the definition of ATDS.  By confirming that ATDS refers to automated telephone dialing systems with the current capacity to randomly or sequentially generate or store telephone numbers and dial those numbers, the FCC correctly calibrates the definition to target the kinds of robocalling systems it was intended for, while avoiding a nonsensical application of the definition that would sweep in any computer, smart phone, or other device that could  be programmed to meet the definition even though it currently bears no resemblance to an ATDS and is not used for that purpose.

Similarly, the FCC should establish that YouMail auto-receipts (since they are sent in response to an in-bound call from the user of a cellular telephone) are sent with the requisite prior consent, since they do no more than the individual cell phone user could do on their own.

Indeed, the most popular phone on the market now requires its users to decide whether to reply to an in-bound call by return call or return text.  Recognizing the manner in which today's phones work is necessary to thwart plaintiffs' unfair efforts to create strict liability under the TCPA for virtually all telephone users.  Like the Commission's recent *SoundBite* decision, a common sense clarification on this issue would eliminate great uncertainty in the marketplace, avoid a bizarre environment creating strict liability for most phone users, and pose no threat to consumers' privacy.  Anyone receiving a call on his or her cell phone can text back a response.  Liability should not change if they do so using the YouMail virtual receptionist.

Finally, the Commission should recognize that YouMail is simply an intermediary for individuals' communications and hold that it is exempt from liability under the TCPA.  As described in the Petition, YouMail's system does not "make" calls, it simply provides a tool to transmit messages on the user's behalf to the calling party.

Absent swift action from the Commission to announce a common sense declaratory ruling as outlined herein, innovators like YouMail will continue to be targeted by opportunistic class action TCPA lawsuits, which continue to skyrocket and are crippling small businesses and chilling investment in entrepreneurial enterprises.  The pendulum must swing back toward common sense.

## Table of Contents

**Page**

Summary ............................................................................................................... i

Table of Contents ............................................................................................... iii

REPLY COMMENTS OF YOUMAIL, INC. ..................................................... 1

   YouMail's System Is Not An ATDS ............................................................ 2

   Callers Consent to Receive YouMail Users' Reply Texts .......................... 6

   YouMail is Not Telemarketing .................................................................... 9

   YouMail Does Not "Make" a "Call" Under the TCPA ............................... 11

Conclusion ......................................................................................................... 13

Before the
# Federal Communications Commission
Washington, DC 20554

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Rules and Regulations Implementing the | ) |
| Telephone Consumer Protection Act of 1991 | )    GC Docket No. 02-278 |
| | ) |
| Petition of YouMail, Inc. For Expedited | ) |
| Declaratory Ruling That YouMail's Service | ) |
| Does Not Violate the TCPA | ) |

## REPLY COMMENTS OF YOUMAIL, INC.

YouMail, Inc., ("YouMail"), by its attorneys, respectfully submits these reply comments supporting its Petition for Expedited Declaratory Ruling[1] in the above-captioned proceeding. The Petition and support received from a broad spectrum of commenters establish a strong record urging the Commission to grant the Petition and provide a common sense clarification that there is no violation of the Telephone Consumer Protection Act ("TCPA")[2] in sending a one-time, individual-to-individual text reply to people who *first* initiate calls to a YouMail user. The Petition has received support from industry groups as diverse as the financial services industry, technology innovators, consumer services companies, and others, all of whom recognize that YouMail's virtual receptionist program is consumer friendly,[3] does not constitute

---

[1]   *YouMail, Inc.,* Petition for Expedited Declaratory Ruling, CG Docket No. 02-278 (filed April 19, 2013) ("Petition").

[2]   Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991) *codified at* 47 U.S.C. § 227.

[3]   *See Comments of Nicor Energy Services Company,* CG Docket 02-278 (filed July 25, 2013) ("Nicor Comments") at p. 3.

an automatic telephone dialing system ("ATDS"), and is otherwise not prohibited by the TCPA.[4]

The Petition is not opposed by any consumer group, and the only commenters recommending

denial of the Petition are the plaintiff (through her litigation attorneys) in one of the opportunistic

class action lawsuits filed against YouMail (who have obvious personal incentives at stake), and

three individual commentators who regularly submit comments on TCPA matters before the

Commission.  The majority of commenters further recognize that, without clarification from the

Commission on at least the definition of ATDS, the class action climate surrounding the TCPA

will continue its meteoric rise.  This, in turn, will deprive consumers of useful features and chill

the kind of innovation represented by YouMail and the supporting commenters.

### YouMail's System Is Not An ATDS

One fundamental issue presented by the Petition is a requested finding that YouMail's

auto-receipt texts are not sent via an Automatic Telephone Dialing System.[5]  This issue receives

widespread support from the majority of commenters.  As discussed in the Petition and

articulated in numerous supporting comments, whether YouMail messages are sent via an ATDS

centers on the statutory definition of ATDS.  YouMail and supporting commenters submit the

definition is unambiguous and refers to equipment that *currently* "has the capacity to store or

produce telephone numbers using a random or sequential number generator; and to dial those

numbers."[6]  This interpretation is supported by a plain reading of the statute which uses the

---

[4]    Indeed, even Robert Biggerstaff, a regular opponent to declaratory relief petitions regarding the TCPA, while not wholly supportive of the Petition, concedes that YouMail's practices should not give rise to liability under the TCPA.  *See Comments of Robert Biggerstaff on the Petition of YouMail*, CG Docket No. 02-278 (filed July 25, 2013) at p. 5.

[5]    47 U.S.C. § 227(a)(1); 47 C.F.R. § 64.1200(f)(2).

[6]    *Id.*

present tense of the verb "has."[7]  Thus, it is important to understand that the relief requested by YouMail seeks no change in the definition of ATDS.

Nonetheless, a strong statement from the Commission is needed because various lawsuits against YouMail and other similar companies seek to contort the term "capacity" well beyond any reasonable statutory interpretation.[8]  In particular, among the "creative" arguments advanced to justify class action lawsuits, these attorneys argue that any general-purpose computing device that could run some other application or program in the *future* to store or produce telephone numbers using a random or sequential number generator is an ATDS.[9]  This interpretation of "future capacity" as "capacity" for the purpose of an ATDS would render any smart phone, desktop computer, laptop computer, iPad or other tablet, or even various general-purpose VOIP telephone systems into an "ATDS."  In turn, that would render any person liable under the TCPA who uses a smart phone to call any cell phone (even by dialing a wrong number).  This is clearly inconsistent with the statutory language, the Commission's precedent, and any common sense interpretation of "capacity."  The Commission must act to quash this expansive and insupportable interpretation of "capacity" and consequently of ATDS.[10]  This is surely not what Congress remotely intended when passing the TCPA.[11]

Moreover, the proposed interpretation reads out of existence the portion of the definition of ATDS that reads "using a random or sequential number generator," which clearly is central to

---

[7]  *Id.*

[8]  As commenter Communication Innovators, a coalition of technology companies, notes, more than 500 TCPA lawsuits have been filed in just the first 7 months of 2013, more than double from the previous year.  *See Comments of Communication Innovators*, CG Docket No. 02-278 (filed July 25, 2013) at p. 5. ("CI Comments").

[9]  Commenter Megan Gold is the plaintiff in one of these lawsuits.

[10]  *See* CI Comments at p. 5.

[11]  *See* Nicor Comments at p. 4 (citing H.R. Rep. No 102-317 at 11 (1991) (describing abusive telemarketing practices); S. Rep. No. 102-178 at n. 5 (1991) (same)).

Congress' intent in enacting the legislation.  When the term ATDS is interpreted so broadly as to encompass the telephone on most workplace desks that allows the user to store a few frequently called numbers for rapid dialing, then it does not matter whether the user uses the speed dial function or not.  Merely placing a call to a cell phone via a phone that can store numbers and then automatically dial the same would be a violation.  Yet, the Commission has specifically said "the prohibitions of § 227(b)(1) clearly do not apply to functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message services (PTDMS), because the numbers called are not generated in a random or sequential fashion."[12]

The potential for such overly broad interpretations of ATDS (and the lack of any clear direction from the FCC regarding "capacity") is stifling innovation in the market for new mobile applications. This market is one where U.S. companies are leading innovators.  Companies like YouMail are creating consumer-friendly applications.  It would be antithetical to Congress' intent if these useful applications, developed in the United States by homegrown companies, could not be used because of a rigid (or overly expansive) interpretation of the TCPA.

