UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.: 1:13-cv-22751-UU

ANGELA LARDNER,

    Plaintiff,

v.

DIVERSIFIED CONSULTANTS,
INC,

    Defendant.

_____/

## DEFENDANT'S MOTION TO DISMISS AND/OR MOTION TO STAY CASE PENDING FCC'S DECLARATORY RULING

COMES NOW, Defendant, DIVERSIFIED CONSULTANTS, INC., ("DCI") by and through its undersigned counsel, and files this Motion to Dismiss and/or Motion to Stay Case, and in support thereof, states as follows:

**I. INTRODUCTION**

Plaintiff, Angela Lardner, alleges Defendant, DCI violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.,* by allegedly using an automatic telephone dialing system ("ATDS") to call her cell phone without her prior express consent. According to Ms. Lardner, DCI, a third party debt collector for T-Mobile, placed these calls to "demand payment" on an outstanding telephone bill due and owing to the original creditor. Ms. Lardner's Complaint turns on two issues currently pending before the FCC in four (4) Petitions for Declaratory Ruling: *(1) whether the TCPA applies to non-telemarketing calling activity (such as the debt-collection calls about which Ms. Lardner complains); and (2) whether dialing equipment must have a current capacity to generate and dial random or sequential numbers to be an ATDS (not a mere*

*theoretical capacity if modified by hardware or software).* An FCC ruling that the TCPA does not encompass non-telemarking calling activity could dispose of Ms. Lardner's Complaint. And if the FCC concludes dialing equipment must have the current capacity to generate and dial random or sequential numbers, rather than a mere theoretical capacity (which even consumer smartphones have), that too would gut Ms. Lardner's c l a i m s .

The parties have each filed dispositive motions in which three primary issues have been raised: (1) Does DCI's utilization of a third party vendor, LiveVox, which does not have the present capacity to generate and dial random or sequential numbers as defined under the TCPA, bar relief to the Plaintiff in this action? (2) Does DCI's utilization of a third party dialer, in which the actual call is dialed by LiveVox and not DCI, create vicarious liability upon DCI under the TCPA? (3) Did DCI have prior express consent to call the Plaintiff were as the telephone number was provided by the original creditor? Given the fact that the issue of whether the mechanism meets the definition of "ATDS" under the TCPA, the Court should stay this case either under the primary jurisdiction doctrine or pursuant to the Court's inherent authority pending the FCC's rulings on these petitions.

### *Primary Jurisdiction Doctrine*

The present circumstances meet the standard for staying the case under the primary jurisdiction doctrine. *First,* Ms. Lardner's allegations require resolving whether the TCPA applies to non-telemarketing calls, and whether equipment lacking the current capacity to generate and dial random or sequential numbers falls within the TCPA's ambit. *Second,* the FCC has primary jurisdiction to determine, and in fact will determine, these very issues. *Third,* regulating non-telemarking calls to cell phones and defining what comprise ATDSs requires agency expertise and national uniformity. But regardless of the primary jurisdiction doctrine, the

Court should invoke its inherent power to stay this action to avoid burdening the parties and the Court with further proceedings regarding claims the FCC's imminent rulings might dispose of entirely, particularly where doing so will not prejudice Ms. Lardner.

## II. FACTUAL BACKGROUND

In her Complaint, Ms. Lardner alleges DCI called her cell phone without her consent to "demand payment" for a past due cellular telephone debt obligation. She alleges DCI is a debt collector that during the course of collection of this debt placed these calls to her cell phone using "an automatic telephone dialing system as defined by the TCPA."