One commenter suggests that confirming that the definition of ATDS means equipment with the *current* capacity to store or produce telephone numbers using a random or sequential number generator would result in "most if not all equipment used to make automated calls" becoming exempt from the TCPA.[13]  In fact, the exact opposite is true.  Confirming that ATDS refers to automated telephone dialing systems with the current capacity to randomly or sequentially generate or store telephone numbers and dial those numbers not only underscores

---

[12] *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 7 FCC Rcd 8752 (1992) ("1992 Order") at ¶ 47.

[13] *Comments of Joe Shields on the Petition for Expedited Declaratory Ruling of YouMail, Inc.*, CG Docket No. 02-278 (filed July 25, 2013).

the plain language of the statutory definition, but it correctly calibrates the definition to target the kinds of robocalling systems it was intended for, while avoiding a nonsensical application of the definition that would sweep in any computer, smart phone, or other device that *could* be programmed to meet the definition even though it currently bears no resemblance to an ATDS and is not used for that purpose.  A common sense order like the one issued by the Commission in its *SoundBite* decision[14] is equally necessary here to provide certainty to a presently unstable business environment.

Lastly, it is important to bring into focus that the issue before the Commission is narrow: Whether *YouMail's* system is an ATDS.  It is not.  As set forth in the Petition and ex *parte* materials submitted by YouMail, YouMail's technology does not have the capacity to store or produce numbers using a random or sequential number generator.[15]  YouMail's system sends a single text message to a single caller a single time in an *immediate* response to that caller trying to communicate with a specific YouMail user.  *It does not use lists or databases of numbers.* The *only* way YouMail's system would fit under the definition of ATDS would be via a complete re-programming of the YouMail system—no different than the complete reprogramming of any computer, smart phone or electronic device with memory and the capability to place a call or send a text.  As discussed above, and in many of the Petition's supporting comments, such an interpretation and application of the ATDS definition would serve no consumer purpose, stretch statutory interpretation to the extreme, and defy common sense. Moreover, the Commission has previously ruled that functions similar to those provided by

---

[14]   27 FCC Rcd 15391 (2012).

[15]   *See* CI Comments at p. 4, defining "capacity" as "ability."

YouMail "where numbers are not generated in a random or sequential fashion" are not an ATDS.[16]

### Callers Consent to Receive YouMail Users' Reply Texts

A similar effort is afoot to stretch the concept of the TCPA's term "prior express consent," to the point of strangling nearly all two-way communication.  An order in favor of the Petition on this issue would benefit both consumers and businesses.

No texts from YouMail users are sent unless the calling party chooses to communicate with the YouMail user in the first place.  As the Petition and supporting commenters submit, when considering Congress' intent when enacting the TCPA,[17] the Commission's previous rulings regarding consent,[18] the totality of the circumstances regarding the callers' expectations, and the current social norms regarding telephone interactions, the most reasonable outcome is that callers to YouMail users who receive an auto-receipt consented to that single immediate return communication and benefit from it.[19]

From the beginning of the TCPA, Congress' intent has been clear: a party that has provided its telephone number in normal business communications has in essence requested the returned contact.[20]  That Congressional intent must now be viewed in today's world.   As set forth in the Petition and GroupMe[21] and other supporting comments, courts interpreting this issue have concluded that the prior express consent requirement is satisfied when the return

---

[16]   1992 Order at ¶ 47.

[17]   House Report, 102-317, 1st Sess., 102 Cong. (1991) at p. 13.

[18]   1992 Order at ¶31 (citing *id*).

[19]   In addition, recipients of those text messages can also opt out of ever receiving another text from any YouMail customer by simply replying "stop".

[20]   1992 Order at ¶31 (citing House Report, 102-317, 1st Sess., 102 Cong. (1991) at p. 13).

[21]   *GroupMe, Inc.'s Comments*, CG Docket No. 02-278 (filed July 25, 2013).

communication is made in a situation "where an individual voluntarily divulges her telephone number."[22]  As noted above, a YouMail auto-receipt is *only* sent after someone calls a YouMail user first.  Thus, the YouMail system is only facilitating one-to-one communications between a specific caller and the recipient the caller is trying to reach.  Even in the absence of the YouMail system, the called party (the YouMail user) can *always* send a reply text to someone who has used a cell phone to call them.  The calling party, in choosing to use a cell phone that can receive texts, sets in motion the chain of events that leads to their receipt of a text message.  Under today's norms, anyone who uses a cell phone to call another party knowingly subjects himself or herself to the called party's ability to text or call them back, in response to that call.[23]  This is evident from a basic understanding of modern cell phones, which have call logs for all incoming calls and, for each call log entry, offer the user the ability to text or call back with one press of a button.[24]  Therefore, their use of a cell phone has to be seen as consent to the use of this feature.  YouMail's auto-receipts do nothing more than provide a one-time response, something that the call recipient could do on his or her own and therefore must be seen as falling within the scope of the consent inherent in the use of today's telephones.

Moreover, this norm is not unique to cell phone users.  Landline users are aware that parties they call likely will have caller ID or can use a call return feature (like *69) if they do not have Caller ID.  Telephone users today understand that their call, if they choose not to block

---

[22]  *Id.* at pp. 3-4 (citing *Pinkard v. Wal-Mart Stores, Inc.*, 2012 WL 55511039 (N.D. Ala. Nov. 9, 2012) and *Emanuel v. Los Angeles Lakers, Inc.,* 2013 WL 1719035 (C.D. Cal. Apr. 18, 2013)).

[23]  Moreover, the "real world" described in opposing commenter Mr. Roylance's comments has not existed for decades, as evidenced by his reference to "while-you-were-out" pads and the assumed gender of his hypothetical receptionist.  *See Gerald Roylance's Comments on YouMail's Petition*, CG Docket No. 02-278 (filed July 25, 2013) at p. 4.

[24]  *See* Exhibit A, attached hereto, showing screen shots of cell phone call logs and return call options. Of particular interest, the Samsung Galaxy return call screen devotes equal space to the "call" and "text" icons.

their identity, can be returned, whether they leave a message or not.  Further, in the YouMail context, the auto-receipt is a consumer courtesy no different than an out-of-office reply message, confirming receipt of the caller's initial communication.  YouMail data shows users and their calling partners overwhelming like this feature.  Therefore, there should be no fear that by merely recognizing the reality of today's telephones, the Commission will be opening consumers up to a flood of unsolicited text messages.  The YouMail system simply does not work that way.

     As noted above, adopting the broad definition of ATDS proffered by opposing commenters and Plaintiffs' class action attorneys, along with their proffered rigid definition of consent, would allow plaintiffs to argue that anyone who has called them or texted them, except in an emergency, is strictly liable to them under the TCPA.  This should concern every user of a modern telephone.  Must every smart phone user have prior express consent before calling or texting his or her colleagues, friends, and family members to avoid potential TCPA liability?  Or must we all return to using rotary dial telephones to escape liability?  If a small business owner who uses an iPhone cannot call back a customer who has initiated a call to him or her without being subject to class action lawsuits, then we have far exceeded the Congressional intent of the TCPA,[25] and imposed a significant burden on the conduct of any business in this country, regardless of industry.[26]  Clarification from the Commission that YouMail auto-receipts are sent with the requisite consent is a necessary counterbalance to prevent this potential environment of

---

[25]  House Report, 102-317, 1st Sess., 102 Cong. (1991) at p. 13.

[26]  For the same reasons, it is unreasonable to suggest, as some of the opposing commenters do, that a "press one" message could be delivered during the inbound call to a YouMail user to acquire consent to a return call or text. Under these parameters, every common carrier would have to interject such a message for every single call made using a cell phone (again, an ATDS under opposing commenters' proffered scenario).  Thus, if one receives a call from his mother and wants to return that call with a cell phone, he couldn't unless she first "pressed one" to consent to a return.  The absurdity of this "solution" is self-evident.

strict liability for virtually all telephone users.[27]  YouMail's service enables its users to customize their communications in a manner that allows parties calling them to receive immediate unique information about the called party.[28]  YouMail's service is a one-to-one communication, initiated by the recipient of the auto-receipt; it is not a large scale marketing campaign using robocallers.  Like the Commission's decision in *SoundBite*, a common sense clarification on this issue would eliminate great uncertainty in the marketplace, avoid a bizarre environment creating strict liability for most phone users, and pose no threat to consumers' privacy.