According to Ms. Lardner, these alleged calls violated the TCPA's restrictions on placing telemarketing calls to cell phones using ATDS. Ms. Lardner's counsel acknowledges Congress "enacted the [TCPA] in response to a growing number of consumer complaints regarding certain telemarketing practices." The TCPA prohibits "any person ... [from] mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(l)(A)(iii). It defines an ATDS as "equipment which has the capacity-(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id.* §§ 227(a)(l)(A), (B) It is undisputed in this case that DCI used a third party vendor, LiveVox to actually make the calls and that it is further undisputed that the LiveVox call platform does not have present capacity to "store or produce numbers to be called, using a random or sequential number generator ... and to dial such numbers" as required for its equipment to comprise an ATDS.

3

### A. The Pending Petitions for FCC Declaratory Rulings.

Ms. Lardner contends the Court should hold callers liable for debt-related calls, even though such calls are not telemarketing, and even if the dialing equipment lacks a present capacity to store or produce random or sequential numbers for dialing. DCI has responded to Plaintiff's Motion for Summary Judgment as well as filed its own Motion for Summary Judgment by providing unrebutted testimony the LiveVox dialing software and equipment lacks such capacity. Four petitions for declaratory rulings currently before the FCC ask the agency to decide whether the TCPA applies to non-telemarketing calling activities, and whether equipment that lacks the current capacity for random or sequential number generation constitutes an ATDS.[1]

1. *In re Communication Innovators*

On June 7, 2012, Communication Innovators ("CI") filed a Petition for Declaratory Ruling with the FCC, seeking a declaration that "the Commission clarify, consistent with the text of the TCPA and Congressional intent, that predictive dialers that (1) are not used for telemarketing purposes and (2) do not have the current ability to generate and dial random or sequential numbers, are not 'automatic telephone dialing systems' . . . under the TCPA.

In requesting this ruling, the CI Petition points out that the TCPA does not define "capacity," and urges the FCC to "clarify that the definition of an autodialer under the TCPA reflects equipment that has a *present* capacity, such as having the current ability to generate and dial random or sequential numbers without additional modifications to the equipment." *Id* at 17.

---

[1] The Court may take judicial notice of information made "publicly available by government entities" and whose authenticity no party disputes, such as declaratory ruling petitions filed with the FCC, and subsequent filings by the FCC and other parties on the same docket. *Daniels-Hall v. Nat'l Educ. Ass'n,* 629 F.3d 992, 998-99 (9th Cir. 2010) (citing Fed. R. Evid. 201)).

It argues the FCC "should not interpret capacity as encompassing any conceivable hardware or software modification to a device that would permit it to generate, store, and dial numbers randomly or in sequence." *Id* As the CI Petition notes, interpreting "capacity" broadly to include "any conceivable hardware or software modification" would potentially bring "mobile phones, smart phones, tablets, e-readers, and personal computers" within the TCPA's scope, as each can "theoretically be modified ... to randomly or sequentially generate and dial telephone numbers." *Id* The CI Petition also asks the FCC to "distinguish between telemarketing and informational calls when it clarifies the meaning of capacity." *Id* In particular, the CI Petition contends "today's predictive dialers-many of which have no current capacity to dial random or sequential numbers-are used for a number of innovative non-telemarketing purposes that simultaneously bring benefits to consumers and businesses"[2] such as "allowing businesses with a legitimate need to contact a large number of specific accountholders or other consumers to do so accurately, efficiently, and cost-effectively." *Id* at 18-19. Communication Innovators filed its Petition on June 7, 2012. About four months later, the FCC issued a public notice, seeking comment on the Petition. The deadline for comments and reply comments closed in November 2012, over a year ago. *Id.* Numerous consumer and industry groups commented, most of which generally supported Cl's Petition. (Reply Comments of Communication Innovators, CI Pet., CG Docket No. 02-278 (Nov. 30, 2012)) (discussing various comments filed at pp. 2, 3, 7, 8, 10, 12, 13 & 15). While the formal comment period has now passed, interested parties have continued to submit letters to the Commission and regularly visit with Commission staff