### YouMail is Not Telemarketing

Presently, the TCPA and the Commission's regulations do not distinguish between telemarketing calls and non-telemarketing calls to cellular phones.[29]  A party is liable under the TCPA if it calls a cellular phone using an ATDS without prior express consent, regardless of the purpose of the call (emergency calls excluded).[30]  Thus, the nature of the YouMail auto-receipt is not actually before the Commission, so Commenter Gold's lengthy colloquy alleging that YouMail's auto-receipts are really telemarketing messages serves no purpose other than to attempt to tarnish YouMail to gain a perceived advantage in Ms. Gold's class action litigation against YouMail.  Nonetheless, it is important for YouMail to explain why the messages are not telemarketing to correct the record and because, beginning October 16, 2013, the Commission's

---

[27]  *See* Nicor Comments at pp. 7-8 (discussing interplay between ATDS and consent.)

[28]  *See GroupMe Petition* at p. 7.

[29]  47 U.S.C. § 227(b)(1); 47 C.F.R. § 64.1200(a)(1)(iii).

[30]  *Id.*

9

revised regulations will take effect which will create a heightened "prior express *written* consent" standard for *telemarketing* calls only.[31]

Gold's motives are revealed quickly by the fact that she has included as Exhibit A to her comments the auto-receipt message received by individuals who elect to receive notifications via *email.* That is, these are messages that are displayed on a desktop computer. Her Exhibit A does **_not_** reflect the very different auto-receipt sent via text and displayed on a mobile device. Mobile users receive a different display, which is first shown in YouMail's *ex parte* presentation to Commission staff.[32]

The YouMail auto-receipt is entirely informational for the recipient. It contains the telephone number (and usually name as it appears from the inbound call) of both the YouMail user who was called and the inbound caller, allowing that inbound caller to verify he or she called the intended person. If the YouMail user chooses, the auto-receipt can also contain a picture of the YouMail user who was dialed, providing further information and confirmation to the auto-receipt recipient. The auto-receipt can also contain the customized response created by the YouMail user ("I'm under the sink and will call you back in 30 minutes"). Lastly, it can contain a link that, upon election by the recipient, takes them to an extended information page where they have the option to hear the voicemail they just left, provide additional information about the purpose of their call, edit information about their name (i.e. change "unknown" to actual name to ensure return call), or forever opt out of receiving text messages from YouMail users. This feature allows the auto-receipt recipient to replay the voicemail, permitting further confirmation that he or she was understandable and imparted all desired information. It renders

---

[31]   77 Fed. Reg. 63,240 (Oct. 16, 2012) (to be codified at 47 C.F.R. pt. 64)

[32]   *YouMail Notice of Ex Parte Presentation,* GC Docket No. 02-278 (filed June 13, 2013) at pp. 9-10.

the auto-receipt a true "receipt," providing proof that a voicemail was left and its details. Importantly, it is on this optional second page—not the original text message auto-receipt— which contains additional *information* (still not advertising) about YouMail (also subject to YouMail user control—they know and decide what is valuable to the recipient) so that the recipient knows to which website it has traveled and to prevent spoofing.

Ms. Gold cites the conversion rate of recipients of the auto-receipt into new YouMail users as evidence that YouMail is using its auto-receipts for telemarketing purposes. The fact that recipients of the auto-receipt sign up for YouMail simply proves it is a smart, consumer-friendly, sought-after service (indeed, it is overwhelmingly popular among YouMail users and auto-receipt recipients alike). It does not ascribe a telemarking purpose to the informational auto-receipt (or even the subsequent informational page).

### YouMail Does Not "Make" a "Call" Under the TCPA

The final issue before the Commission raised in the Petition is whether YouMail is the "person" making the "call," the fundamental element for liability under the TCPA.[33]  The commenters addressing this issue in the most persuasive manner are CallFire Inc.[34] and Robert Biggerstaff,[35] strange bedfellows indeed.   Both agree that YouMail "appears to be principally executing directives on behalf of their customer, similar to a common carrier."[36]  Mr. Biggerstaff goes on to note that YouMail's role appears more akin to a conduit, which would "militate against liability" under the TCPA.[37]

---

[33]   47 U.S.C. § 227 (b)(1)(A).

[34]   *Comments of CallFire, Inc.,* GC Docket No. 02-278 (filed July 25, 2013)("CallFire Comments").

[35]   Biggerstaff Comments, supra.

[36]   *Id.*, at p. 4 (emphasis in original).

[37]   *Id.*, at p. 5.

The Commission has previously addressed this issue in a manner consistent with YouMail's Petition, holding intermediaries of someone else's communication exempt from liability."[38]  Here, as described in the Petition, YouMail's system provides a tool capable of applying logic decisions upon request from a YouMail user to send an auto-receipt in order to confirm the recipient can receive an auto-receipt and to send it on the YouMail subscriber's behalf.[39]  In this regard, as Mr. Biggerstaff suggests, YouMail is similar to a common carrier. Not surprisingly, Mr. Biggerstaff is not entirely supportive of YouMail on this issue, and urges the Commission to use caution against the "creeping levels of involvement by conduits like YouMail."[40]  Yet, the services YouMail provides do not make it any more liable under the TCPA than a common carrier.  The statute holds liable those persons that "make" an illegal call.  Like a common carrier, YouMail does not control what number is "called," or when auto-receipts are sent.  Those functions are determined by the inbound call and the YouMail user's settings, who can turn off the feature entirely.  Just like the call recording feature on a VoIP system might be available to all users, it is the customer that has ultimate control over the feature and must use it with the understanding that it must comply with call recording laws.

Some of the individual commenters point to the Commission's recent DISH Network declaratory ruling as guidance on this issue.[41]  In DISH Network, the Commission determined that a third party seller does not "initiate" calls made through a third party telemarketer under the TCPA, but may be held vicariously liable on common law principles of agency for violations by

---

[38]  *See* CallFire Comments at p. 5 (quoting *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 7 F.C.C.R. 8752, 8780).

[39]  YouMail Petition at p. 13.

[40]  Biggerstaff Comments at p. 6.

[41]  See, e.g. Biggerstaff Comments (citing the Joint Petition Filed by DISH Network, LLC, FCC 13-54 (April 17, 2013) (Declaratory Ruling)).

the third parties.[42]  DISH Network is not instructive in this case because YouMail cannot be analogized to either a seller or a telemarketer.  In the DISH Network situation, EchoStar and DISH had enlisted telemarketing "retailers" and "dealers" who were violating the TCPA while telemarketing as "agents" for DISH and EchoStar.[43]  Here, as Mr. Biggerstaff correctly observes, it is ultimately the YouMail user who is responsible for the existence and content of the message.[44]  Mr. Biggerstaff further correctly observes that a person "initiates" a telegram by dictating it to a Western Union clerk—not by tapping out Morse code on the key.[45]  Where Mr. Biggerstaff errs is by suggesting that this interpretation runs counter to the DISH Network Order.  It does not run counter; the DISH Network ruling simply does not apply because YouMail is not like *either* the seller or the telemarketer in the DISH Network case.  It is exempt entirely as the common carrier intermediary.  Just like telephone companies offer feature–rich services that allow their users to enhance their calling abilities (including automatically dialing return calls like *69), and ultimately connect the call when the user selects those features, the common carrier does not become liable under the TCPA.  The same must be true for YouMail.

## Conclusion

The great weight of commentary in the record supports YouMail's arguments that its individual-to-individual, one-time immediate auto-receipts are not prohibited by the TCPA, and are overwhelmingly appreciated and sought after by those who receive them.   Confirmation from the Commission that YouMail's system does not constitute an ATDS, that recipients of the auto-receipts consent to receive them, and that YouMail does not "make" or "initiate" calls under

---

[42]  The Joint Petition Filed by DISH Network, LLC, FCC 13-54 (April 17, 2013) (Declaratory Ruling)

[43]  DISH Network Ruling at ¶ 6, 9.

[44]  Biggerstaff Comments at p. 4.

[45]  *Id.*

the TCPA is necessary to provide clarity in the marketplace and permit continued innovation, particularly for mobile applications.  Accordingly, YouMail respectfully requests that the Commission grant its request for an expedited declaratory ruling as set forth in its Petition.