---

[2] The FCC has interpreted the TCPA's definition of ATDS to include equipment that dials lists of number without human intervention. In *re Rules & Regs. Implementing the TCPA,* 73 Fed. Reg. 6041, 6042 (Feb. 1, 2008). The FCC calls this equipment "predictive dialers." *In re Rules & Regs. Implementing the TCPA,* 68 Fed. Reg_ 44144, 44161 (July 25, 2003).

urging prompt action. Recently, the FCC has indicated that it may issue a decision regarding the CI Petition imminently. On September 27, 2013, the FCC released an exchange of correspondence between several Members of Congress and the then-FCC Chair (and the Acting Chief of the Consumer and Governmental Affairs Bureau), in which the Commission stated that "[a] draft order to resolve the [CI] Petition is under consideration by the Commission, and Communication Innovators has met with the staff recently to discuss the matter." The letter from Congress (signed by three Members) to the then-FCC Chair was dated June 19, 2013, and the FCC's response, though not released until September 27, 2013, was dated September 10, 2013. This recent flurry of activity regarding the CI Petition bolsters the assumption that the FCC will issue directly relevant guidance soon.

    2.    *In re GroupMe*

In its Petition for Declaratory Ruling, filed on March 1, 2012, GroupMe also requested "that the Commission issue a ruling defining 'capacity' to encompass only equipment that, *at the time of use,* could, in fact, have autodialed random or sequential numbers without human intervention and without first being technologically altered." (GroupMe Pet. at 14). On July 24, 2012, the FCC issued a public notice seeking comment on GroupMe's petition. *Id* (FCC Pub. Notice, Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Expedited Declaratory Ruling from GroupMe, Inc. (July 24, 2012)). The deadline for comments was August 30, 2012, and for reply comments, September 10, 2012.

    3.    *In re YouMail*

YouMail, Inc. filed its Petition for Declaratory Ruling on April 19, 2013. Like Communication Innovators and GroupMe, YouMail asks that "the Commission affirmatively

state that only equipment that has a <u>current</u> capacity to store and produce telephone numbers to be called using a random or sequential number generator-and is currently being used for that purpose-should be considered an ATDS." (YouMail Pet. at 11). On June 25, 2013, the FCC issued a public notice seeking comment on YouMail's petition. (FCC Pub. Notice, Consumer and Governmental Affairs Bureau Seeks Comment on Petition for Expedited Declaratory Ruling from YouMail, Inc. (June 25, 2013)). The deadline for comments was July 25, 2013, and for reply comments, August 9, 2013. YouMail's proposed interpretation of the term "capacity" as current capacity received "widespread support from the majority of commenters." *Id* (Reply Comments of YouMail, Inc. at 2 (Aug. 9, 2013)).

    4.    *In re ACA International*

ACA International, representing the interests of third party debt collectors, debt buyers and collection attorneys filed its Petition for Declaratory Ruling on January 31, 2014 raising the very same issues and concerns. A copy of the ACA Petition is attached hereto as **Exhibit "A"** for the court review and consideration. Similarly, DCI, in this action has raised the very same issues of concern and interpretation before this court.

### III. ARGUMENT

#### A. The Court Should Stay This Action Under the Primary Jurisdiction Doctrine Pending FCC Guidance That May Dispose of Plaintiff's Claims.

Under the primary jurisdiction doctrine, courts may stay proceedings or dismiss a complaint without prejudice pending resolution of "'an issue within the special competence of an administrative agency.'" N. Cnty. Commc'ns Corp. v. Cal. Catalog & Tech., 594 F.3d 1149, 1162 (9th Cir. 2010) *(quoting* Clark v. Time Warner Cable, 523 F.3d 1110, 1114 (9th Cir. 2008)). Courts invoke the primary jurisdiction doctrine "to advance regulatory uniformity," "to answer a question ... within the agency's discretion," and "to benefit from

technical or policy considerations within the agency's ... expertise." <u>Charvat v. EchoStar Satellite, LLC</u>, 630 F.3d 459, 466 (6th Cir. 2010) (invoking primary jurisdiction doctrine in TCPA case) (internal quotation marks omitted). Courts are instructive that a court may stay a case pending an agency determination "where there is (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to the statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration. "<u>Davel Commc'ns, Inc. v. Qwest Corp.</u>, 460 F.3d 1075, 1086-87 (9th Cir. 2006) (internal quotation marks omitted). This case satisfies all of these factors. The Court should stay this action pending the FCC's likely imminent ruling on the pending petitions.