Respectfully submitted,

**YOUMAIL, INC.**

By:
Lauren Lynch Flick
Andrew D. Bluth

Its Attorneys in this Matter

PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000

Dated:  August 9, 2013

14

EXHIBIT A





704686679







704686679

## DECLARATION

I, Alex Quilici, Chief Operating Officer of YouMail, Inc., hereby declare under penalty of perjury that I have reviewed the foregoing "REPLY COMMENTS OF YOUMAIL, INC.," and, except for (a) matters cited therein contained in the FCC's records, (b) matters for which other support is provided, and (c) matters of which the Commission may take official notice, the facts set forth therein are true and correct to the best of my personal knowledge, information and belief.

Respectfully submitted,

_____
Alex Quilici

Dated: August 9, 2013.

Exhibit H

**BEFORE THE**
**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | CG Docket No. 02-278 |
| Rules and Regulations Implementing the | ) | |
| Telephone Consumer Protection Act of 1991 | ) | |

**Professional Association for Customer Engagement's**
**Petition for Expedited Declaratory Ruling and/or Expedited Rulemaking**

**Filed October 18, 2013**

Phillip J. Grudzinski
Professional Association for Customer
Engagement
8500 Keystone Crossing, Suite 480
Indianapolis, IN 46240

Michele A. Shuster, Esq.
Nicholas R. Whisler, Esq.
Mac Murray, Petersen & Shuster LLP
6530 West Campus Oval, Suite 210
New Albany, OH 43054

***President and CEO of Professional***
***Association for Customer Engagement***

***Counsel for Professional Association***
***for Customer Engagement***

# TABLE OF CONTENTS

I.    **Introduction and Summary** ....................................................................................4

II.   **Businesses Desperately Need Clarification from the Commission Regarding What Type of Equipment Does Not Constitute an ATDS** .......................................................5

III.  **The Definition of ATDS Does Not Include Equipment that Lacks the Capacity to, *Inter Alia*, Dial Telephone Numbers Without Human Intervention**............................................7

      A.  The Second Prong in the Definition of ATDS Implies that the Equipment Must Have the Capacity to Dial Without Human Intervention ...........................................................8

      B.  The Use of a One-Click Dialing Method is Irrelevant to the Determination of Whether an ATDS was Used to Initiate the Call ...........................................................9

IV.   **A System's "Capacity" is Limited to What it is Capable of Doing, Without Further Modification, at the Time the Call is Made** .......................................................10

V.    **The Commission Can Provide the Requested Clarifications via a Declaratory Ruling**..12

VI.   **Conclusion** ....................................................................................13

**BEFORE THE**
**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | CG Docket No. 02-278 |
| Rules and Regulations Implementing the | ) | |
| Telephone Consumer Protection Act of 1991 | ) | |

**PETITION FOR EXPEDITED DECLARATORY RULING OR, IN THE**
**ALTERNATIVE, PETITION FOR EXPEDITED RULEMAKING**

Pursuant to 47 CFR 1.2, the Professional Association for Customer Engagement (PACE) hereby respectfully requests the Federal Communications Commission (Commission) to issue an Expedited Declaratory Ruling to clarify that: (1) a system is not an automatic telephone dialing system (ATDS) unless it has the capacity to, *inter alia*, dial numbers **without human intervention**; and (2) a system's "capacity" is limited to what it is capable of doing, without further modification, ***at the time the call is placed***.  In the alternative, PACE respectfully petitions the Commission for a Rulemaking proceeding pursuant to 47 CFR 1.401 to: (1) define the term "capacity," as used in the Telephone Consumer Protection Act (TCPA) and the Commission's TCPA regulations, as "the current ability to operate or perform an action, when placing a call, without first being modified or technologically altered;" and (2) modify the definition of ATDS in 47 CFR 64.1200(f)(2) by adding the phrase "without human intervention" to the end of the definition.  PACE respectfully makes these requests in addition to, rather than in lieu of, the requests made in its Petition for Reconsideration, which is currently pending before the Commission.

## I.  <u>Introduction and Summary</u>

PACE is the only non-profit trade organization dedicated exclusively to the advancement of companies that utilize contact centers as an integral channel of operations.  PACE members include companies with inbound and outbound contact centers, users of teleservices, trainers, consultants, and equipment suppliers who initiate, facilitate, and generate telephone, Internet, and e-mail sales, chat service, and support.  Founded in 1983, PACE represents more than 4,000 contact centers that account for over 1.8 million professionals worldwide.  Contact centers offer traditional and interactive services that support the e-commerce revolution, provide specialized customer service for Fortune 500 companies, and generate annual sales of more than $900 billion.

The TCPA prohibits the use of an ATDS to call cell phones unless the call recipient has provided prior express consent to receive such calls.[1]  Due to several recent developments, including the Commission's adoption of amended TCPA regulations (which require **written** consent for telemarketing calls made to cell phones using an ATDS),[2] the explosion of class action TCPA litigation and problematic court rulings related to this restriction, this TCPA provision poses a significant and unnecessary threat to legitimate businesses.  The threat is exacerbated by the lack of clarity regarding what type of equipment does not constitute an ATDS.  The Commission should, therefore, clarify that:  (1) a system is not an ATDS unless it has the capacity to, *inter alia*, dial numbers **without human intervention** (regardless of whether the call is initiated by entering all ten digits of a telephone number or via a one-click dialing method); and (2) a system's "capacity" is limited to what it is capable of doing, without further modification, **at the time the call is placed**.  Such a ruling will provide much needed clarity to

---

[1] 47 U.S.C. § 227(b)(1)(A)(iii).
[2] 47 CFR 64.1200(a)(2).

compliance minded businesses and represents sound public policy, as a contrary ruling would result in significant unintended consequences.

## II.   Businesses Desperately Need Clarification from the Commission Regarding What Type of Equipment Does Not Constitute an ATDS

Since its inception, the TCPA has prohibited the use of an ATDS to call cell phones without the call recipient's prior express consent.[3]  In a 1992 Report and Order and a 2008 Declaratory Ruling, however, the Commission held that, subject to a few restrictions, a person who provides a telemarketer and/or creditor with their telephone number has provided "prior express consent" to be contacted at that number absent instructions to the contrary.[4]  These Rulings and courts' historical deference to the FCC on this issue provided a relatively workable, if not ideal, regulatory landscape within which businesses could contact their existing customers in an efficient manner.  Several recent developments, however, significantly threaten the ability of businesses to call their customers' cell phones (for both solicitation and non-solicitation purposes), thereby threatening the viability of many of these businesses and third party contact centers that make calls on their behalf.

First, the Commission's amended TCPA regulations prohibit the use of an ATDS to make telemarketing or advertising calls to cell phones without the call recipient's "prior express *written* consent."[5]  The consumer's provision of his telephone number no longer constitutes sufficient consent for a business to use an ATDS to call his cell phone for solicitation purposes. A business that wishes to contact a customer on his cell phone in compliance with the TCPA, therefore, has two options: (1) obtain prior express written consent to call the customer's cell

---

[3] 47 U.S.C. § 227(b)(1)(A)(iii).
[4] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 7 FCC Rcd. 8752 at ¶ 31 (1992); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling 23 FCC Rcd 559 at ¶¶ 9-10 (2008).
[5] 47 CFR 64.1200(a)(2).

5

phone; or (2) call the customer using equipment that does not constitute an ATDS.  Although many businesses are diligently working to get written consent to call their customers' cell phones, this is not a viable option for all businesses, especially those with millions of customers. Such businesses have no choice but to initiate calls using equipment that is not an ATDS, and need clarity on what type of equipment qualifies as such.

Second, as the Commission is aware, the number of class action TCPA cases filed against sellers and teleservices providers alike has skyrocketed in recent years, subjecting these businesses to staggering litigation costs and settlement amounts.[6]  These class actions pose a significant threat to the viability of many businesses while providing little net tangible benefit to anyone other than plaintiffs' counsel.  The collective financial benefit consumers receive as part of these class action settlements is likely dissipated by increased prices for consumer goods and services, which naturally flows from the increased risk these class actions pose on legitimate businesses.  This leaves plaintiffs' counsel as the primary benefactors of TCPA litigation, which is likely to increase further now that the Commission's written consent rules are effective.