A similar request for a stay has been recently granted in the case <u>Hurrle v. Real Time Resolutions, Inc.</u>, 2014 WL 670639 (W.D. Wash 2014) in which the court granted the Defendant's stay pending the outcome of the pending petitions to the Federal Communications Commission's ("FCC"). An identical request is herein made to this court.

**B. Ms. Lardner's Claims Require Resolving Whether the TCPA Applies to Non-Telemarketing Calls and What Constitutes an ATDS.**

To prove her TCPA claim, at a minimum, Ms. Lardner must show DCI used an ATDS to call her cell phone without her consent. 47 U.S.C. § 227(b)(l)(A)(iii). Ms. Lardner agrees Congress passed the TCPA to curb telemarketing activities. Ms. Lardner alleges DCI, rather than LiveVox called her cell phone without her consent to "demand payment" for a past due cellular telephone bill.

Although she claims DCI used an ATDS, she does not allege DCI's calling equipment has the current capacity to store or produce randomly or sequentially generated numbers, yet she claims these alleged calls violated the TCPA. The FCC's declaratory ruling on the

8

Petitions will resolve whether debt-related calls (i.e., non-telemarketing calls) and calls placed from a dialer that lacks a current capacity to store or produce randomly or sequentially generated numbers fall within the TCPA's prohibitions.

Originally, the FCC determined that debt-collection calls not directed to random or sequential numbers did not fall within the TCPA's definition of an ATDS. *See In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991,* 7 FCC Red. 8752 39 (1992). In that ruling, the FCC also recognized Congress passed the TCPA to protect consumers from unrestricted telemarketing practices, not non-telemarketing calling activities. *Id. at* 9. A few years later, the FCC confirmed the TCPA does not prohibit certain non-telemarketing calls because such calls "are not directed to randomly or sequentially generated telephone numbers, but instead are directed to the specifically programmed contact numbers." *In re Rules & Regs. Implementing the Tel. Consumer Prof. Act of 1991,* 10 FCC Red. 1239119 (1995).

In 2003, however, the FCC ruled that some predictive dialers that do not use a random or sequential number generator are ATDSs under the TCPA. *In re Rules & Regs. Implementing the Tel. Consumer Prof. Act of 1991,* 18 FCC Red. 14014 133 (2003). In particular, the FCC ruled "to be considered an 'automatic telephone dialing system,' the equipment need only have the *capacity* to store or produce telephone numbers." *Id at* 132. The FCC reached this conclusion out of concern that technological changes had influenced telemarketers to use predictive dialers to call lists of numbers rather than to call random or sequential numbers. *Id* The FCC reaffirmed this position in a 2008 ruling. *In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991,* 23 FCC Red. 559 (2008). But neither the TCPA nor the FCC has defined what "capacity" means-whether it includes non-

9

telemarketing calls and calls placed from equipment that lacks the current "capacity" to store or produce randomly or sequentially generated numbers. 47 U.S.C. § 227(a)(l)(A).

Resolving Ms. Lardner's claims will require answering these questions. Ms. Lardner cannot state a TCPA claim against DCI unless she can prove DCI "actually used" an ATDS and placed prohibited calls. *See id* § 227(b)(l)(A)(iii). The Petitions place these questions, which raise first impression issues, squarely before the FCC.

### C. Congress Granted the FCC Primary Jurisdiction to Resolve Whether the TCPA Applies to Non-Telemarketing Calls and What Constitutes an ATDS.