Finally, recent court decisions have created even more uncertainty regarding the applicability of the TCPA to campaigns involving calls to cell phones.  For example, the Southern District of Florida recently held that the Commission's Ruling on what constitutes "prior express consent" under the TCPA is contrary to the plain language of the TCPA and, therefore, invalid.[7]  The decision is contrary to every other court opinion on this issue and is currently being appealed; however, it demonstrates that there is some risk associated with

---

[6] *See e.g.*, *Communication Innovators Petition for Declaratory Ruling*, at pp. 14-15 (filed June 7, 2012) (estimating a 592% increase in the number of TCPA class actions involving autodialers and an 800% increase in the number of TCPA class actions involving predictive dialers over the last few years).
[7] Mais v. Gulf Coast Collection Bureau, Inc., 2013 U.S. Dist. LEXIS 65603 (S.D. Fla. May 8, 2013).

reliance on the Commission's Ruling.[8]  Businesses that want to take a conservative approach may wish to dial telephone numbers without the use of an ATDS.  These businesses, however, lack clarity on what type of equipment does not constitute an ATDS.  A recent opinion issued by the Western District of Wisconsin, in *Nelson v. Santander Consumer USA, Inc.*,[9] illustrates this issue.  In *Nelson*, the Court held that calls made using "preview mode" on a dialer were made with an ATDS because the dialer also had the capacity to dial in a predictive mode.[10]  The Court described preview mode as follows:  "In preview dialing, an employee chooses a telephone number by clicking on a computer screen and the system calls it.  Defendant's employees never called plaintiff by pressing numbers on a keypad."[11]  Although the Court's opinion was based on the ***uncontested*** fact that the equipment had the "capacity" to dial numbers automatically, not the fact that calls were initiated using a one-click dialing method, it nonetheless created industry wide confusion as to whether the use of a one-click dialing process is *per se* prohibited.  Moreover, even though this decision was vacated pursuant to a joint stipulation of the parties, businesses are still concerned that courts will reach the same conclusion as part of future lawsuits, and want assurances that equipment is not an ATDS merely because it is capable of dialing numbers at the click of a single button.

## III.   The Definition of ATDS Does Not Include Equipment that Lacks the Capacity to, *Inter Alia*, Dial Telephone Numbers Without Human Intervention

ATDS is defined as "equipment which has the capacity-- (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial

---

[8] The "prior express consent" standard remains the valid standard for non-telemarketing calls; therefore, this decision has a significant impact on these types of campaigns.
[9] Nelson v. Santander Consumer USA, Inc., 2013 U.S. Dist. LEXIS 40799 (W.D. Wis. Mar. 8, 2013).
[10] *Id*.
[11] *Id*. at 8.

such numbers."[12]  The Commission has provided little guidance on the scope of this term outside its 2003 Report and Order and a 2008 Declaratory Ruling, which both addressed a specific type of predictive dialing solution that involved pairing predictive software with an autodialer.[13] Specifically, the Commission affirmed that pairing such software with autodialer equipment would not make the autodialer equipment suddenly exempt from the autodialer restriction because of the software's ability to dial from a calling list.[14]

### A. The Second Prong in the Definition of ATDS Implies that the Equipment Must Have the Capacity to, *Inter Alia*, Dial Without Human Intervention

Although the term "human intervention" does not appear in the definition of ATDS, the second prong of the definition (the capacity to dial telephone numbers) presupposes that the equipment has the capability of, *inter alia*, **automatically** dialing telephone numbers rather than being capable of dialing the numbers only after being prompted to do so by a human.  Indeed, the Commission has stated that "the statutory definition contemplates **autodialing equipment** that either stores or produces numbers."[15]  Although PACE believes the "either stores or produces numbers" language is an oversimplification of the first prong of the definition (it would mean that the Commission has effectively removed the "using a random or sequential number generator" language from the statutory definition, contrary to the TCPA), this demonstrates the Commission's tacit acknowledgment the capacity to dial **without human intervention** is a prerequisite to the second prong of the definition.

---

[12] 47 U.S.C. § 227(a)(1); *see also* 47 CFR 64.1200(f).

[13] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd 14014 at ¶ 131 (2003); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling 23 FCC Rcd 559 at ¶ 12 (2008).

[14] *Id*.  Although not germane to this Petition, PACE reiterates the position outlined in its Petition for Reconsideration and several other petitions filed before the Commission, that a predictive dialer is not an ATDS unless it has the capacity to store or produce numbers **using a random or sequential generator**.

[15] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd 14014 at ¶ 132 (2003).

This distinction becomes even more critical when you consider the impact of the Commission's oversimplification of the first prong.  If equipment is an ATDS merely because it has the capacity to: (a) store or produce numbers to be called; and (b) dial such numbers after being prompted by a human, virtually every modern telephone (including smart phones and any phone with speed dial functionality) is an ATDS because they have the capacity to both store numbers and dial them upon command.  Under this interpretation, no calls can be made from one cell phone to another without the called party's prior express (written) consent, regardless of the parties involved or the purpose of the call.  This is an absurd interpretation that contravenes both Congressional intent and sound public policy.  It also conflicts with the Commission's previous holding that the TCPA's ATDS restrictions "clearly do not apply to functions like 'speed dialing,' [or] 'call forwarding,'...because the numbers called are not generated in a random or sequential fashion."[16]  The only logical interpretation is that the second prong requires the equipment to have the capacity to dial telephone numbers *without human intervention*.

### B.  The Use of a One-Click Dialing Method is Irrelevant to the Determination of Whether an ATDS was Used to Initiate the Call

The decision in *Nelson* has created industry wide confusion regarding the legality of using a one-click dialing method to initiate calls.  Whether calls are initiated by entering all ten digits of the phone number or via a one-click process, however, is irrelevant to the determination of whether an ATDS was used to make the call.   As indicated above, the statutory definition of ATDS inherently requires the equipment to have the capacity to, *inter alia*, dial numbers without human intervention to be an ATDS.  Both dialing methods (entering all ten digits and one-click dialing) involve human intervention for each and every call.  There is nothing in the TCPA, the Commission's regulations or any Commission Rulings or Orders that indicates all ten digits of a

---

[16] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 7 FCC Rcd. 8752 at ¶ 47 (1992).

telephone number must be entered for equipment to be outside the definition of an ATDS. Conversely, public policy and common sense dictate that, for purposes of the TCPA, there is no distinction between the two dialing methods. If equipment meets the definition of an ATDS merely because it can dial multi-digit telephone numbers at the touch of a single button, virtually every modern telephone (including cell phones and all phones with speed dial functionality) constitutes an ATDS. As discussed above, this interpretation is manifestly against Congressional intent, prior Commission holdings and sound public policy.

## IV.   A System's "Capacity" is Limited to What it is Capable of Doing, Without Further Modification, at the Time the Call is Made

As noted above, in the 2003 Report and Order, there is an important discussion regarding the capacity of equipment to make calls "when paired with certain software."[17] The Commission did not specify whether it was contemplating the capacity of the equipment when paired with the software *at the time the call is made* or its theoretical capacity (i.e. its capacity if the software were installed in the future). PACE agrees with the positions outlined in other petitions filed with the Commission,[18] that the equipment's "capacity" must be limited to what it is capable of doing *at the time the call is placed* rather than taking into account what the "capacity" of the equipment would be if it were modified or altered in some way.

The term "capacity" is not defined in the TCPA or the Commission's regulations. When a statute does not define a term, the everyday meaning of the term governs.[19] Relevant dictionary definitions for the term capacity (and example sentences provided in these dictionaries) include the following:

---

[17] *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd 14014 at ¶ 131 (2003).

[18] *See, e.g., Communication Innovators Petition for Declaratory Ruling*, at 16-18 (filed June 7, 2012); *GroupMe, Inc. Petition for Expedited Declaratory Ruling and Clarification*, at 9-14 (filed March 1, 2012).

[19] *See e.g.*, Watson v. United States, 128 S. Ct. 579, 583 (U.S. 2007); United States v. Hildenbrand, 527 F.3d 466, 476 (5th Cir. Tex. 2008).

| Dictionary Definition | Example Sentences in the Dictionary |
|---|---|
| "The ability to do something."[20] | "Her poor health limits her earning capacity." |
| "The facility or power to produce, perform, or deploy."[21] | "A plan to double the factory's capacity." |
| "Actual or potential ability to perform, yield, or withstand."[22] | "The capacity of the oil well was 150 barrels a day." |
| "The ability to do or produce."[23] | "The factory's output was not at capacity." |

As demonstrated by the examples provided in these dictionaries, each definition pertains to the *current* capacity of a person, organization or object.  For example, the capacity of the factory in the second example above is measured based on its current limitations.  Once the factory is modified, its capacity changes (doubling in this case).  The clear takeaway from these definitions is that, although the capacity of an object is not necessarily limited to the manner in which it is currently being used, it is limited to its current capabilities.  The Commission should, therefore, clarify that, in accordance with the everyday meaning of the term capacity, a system's "capacity" is limited to what it is capable of doing, without further modification, *at the time the call is placed*.