Congress explicitly gave the FCC the power to implement and construe the TCPA. *Id.* § 227(b)(2). Specifically, the TCPA empowers the FCC to prescribe regulations under the Act, *see id.* §§ 227(b)(2), (c)(l), (c)(2), to exempt calls from the requirements of the Act, *see id.* §§ 227(b)(2)(B), (b)(2)(C), to intervene in suits filed by state attorneys general, *see id.* § 227(g)(3), and to enforce the Act and its accompanying regulations. *See also Charvat,* 630 F.3d at 466-67 (same). "Congress vested the FCC with considerable authority to implement" and construe the TCPA. *Id.* at 466 (citing 47 U.S.C. § 227(b)(2)). Consistent with that authority, the FCC has created a complex regulatory scheme that governs telemarketing. It has done so by adopting new regulations as technologies and business practices evolve. *See, e.g., In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991,* 18 FCC Red. 14014 132-133; *Fried v. Sensia Salon, Inc.,* 2013 WL 6195483, at *5 (S.D. Tex. Nov. 27, 2013) ("The FCC has regulatory power over this [telemarketing] industry and can respond to changes in the industry through regulations, reports and orders, declaratory rulings, and other available tools."; staying case). In fact, the FCC has enacted rules and rules revisions regarding the permissible scope of automated telephoning activity under the TCPA dozens of times since 1992. *See* 47 C.F.R. § 64.1200 (rule-making history). Given the specific role

Congress conferred on the FCC under the TCPA, the FCC occupies the best position to determine whether non-telemarketing activity falls within the TCPA's sphere and what "capacity" means under the TCPA. Resolving these questions will require the FCC to reconcile its prior rulings, as well as to interpret the TCPA. A ruling from the FCC (1) declaring non-telemarketing calling activity as outside the TCPA's domain (either generally or because it does not meet the TCPA's definition of an ATDS), or (2) declaring that capacity" under the TCPA means current capacity (not a theoretical capacity if modified), could dispose of Ms. Lardner's claims.

### D. Regulating Non-Telemarketing Calls and Defining What Constitutes an ATDS Requires Agency Expertise and National Uniformity.

In enacting the TCPA, Congress intended to "promote a uniform regulatory scheme under which telemarketers would not be subject to multiple, conflicting regulations.... [and] to avoid burdensome compliance costs for telemarketers." *In re Rules & Regs. Implementing the Tel. Consumer Prat. Act of 1991,* 18 FCC Red. 14014 83 (2003). "[T]hrough the application of the doctrine of primary jurisdiction, the courts and the FCC should be able to prevent ... significant inconsistent application of FCC rules ...." *S. Cent. Bell Tel. Co. v. La. Pub. Serv. Comm'n,* 744 F.2d 1107, 1118 (5th Cir. 1984), *vacated on other grounds,* 476 U.S. 1166 (1986).

Here, because whether the TCPA applies only to telemarketing activity and what "capacity" means present first impression issues, a risk of "significant inconsistent application of FCC rules" on these issues exists. *Id.* Indeed, plaintiffs have filed numerous TCPA class actions regarding collection calls just this year alone.[3] The sheer "volume of

---

[3] *See, e.g., Blair v. CBE Grp., Inc.,* 2013 WL 5677026 (S.D. Cal. Oct. 17, 2013); *Iniguez v. CBE Grp.,* ___ F. Supp. 2d ___ J 2013 WL 4780785 (E.D. Cal. Sept. 5, 2013); *Rogers v. Medicredit, Inc.,* 2013 WL 4496278 (E.D. Mo. Aug. 21, 2013); *O'Connor v. Diversified*

11

[pending] lawsuits heightens the risk that individuals and companies will be subject to decisions pointing in opposite directions." *Charvat,* 630 F.3d at 466.