This interpretation is not only required by principles of statutory construction, it is also sound public policy.  If the term capacity encompasses an object's theoretical capacity, the object would have a virtually infinite capacity.  Relevant to the TCPA, this interpretation would mean that all computers and cell phones constitute ATDSs because they can be paired with software that allows them to autodial telephone numbers.[24]  As discussed above, such an interpretation is contrary to Congressional intent, prior Commission holdings and sound public policy.

---

[20] Macmillan Dictionary, available at:  http://www.macmillandictionary.com/us/dictionary/american/capacity.

[21] Merriam-Webster Dictionary, available at:  http://www.merriam-webster.com/dictionary/capacity.

[22] Dictionary.com, available at:  http://dictionary.reference.com/browse/capacity.

[23] WordReference.com, available at:  http://www.wordreference.com/definition/capacity.

[24] *See, e.g.*, *GroupMe, Inc. Petition for Expedited Declaratory Ruling and Clarification*, at 10-11 (filed March 1, 2012).

Moreover, PACE's request and the underlying rationale for the same comports with the recent decision issued by the Northern District of Alabama, in *Hunt v. 21st Mortg. Corp.*, which held that "to meet the TCPA definition of [ATDS], a system must have a **present** capacity, at the time the calls were made, to store or produce and call numbers from a number generator."[25] According to the Court, a defendant cannot be held liable "if substantial modification or alteration of the system would be required to achieve that capability."[26]  Similar to PACE's contentions here, the Court noted that a broader interpretation of the term "capacity" would sweep consumer devices such as iPhones within the definition of ATDS.[27]

## V.  The Commission Can Provide the Requested Clarifications via a Declaratory Ruling

PACE is mindful that the Commission cannot make a rule change via a Declaratory Ruling.  PACE's requests, however, do not necessitate a rule change.  PACE merely seeks *clarification* on the *existing* definition of ATDS as follows:  (1) that the second prong of the definition requires that equipment have the capacity to, *inter alia*, dial numbers *without human intervention* to constitute an ATDS; and (2) that, pursuant to the everyday meaning of the term capacity, a system's "capacity" is limited to what it is capable of doing, without further modification,  *at the time the call is placed*.  These requests are consistent with the language in the TCPA, the FCC's TCPA regulations, and prior Commission Rulings; therefore, no rule change is necessary.

In the event that the Commission disagrees with this position, PACE respectfully petitions the Commission for an Expedited Rulemaking pursuant to 47 CFR 1.401 to:  (1) define the term "capacity," as used in the TCPA and Commission's rules, as "the current ability to operate or perform an action, when placing a call, without first being modified or technologically

---

[25] Hunt v. 21st Mortg. Corp., 2013 U.S. Dist. LEXIS 132574 at 11 (N.D. Ala. Sept. 17, 2013).
[26] *Id.*
[27] *Id.*

altered;" and (2) modify the definition of "automatic telephone dialing system" in 47 CFR 64.1200(f)(2) by adding the phrase "without human intervention" to the end of the definition.

## VI.   <u>Conclusion</u>

For the foregoing reasons, the Commission should clarify that (1) a system is not an ATDS unless it has the capacity to, *inter alia*, dial numbers **without human intervention**; and (2) a system's "capacity" is limited to what it is capable of doing, without further modification, ***at the time the call is placed***.  Alternatively, the Commission should initiate an Expedited Rulemaking to: (1) define the term "capacity," as used in the TCPA and Commission's rules, as "the current ability to operate or perform an action, when placing a call, without first being modified or technologically altered;" and (2) modify the definition of "automatic telephone dialing system" in 47 CFR 64.1200(f)(2) by adding the phrase "without human intervention" to the end of the definition.

Respectfully submitted,


/s/ Michele A. Shuster
Michele A. Shuster, Esq.
Nicholas R. Whisler, Esq.
Mac Murray, Petersen & Shuster LLP
6530 West Campus Oval, Suite 210
New Albany, OH 43054
Telephone:  (614) 939-9955
Facsimile:   (614) 939-9954

***Counsel for the Professional Association for Customer Engagement***

Exhibit I

# PUBLIC NOTICE

**Federal Communications Commission**
**445 12th St., S.W.**
**Washington, D.C. 20554**

News Media Information 202 / 418-0500
Internet: http://www.fcc.gov
TTY: 1-888-835-5322

---

DA 13-2220
Released:  November 19, 2013

### CONSUMER AND GOVERNMENTAL AFFAIRS BUREAU SEEKS COMMENT ON PETITION FOR EXPEDITED DECLARATORY RULING AND/OR EXPEDITED RULEMAKING FROM THE PROFESSIONAL ASSOCIATION FOR CUSTOMER ENGAGEMENT

### CG Docket No. 02-278

**Comment Date:  December 19, 2013**
**Reply Comment Date:  January 4, 2014**

With this Public Notice, and consistent with sections 1.2(b) and 1.403 of the Commission's rules, we seek comment on the Petition for Expedited Declaratory Ruling and/or Expedited Rulemaking filed by the Professional Association for Customer Engagement (PACE).[1]  PACE seeks clarification through an Expedited Declaratory Ruling that a dialing system is not an automatic telephone dialing system for purposes of the Telephone Consumer Protection Act (TCPA)[2] unless it has the capacity to dial numbers without human intervention, regardless of whether a call is initiated by entering ten digits of a telephone number or by a one-click dialing method.[3]  PACE also seeks clarification that, for TCPA purposes, a dialing system's "capacity" is limited to what it is capable of doing, without further modification, at the time the call is placed.[4]  PACE asserts that the Commission could provide the requested clarification in a Declaratory Ruling because no rule changes would be necessary.[5]

In the alternative, PACE requests an Expedited Rulemaking should the Commission disagree that Declaratory Ruling is appropriate.[6]  PACE requests that, in an Expedited Rulemaking, the Commission define the term "capacity" as used in the TCPA and the Commission's rules as "the current ability to

---

[1] *See Professional Association for Customer Engagement*, Petition for Expedited Declaratory Ruling and/or Expedited Rulemaking, CG Docket No. 02-278 (filed Oct. 18, 2013) (*Petition*).  PACE is a "non-profit trade organization dedicated exclusively to the advancement of companies that utilize contact centers as an integral channel of operations."  *Petition* at 4.  The Petition is styled differently on the cover page than it is within the Petition itself.  The body of the Petition, however, is clear that PACE requests an expedited a rulemaking "[i]n the alternative" to a declaratory ruling, rather than "and/or" a declaratory ruling.  *Compare Petition* at 1 *with* 3.

[2] Codified as 47 U.S.C. § 227.

[3] *Petition* at 4.

[4] *Id.*

[5] *Id.* at 12.

[6] *Id.  See also* 47 C.F.R. § 1.2(a).

operate or perform an action, when placing a call, without first being modified or technologically altered."[7]  PACE further asks that the Expedited Rulemaking modify the definition of "automatic telephone dialing system" in section 64.1200(f)(2) of the Commission's rules by adding, to the end of the definition, "without human intervention."[8]

We seek comment on PACE's *Petition*, including whether declaratory ruling or rulemaking is the appropriate type of proceeding in which to consider the merits of its arguments.

Pursuant to sections 1.415 and 1.419 of the Commission's rules,[9] interested parties may file comments and reply comments on or before the respective dates indicated on the first page of this Notice. Comments may be filed using the Commission's Electronic Comment Filing System (ECFS).  *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).

- Electronic Filers:  Comments may be filed electronically using the Internet by accessing the ECFS:  http://fjallfoss.fcc.gov/ecfs2/.

- Paper Filers:  Parties who choose to file by paper must file an original and one copy of each filing.

- Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail.  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

- All hand-delivered or messenger-delivered paper filings for the Commission's Secretary must be delivered to FCC Headquarters at 445 12th St., SW, Room TW-A325, Washington, DC 20554.  The filing hours are 8:00 a.m. to 7:00 p.m.  All hand deliveries must be held together with rubber bands or fasteners.  Any envelopes and boxes must be disposed of before entering the building.

- Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9300 East Hampton Drive, Capitol Heights, MD  20743.

- U.S. Postal Service first-class, Express, and Priority mail must be addressed to 445 12th Street, SW, Washington DC  20554.

People with Disabilities:  To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty).

The proceeding this Notice initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[10]  Persons making *ex parte* presentations must file a

---

[7] *Petition* at 12-13.

[8] *Petition* at 13; 47 C.F.R. § 64.1200(f)(2).

[9] 47 C.F.R. §§ 1.415, 1.419.

[10] 47 C.F.R. §§ 1.1200 *et seq*.

copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation.  If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum.  Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with rule 1.1206(b).  In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (*e.g.*, .doc, .xml, .ppt, searchable .pdf).  Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

**FOR FURTHER INFORMATION CONTACT:**  Kristi Lemoine, Consumer and Governmental Affairs Bureau, Federal Communications Commission, 202-418-2467, and kristi.lemoine@fcc.gov.

**-FCC-**

Exhibit J

# Chamber of Commerce
## of the
# United States of America

**William L. Kovacs**
Senior Vice President
Environment, Technology &
Regulatory Affairs

1615 H Street, N.W.
Washington, D.C.  20062
(202) 463-5457

December 19, 2013

**Via Electronic Filing**

Ms. Marlene H. Dortch
Secretary
Federal Communications Commission
445 12th Street, SW
Washington, DC  20554

Re:  *In the Matter of Application of Rules and Regulations Implementing the Telephone Consumer Protection Act:  Professional Association for Customer Engagement (PACE) Petition for Expedited Declaratory Ruling and/or Expedited Rulemaking,* CG Docket No. 02-278

Dear Ms. Dortch:

The U.S. Chamber of Commerce ("Chamber")[1] respectfully submits these comments to the Federal Communications Commission ("Commission") in response to its Public Notice[2] requesting comment on the Petition for Expedited Declaratory Ruling and/or Expedited Rulemaking filed by the Professional Association for Customer Engagement ("PACE Petition") in the above-referenced docket.

The Chamber supports PACE's request for a Declaratory Ruling to clarify that for purposes of the Telephone Consumer Protection Act ("TCPA"):[3] (1) a system is not an automatic telephone dialing system ("ATDS") unless it has the capacity to, *inter alia*, dial numbers without human intervention; and (2) a system's "capacity" is limited to what it is capable of doing, without further modification, at the time the call is placed.[4]  If the Commission determines that a Declaratory Ruling is not appropriate, then the Chamber also supports PACE's request for a Rulemaking to: (1) define the term "capacity," as used in the TCPA and the Commission's rules, as "the current ability to operate or perform an action, when placing a call, without first being modified or technologically altered;" and (2) modify the definition of "automatic telephone

---

[1] The U.S. Chamber of Commerce is the world's largest business federation, representing the interests of more than three million businesses and organizations of every size, sector, and region, dedicated to promoting, protecting, and defending America's free enterprise system.

[2] Public Notice, *Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Expedited Declaratory Ruling and/or Expedited Rulemaking from the Professional Association for Customer Engagement*, CG Docket No. 02-278, DA 13-2220 (rel. Nov. 19, 2013).

[3] 47 U.S.C. § 227.

[4] *Id.*

Ms. Marlene H. Dortch
December 19, 2013
Page 2 of 6

dialing system" in 47 CFR 64.1200(f)(2) by adding the phrase "without human intervention" to the end of the definition.[5]

### I.    The Chamber Agrees with PACE that Businesses Desperately Need Clarification from the Commission Regarding What Type of Equipment Does Not Constitute an ATDS

Instead of going after abusive marketers as originally intended by Congress, the TCPA has been turned into a "juggernaut:  a destructive force that threatens companies with annihilation for technical violations that cause no actual injury or harm to any consumer."[6]  A company facing a TCPA lawsuit is forced to decide whether to reach a settlement with the plaintiff's counsel or to accept the risk and spend significant resources defending itself against an action where the alleged statutory damages may be in the millions or billions of dollars.[7]

### A.  The TCPA's Restrictions on ATDS are Only Applicable to Calls Made to Cell Phones

When Congress enacted the TCPA in 1991, wireless phones were a luxury item and the landline was the dominant consumer telecommunications device.  Thus, certain restrictions in the TCPA are only applicable to calls made to cell phones.  Specifically, the TCPA prohibits the use of an ATDS to call or send texts to mobile phones without the consent of the recipient.  Under the TCPA, an ATDS is defined as "equipment which has the capacity:  (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."[8]  If this prohibition is violated, the TCPA permits a private right of action and allows statutory damages of $500 per call or text, which can be trebled if the violation is willful.[9]

### B.  Wireless Usage is Vastly Different Than When the TCPA Was Enacted

However, as the Commission itself has acknowledged, "wireless use has expanded tremendously since passage of the TCPA in 1991."[10]  The number of "wireless-only" households increased to 39.4% during the first half of 2013 from 38.2% during the second half of 2012.[11]  An additional 15.7% of U.S. households were "wireless-mostly" (i.e., the household has a

---

[5] *Id.*

[6] Becca J. Wahlquist, *The Juggernaut of TCPA Litigation* (prepared for the U.S. Chamber Institute for Legal Reform) at 1, (Oct. 2013), *available at* http://www.instituteforlegalreform.com/uploads/sites/1/TheJuggernautofTCPALit_WEB.PDF.

[7] *Id.*

[8] 47 U.S.C. § 227(a)(1).

[9] *Id. at* (b)(3).

[10] *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991* ("*2012 TCPA Order*"), 55 Communications Reg. (P&F) 356, ¶ 29 (2012).

[11] Stephen J. Blumberg & Julian V. Luke, Div. of Health Interview Statistics, Nat'l Ctr. for Health Statistics, Centers for Disease Control and Prevention, *Wireless Substitution: Early Release of Estimates From the National Health Interview Survey, January–June 2013*, at 1 (Dec. 2013), *available at* http://www.cdc.gov/nchs/data/nhis/earlyrelease/wireless201312.pdf.

Ms. Marlene H. Dortch
December 19, 2013
Page 3 of 6

landline but receives all or most calls on a wireless phone).[12]  No matter where they are at the moment, consumers want to be connected.  Thus, smartphones in the United States are now used by 64% of all mobile phone owners and account for 80% of recently purchased mobile phones.[13]  Consumers use their smartphones to communicate in the manner (e.g., voice calls, text messaging, e-mail, video chat, social media, gaming, etc.) that best meets their needs at the time.

### C.   Regulatory Uncertainly Concerning the Definition of ATDS Has Resulted in a Tsunami of TCPA Litigation

As wireless devices have become dominant, clarification by the Commission of what type of equipment does not constitute an ATDS—a discussion that would have been unnecessary in 1991, is now needed to bring regulatory certainty to the business community and to stem the tsunami of class action TCPA lawsuits driven not by aggrieved consumers, but by opportunist plaintiffs' firms taking advantage of this uncertainty in the law to rake in attorney fees.  As another petitioner in this docket elegantly stated, "Without some guidance, the evolution of the definition of the term ATDS is limited only by class counsel's imagination, or worse yet, will come to encompass every type of telephonic device in existence, thereby preventing anyone from calling a cellular phone number without express consent or except in an emergency."[14]

TCPA lawsuits against businesses are skyrocketing.  There have been 1,332 TCPA lawsuits in the first nine months of 2013 compared to 824 for all of 2011, an increase of 62%.[15]  Unfortunately, the growth in TCPA lawsuits shows no indication of slowing down.  There were 162 TCPA lawsuits filed in September 2013 compared to 75 in September 2012, an increase of 116%.[16]

These suits create a number of problems.  First, businesses face the significant cost of defending against these suits, which are often not resolved until summary judgment after months of expensive discovery.  Second, as courts and practitioners have noted, the combination of statutory damages (as in the TCPA) and the class-action device amounts to a "perfect storm."[17]  That "perfect storm" allows for damages demands so high as to force defendants to "stake their companies on the outcome of a single jury trial, or be forced by fear of the risk of bankruptcy to

---

[12] *Id.*

[13] *Smartphone Switch: Three-Fourths of Recent Acquirers Chose Smartphones,* The Nielsen Company (Sept. 17, 2013), *available at* http://www.nielsen.com/us/en/newswire/2013/smartphone-switch--three-fourths-of-recent-acquirers-chose-smart.html.