And in fact courts have disagreed over what "capacity" means under the TCPA. For instance, in *Hunt v. 21st Mortgage Corp.,* 2013 WL 5230061, at *3-4 (N.D. Ala. Sept. 17, 2013), the court concluded that "to meet the TCPA definition of an 'automatic telephone dialing system,' a system must have a *present* capacity, at the time the calls were being made, to store or produce and call numbers from a number generator." (Italicized emphasis added.) In reaching this conclusion, the court refused to interpret "capacity" as broadly encompassing equipment with a theoretical capacity to store or produce randomly or sequentially generated numbers because "in today's world, the possibilities of modification and alteration are virtually limitless." *Id.* at *4. As the court explained, it is "virtually certain that software could be written, without much trouble, that would allow iPhones" to fall under the auspices of the TCPA. *Id.* Such a limitless definition of capacity would mean that "roughly 20 million American iPhone users [would be] subject to the mandates of § 227(b)(l)(A)." *Id.* Meanwhile, the court in *Nelson v. Santander Consumer USA, Inc.,* 931 F. Supp. 2d 919, 928-29 (W.D. Wis. 2013), *vacated in its entirety by* 2013 WL 5377280 (W.D. Wis. June 7, 2013), interpreted ATDS broadly to encompass any equipment that could store or produce randomly or sequentially generated numbers when paired with the appropriate hardware or software.

That courts have disagreed over what "capacity" means and what calling activity or equipment meets the definition of an ATDS further demonstrates that staying this case pending the FCC's ruling on the Petitions will ensure much-needed uniformity. *See Barahona v. T-Mobile US, Inc.,* 628 F. Supp. 2d 1268, 1272 (W.D. Wash. 2009) ("In view of the disparity

---

*Consultants, Inc.,* 2013 WL 2319342 (E.D. Mo. May 28, 2013); *Mais v. Gulf Coast Collection Bureau, Inc.,* __ F. Supp. 2d __, 2013 WL 1899616 (S.D. Fla. May 8, 2013)

between the cases cited by the parties, the Court finds that the interest of uniformity weighs heavily in favor of deferring to the expertise of the FCC under the primary jurisdiction doctrine."); *Charvat,* 630 F.3d at 466 (staying case under primary jurisdiction doctrine because; among other things, the TCPA and its regulations control "services nationally, creating the possibility of conflicting decisions in different state and federal jurisdictions"). This uniformity principle applies with particular force here, as the TCPA is a 'strict liability" statute, subjecting defendants to potentially staggering monetary damages that could be based on a faulty reading of the statute. *See Alea London Ltd* v. *Am. Home Servs., Inc.,* 638 F.3d 928 F. Supp. 2d 1182 (S.D. Cal. 2013); *Malta v. Fed Home Loan Mortg. Corp.,* 2013 WL 444619 (S.D. Cal. Feb. 5, 2013). *See United States* v. *W. Pac. R.R. Co.,* 352 U.S. 59, 64 (1956) (allowing agency to decide issue first ensures "the limited functions of review by the judiciary are more rationally exercised").

Ms. Lardner's Complaint requires resolving questions that are pending before the agency Congress charged with regulatory authority over her sole TCPA cause of action. The TCPA subjects automated telephone calling to a comprehensive regulatory scheme that requires the FCC's expertise for uniform administration. The Court should therefore stay this action under the primary jurisdiction doctrine until the FCC issues its ruling on the pending Petitions, as many courts have done in similar circumstances.[4]

---

[4] *See, e.g., Clark,* 523 F.3d at 1114-16 (affirming stay under primary jurisdiction doctrine where claim raised first impression issues within FCC's special competence would decide threshold liability questions); *Charvat,* 630 F.3d at 465-68 (referring case to FCC under primary jurisdiction doctrine to determine if DISH Network was liable under TCPA for sales calls made by independent contractor retailers; court cited benefits of uniformity, discretion, and expertise in making referral, stating that the "agency's views are the logical place for the judiciary to start") (internal quotation marks omitted}; *Glauser v. Twi/io, Inc.,* 2012 WL 259426, at *2 (N.D. Cal. Jan. 27, 2012) (resolving, among other things, "who qualifies as an auto-dialer subject to the TCPA" necessary to claims before the court and within FCC's jurisdiction); *Barahona,* 628 F. Supp. 2d at 1271 (staying case under primary jurisdiction doctrine where, among other things, Congress placed regulation of cell phone services in