[14] *YouMail, Inc., Petition for Expedited Declaratory Ruling That YouMail's Service Does Not Violate the TCPA,* CG Docket No. 02-278, at 11 (filed Apr. 19, 2013), *available at* http://apps.fcc.gov/ecfs/document/view?id=7022288462.

[15] Ben Goad, "Lawsuits surge against robo-callers," *The Hill,* Nov. 3, 2013, *available at* http://thehill.com/blogs/regwatch/pending-regs/189039-new-robo-call-regs-expected-to-cause-flood-of-lawsuits; and Patrick Lunsford, *TCPA Lawsuits Really Are Growing Compared to FDCPA Claims*, Oct. 22, 2013, *available at* http://www.insidearm.com/daily/debt-buying-topics/debt-buying/tcpa-lawsuits-really-are-growing-compared-to-fdcpa-claims/.

[16] Lunsford, *TCPA Lawsuits Really Are Growing Compared to FDCPA Claims.*

[17] *Sittlmock v. Weis Mkts., Inc.*, 385 F. App'x 267, 276 (4th Cir. 2010) (Wilkinson, J., concurring).

Ms. Marlene H. Dortch
December 19, 2013
Page 4 of 6

settle even though they have no legal liability."[18] The fear of such "annihilating damages" can deter companies from engaging with consumers. Moreover, "[t]he mere threat of a 'potentially enormous aggregate recovery for plaintiffs' raises concerns about 'an *in terrorem* effect on defendants, which may induce unfair settlements.'"[19]

## II.    The Chamber Agrees with PACE that the Commission Should Clarify that a System is not an ATDS Unless it has the Capacity to, *Inter Alia*, Dial Numbers Without Human Intervention

A recent decision by the Western District of Wisconsin in *Nelson v. Santander Consumer USA, Inc.* held that a dialer used to make calls in "preview mode" was an ATDS because the dialer also had the capacity to dial in predictive mode. [20] Though the decision was ultimately vacated by a joint motion and stipulation by the parties, the case has generated enormous concern within the business community about whether "one-click" preview dialing[21] could constitute a *per se* violation of the TCPA and has caused speculation about whether even manually-dialed calls could eventually be deemed violations if made using a device as simple as a cell phone.

Therefore, the Chamber agrees with PACE that the Commission should clarify that a system is not an ATDS unless it has the capacity to, *inter alia*, dial numbers without human intervention.[22] The Chamber also agrees with PACE that human intervention is the key factor and it should not matter whether calls are commenced by entering all of the digits of the phone number or by using the "one-click" process because in both of these situations there is human intervention that is required before a number is dialed.[23]

If viewed otherwise, "after being prompted by a human" effectively becomes part of the "dial such number" prong of the ATDS definition. Under this interpretation, cell phones would be considered an ATDS because they have the capacity to both store numbers and dial them at the user's request. The real world consequence of this disastrous interpretation would mean that individuals could not call or text the mobile phones of anyone on their contact list without the recipient's prior consent. For example, this type of interpretation of the TCPA would force compliance onto small business owners seeking to follow up with their customers, business colleagues seeking to communicate with each other, and many other callers not intended to be regulated by the TCPA. Such a result would be nonsensical and contrary to both Congressional intent and public policy as well as inconsistent with a prior Commission holding that the restrictions of the TCPA "clearly do not apply to functions like 'speed dialing' [or] 'call

---

[18] *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1299 (7th Cir. 1995).

[19] John Nadolenco, Archis A. Parasharami & Joseph P. Minta, *Too High A Price? The Perilous Combination Of Statutory Damages And Class Certification*, 18 No. 1 Westlaw Journal Class Action 1, 3 (2011) (quoting *Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 22 (2d Cir. 2003)).

[20] *Nelson v. Santander Consumer USA, Inc.*, 2013 U.S. Dist. LEXIS 40799 (W.D. Wis. Mar. 8, 2013).

[21] "In preview dialing, an employee chooses a telephone number by clicking on a computer screen and the system calls it. Defendant's employees never called plaintiff by pressing numbers on a keypad." *Id.* at 8.

[22] Professional Association for Customer Engagement (PACE), Petition for Expedited Declaratory Ruling and/or Expedited Rulemaking, CG Docket No. 02-278 (filed Oct. 18, 2013) at 7-10. ("PACE Petition").

[23] *Id. at 9-10.*

Ms. Marlene H. Dortch
December 19, 2013
Page 5 of 6

forwarding' …because the numbers called are not generated in a random or sequential fashion."[24]

### III. The Chamber Agrees With PACE that the Commission Should Clarify that a System's "Capacity" is Limited to What it is Capable of Doing, Without Further Modification, at the Time the Call is Placed

Consistent with the Chamber's previous filings in this docket,[25] the Chamber strongly supports PACE's request that the Commission clarify that "capacity" must be limited to what the system or equipment is capable of doing at the time the call is placed rather than based on a theoretical capacity if modified or altered.[26]  Businesses wish to use ATDS that access their own databases of contacts to inform consumers about products, services, and accounts; these phone numbers are not randomly or sequentially stored or produced.  However, conceivably any telephone equipment could be modified to dial randomly or sequentially stored or produced numbers.  Therefore, logically, capacity should be limited to what the equipment is capable of doing, without further modification, at the time the call is placed; otherwise, the TCPA would be applicable to a much broader array of equipment, including cell phones, than Congress intended.

The Chamber also notes that a recent decision by the U.S. District Court for the Northern District of Alabama in *Hunt v. 21st Mortg. Corp.* expressed the same concern about a broad definition of "capacity," stating that "it is virtually certain that software could be written, without much trouble, that would allow iPhones 'to store or produce telephone numbers to be called, using a random or sequential number generator, and to call them.'  Are the roughly 20 million American iPhone users subject to the mandates of…the TCPA?"[27]  Therefore, the Court held that to "meet the TCPA definition of an 'automatic telephone dialing system,' a system must have a present capacity, at the time the calls were being made, to store or produce and call numbers from a number generator."[28]

### IV. If the Commission Determines that the Relief Sought is Beyond the Agency's Ability to Grant in a Declaratory Ruling, then the Chamber Supports the Commencement of an Expedited Rulemaking to Address These Issues

If the Commission determines that a Declaratory Ruling is not a workable means of granting the relief sought, then, in the alternative, the Chamber supports PACE's request for an Expedited Rulemaking to: (1) define the term "capacity," as used in the TCPA and the Commission's rules, as "the current ability to operate or perform an action, when placing a call,

---

[24] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd 8752, 8775 ¶ 47 ("*1992 TCPA Order*").

[25] *See* U.S. Chamber Comments on Communication Innovators' Petition for Declaratory Ruling (filed Nov. 15, 2012), *available at* http://apps.fcc.gov/ecfs/document/view?id=7022056396, and U.S. Chamber Comments on GroupMe's Petition for Declaratory Ruling (filed Aug. 30, 2012), *available at* http://apps.fcc.gov/ecfs/document/view?id=7022008729.

[26] PACE Petition at 10-12.

[27] *Hunt v. 21st Mortg. Corp.*, 2013 U.S. Dist. LEXIS 132574 at 11 (N.D. Ala. Sept. 17, 2013).

[28] *Id.*

Ms. Marlene H. Dortch
December 19, 2013
Page 6 of 6

without first being modified or technologically altered;" and (2) modify the definition of "automatic telephone dialing system" in 47 CFR 64.1200(f)(2) by adding the phrase "without human intervention" to the end of the definition.[29]

### V.      Conclusion

The Chamber supports Commission action that clarifies that:  (1) a system is not an ATDS unless it has the capacity to, *inter alia*, dial numbers without human intervention; and (2) a system's "capacity" is limited to what it is capable of doing, without further modification, at the time the call is placed.  In the alternative, the Chamber would also support an Expedited Rulemaking to achieve a similar result.  By granting the PACE Petition, the Commission can help curtail abusive lawsuits and provide American businesses with desperately needed certainty.

Sincerely,

William L. Kovacs

---

[29] PACE Petition at 12-13.