### IV. The Court Should Stay This Action Pursuant to the Court's Inherent Authority.

Regardless of the primary jurisdiction doctrine, the Court should stay this case pursuant to its inherent authority.

> A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case. This rule ... does not require that the issues in such proceedings are necessarily controlling of the action before the court.

*Leyva v. Certified Grocers of Cal., Ltd.,* 593 F.2d 857, 863-64 (9th Cir. 1979) (citing, *inter alia, Landis v. N Am. Co.,* 299 U.S. 248, 254-55 (1936)). Absent a stay, DCI may be forced to incur the burden and expense of defending numerous claims that the FCC's guidance may reveal to lack merit. And given the stage of this case and the likelihood of an FCC ruling in the near future as to these issues, Ms. Lardner cannot show she would suffer prejudice by a short stay.[5] *See Frontier Tel. of Rochester, Inc. v. USA Datanet Corp.*, 386 F. Supp. 2d 144, 151 (W.D.N.Y. 2005) (granting a stay where it appeared FCC decision "[would] be forthcoming in a matter of months").

### V. CONCLUSION

For the foregoing reasons, the Court should stay this case under the primary

---

FCC's special competence); *Fried,* 2013 WL 6195483, at *4 (staying case under primary jurisdiction doctrine because "the FCC is in the best position to opine, in the first instance, on the technical and potentially far-reaching issues implicated in Plaintiffs' claims, namely, whether the use of [the] systems [at issue] ..• violates the TCPA"); *United States v. DISH Network. LLC,* 2011 WL 475067, at *3 (C.D. Ill. Feb. 4, 2011) (citing primary jurisdiction doctrine in staying TCPA claims against DISH Network pending FCC ruling in *Charvat).*

[5] It is well recognized that the Southern District of Florida is one of the leading district courts in number of TCPA cases and over the past six (6) years consumer litigation under TCPA has increased exponentially in this district alone. Several TCPA decisions from the Southern District of Florida are pending in the Eleventh Circuit Court of Appeals regarding interpretations of the TCPA and well as challenges to the FCC's own interpretations of this statute. In fact, Ms. Lardner alone has brought at least six (6) separate lawsuits seeking damages against various debt collectors under the TCPA within the past year.

14

jurisdiction doctrine or pursuant to its inherent authority until the FCC rules on the pending Petitions.

### CERTIFICATE OF GOOD FAITH CONFERENCE

In compliance with Local Rule 7.1(a)(3), on March 11, 2014, the undersigned conferred with Bret Lusskin, Esquire, counsel for Plaintiff, and Plaintiff's counsel opposes the relief sought herein.

Dated this 17th day of March, 2014.

Respectfully submitted,

/s/ Ernest H. Kohlmyer, III
Ernest H. Kohlmyer, III
Florida Bar No. 110108

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been electronically filed on **March 17, 2014**, via the Clerk of Court's CM/ECF system which will provide electronic notice to the following attorney of record: Bret L. Lusskin, Jr., Esquire at blusskin@lusskinlaw.com.

/s/ Ernest H. Kohlmyer, III
Ernest H. Kohlmyer, III
Florida Bar No.: 110108
kohlmyer@urbanthier.com
Urban, Thier, Federer & Chinnery, P.A.
200 S. Orange Avenue, Suite 2000
Orlando, FL 32801
Phone: (407) 245-8352
Fax: (407) 245-8361
Attorneys for Defendant